**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF MICHIGAN**

**SOUTHERN DIVISION**

ESTATE OF JOHN JENUWINE, deceased, by LARRY JENUWINE, Personal Representative,

Plaintiff,

vs.

WASHTENAW COUNTY; DEPUTY JACOB CUSO, individually; DEPUTY VON HEATH, individually; DEPUTY GABRIEL BECHTOL, individually; DEPUTY JACOB GOMBOS, individually; DEPUTY JONATHAN EARLEY, individually; SERGEANT THOMAS PENNINGTON, individually; DEPUTY BRYAN TRIPP, individually; and SERGEANT SAMUEL WALLACE, individually,

Defendants.

_______________________________________/

Case No. 2:26-cv-11937-MFL-APP

Hon. Matthew F. Leitman

Mag. Judge Anthony P. Patti

**<u>FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL</u>**

Plaintiff, LARRY JENUWINE, as Personal Representative of the Estate of JOHN JENUWINE, by and through his attorneys, Flood Law, PLLC, states the following for his First Amended Complaint against Defendants:

## INTRODUCTION

On January 6, 2026, at 2:07 in the morning, three Washtenaw County Sheriff's deputies shot JOHN JENUWINE to death inside a wrecked van that could not move. He was alone. He was unarmed. In a matter of seconds the deputies fired approximately thirty-four rounds at him through the windshield and underside of the vehicle. Seven hit him. Six of the seven entered his body from below and behind.

Thirty-four minutes earlier, dispatch had told every deputy on the channel that two Black men in a white van had pulled a handgun on a woman. Within a minute of finding JOHN's van, the deputies knew he was one white man. Two of them looked straight at him and saw that what he was holding was a glass bottle. They chased him anyway, at low speed, through empty streets, for thirteen minutes. Halfway through the chase they confirmed over radio that the van was driven by a single white male. A deputy rammed the van while it was stopped against a grassy hill at the edge of a school parking lot. The deputy in his passenger seat had been urging him on ("get him, get him") and, after the crash, yelled "fuck you, you piece of shit." Another deputy ran up and stabbed at the van's tire with a folding knife but

hit the wheel rim. The deputy who had rammed the van then announced on the County radio, "I am going to take primary and finish this," and flipped the van onto its side with a PIT maneuver on a residential street. Sixteen seconds later, multiple deputies ran at the overturned van with their pistols out, one of them shouted "gun," and three of them opened fire. Exhibit F 0:00–0:16[1] and Exhibit J 0:00–1:14.[2]

There was no gun. After the shooting stopped, a deputy put out over the radio that JOHN was "armed with a shotgun." No one had said "shotgun" before the shooting. There was no shotgun. The Sheriff's Office's own detective closed the search of the van with the words: "No firearm was located in the vehicle."

Then they let him die. For the next twenty minutes the deputies watched JOHN respond to their commands by moving, kicking and crying "help" inside the van. They narrated it to one another and over the radio, and did nothing to save him. The Sheriff's Office's own policy required them to render or request medical aid "as soon as practical." Ambulances were minutes away and then staged blocks away. The University of Michigan's Level I trauma center was minutes from the scene. Instead, the deputies barricaded themselves behind their cars, waited for SWAT operators who were thirty to forty-five minutes out, and let a wounded, unarmed man bleed to death from a survivable chest wound. SWAT operators pushed a "New

---

[1] Dash camera footage: https://bit.ly/3Tb6PmS (16 seconds of a 34:32 video)
[2] Dash camera footage: https://bit.ly/4AhGyE9 (1:14 of a 4:08:30 video)

York Hook" through the front window to prod his body for a response, then opened the van at about 4:06 a.m. and found him dead, one hour and fifty-nine minutes after he was shot. Exhibit P 0:00–5:22[3] and Exhibit Q 0:00–4:13.[4]



*JOHN JENUWINE as SWAT operators found him, with the "New York Hook" they used to check whether he was alive.*

The three deputies who fired have never given an account of what they saw or why they shot. Each filed a report that says only "No Narrative." When the Michigan State Police asked whether they carried full magazines, so that

[3] Footage: https://bit.ly/4hxaXai (5:22 of combined 4:30:48 body camera and in-car video)
[4] Dash camera footage: https://bit.ly/4xZjR67 (4:13 of a 4:08:30 video)

investigators could count the shots, the deputies, on the advice of Washtenaw County's lawyer, refused to answer.

Plaintiff brings this action under 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments, and under Michigan law for gross negligence, willful and wanton misconduct, assault and battery, and wrongful death, M.C.L. § 600.2922. The individual Defendants are sued in their individual capacities. Washtenaw County is sued under *Monell v. Department of Social Services* for the failures of supervision, training and policy that were the moving force behind JOHN JENUWINE's death.

## JURISDICTION AND VENUE

1. This is a civil action for money damages arising from the police shooting and killing of JOHN JENUWINE on January 6, 2026, in Ypsilanti, Michigan.

2. This action is brought under 42 U.S.C. § 1983, which creates a right to sue any person who, acting under color of state law, deprives another of rights secured by the United States Constitution.

3. This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343. This Court has supplemental jurisdiction over the Michigan state-law claims under 28 U.S.C. § 1367 because they arise from the same facts as the federal claims and form part of the same case or controversy.

4. Plaintiff seeks all damages allowed under 42 U.S.C. § 1983 and M.C.L. § 600.2922, punitive damages against the individual Defendants on the federal claims, and costs, interest, expert fees, and attorney fees under 42 U.S.C. § 1988.

5. Venue is proper in the Eastern District of Michigan under 28 U.S.C. § 1391 because all Defendants reside in this District and every event giving rise to this Complaint occurred in Washtenaw County, Michigan.

6. The amount in controversy exceeds $75,000, exclusive of interest, costs and attorney fees.

**PARTIES**

7. The decedent, JOHN JENUWINE, was 34 years old and, at all material times, a resident of China Township, Michigan.

8. Plaintiff, LARRY JENUWINE, is John's father, a resident of Cottrellville, Michigan, and the duly appointed Personal Representative of the Estate of JOHN JENUWINE, appointed by the St. Clair County Probate Court.

9. Defendant, WASHTENAW COUNTY, is a municipal entity organized under the laws of the State of Michigan that operates, manages, and controls the Washtenaw County Sheriff's Office, headquartered at 2201 Hogback Road, Ann Arbor, Michigan. The County employs, trains, supervises, and disciplines the deputies named below and is responsible for the policies,

customs, and practices of the Sheriff's Office, including its policies on vehicle pursuits, ramming and PIT maneuvers, the use of deadly force, de-escalation, and the duty to render medical aid.

10. The Washtenaw County Sheriff's Office publicly acknowledges that its authority must be exercised "judiciously and with respect for equitable treatment, human rights, dignity, and the sanctity of all human life." "Subject Control/Use of Force" (3.04 GO), Exhibit A, p. 2.

11. Defendant, DEPUTY JACOB CUSO, is sued in his individual capacity. At all relevant times, he was acting under color of state law as a deputy sheriff employed by the Washtenaw County Sheriff's Office, within the scope of his employment, and, on information and belief, resides in Michigan. He is one of the three deputies who shot JOHN JENUWINE.

12. Defendant, DEPUTY VON HEATH, is sued in his individual capacity. At all relevant times, he was acting under color of state law as a deputy sheriff employed by the Washtenaw County Sheriff's Office, within the scope of his employment, and, on information and belief, resides in Michigan. He initiated the stop, led the pursuit, and is one of the three deputies who shot JOHN JENUWINE.

13. Defendant, DEPUTY GABRIEL BECHTOL, is sued in his individual capacity. At all relevant times, he was acting under color of state law as a

deputy sheriff employed by the Washtenaw County Sheriff's Office, within the scope of his employment, and, on information and belief, resides in Michigan. He is one of the three deputies who shot JOHN JENUWINE.

14. Defendant, DEPUTY JACOB GOMBOS, is sued in his individual capacity. At all relevant times, he was acting under color of state law as a deputy sheriff and K-9 handler employed by the Washtenaw County Sheriff's Office, within the scope of his employment, and, on information and belief, resides in Michigan. He rammed JOHN JENUWINE's van and then flipped it with a PIT maneuver.

15. Defendant, DEPUTY JONATHAN EARLEY, is sued in his individual capacity. At all relevant times, he was acting under color of state law as a deputy sheriff employed by the Washtenaw County Sheriff's Office, within the scope of his employment, and, on information and belief, resides in Michigan. He rode in the passenger seat of Defendant GOMBOS's patrol car and urged the ramming.

16. Defendant, SERGEANT THOMAS PENNINGTON, is sued in his individual capacity. At all relevant times, he was acting under color of state law as a sergeant and the east-side patrol supervisor for the Washtenaw County Sheriff's Office, within the scope of his employment, and, on information and

belief, resides in Michigan. He was the supervisor responsible for the deputies in the pursuit.

17. Defendant, DEPUTY BRYAN TRIPP, is sued in his individual capacity. At all relevant times, he was acting under color of state law as a deputy sheriff employed by the Washtenaw County Sheriff's Office, within the scope of his employment, and, on information and belief, resides in Michigan.

18. Defendant, SERGEANT SAMUEL WALLACE, is sued in his individual capacity. At all relevant times, he was acting under color of state law as a sergeant and the West Operations Command officer for the Washtenaw County Sheriff's Office, within the scope of his employment, and, on information and belief, resides in Michigan. He was a command officer with authority over the pursuit and, after the shooting, requested the SWAT and negotiation response and helped direct the "barricade" that kept medical aid from JOHN JENUWINE.

## FACTUAL ALLEGATIONS

### A. The 911 calls

19. At about 1:24 a.m. on January 6, 2026, a man named Matthew Craiger called Washtenaw County 911 to report a "white turtle top construction van" driving erratically near Hunter and Holmes in Ypsilanti Township. He reported no weapon and gave no description of the driver.

20. At about 1:30 a.m., a man named Christopher Cummings called 911 while driving. He said a white van had been following his wife on Clark Road and that "they just waved a gun at my wife." He said, "they pulled up to the side of her and showed her a gun."

21. Mr. Cummings had not seen the van do anything to his wife. He was on the phone with her while she drove home. He was repeating what she told him.

22. When the dispatcher asked whether he saw who was in the van, Mr. Cummings said: "It's two black guys, I think it's two black guys, two guys in the vehicle." When asked what kind of gun, he said: "She said it was a handgun."

23. At 1:33 a.m., Washtenaw County dispatch broadcast to every deputy on the Metro East channel that a white construction van "occupied by two black males" had "pulled a handgun" on the caller's wife. The word "think" did not make it into the broadcast. Neither did the fact that the caller had seen nothing himself.

24. Mr. Cummings's wife, Macenzie Caddell, was the only person who saw the van on Clark Road. She was interviewed four times by the Sheriff's Office. Every interview was recorded. In none of them did she say she saw a gun.

25. At 1:33 a.m., dispatch sent Defendant TRIPP and Deputy DiCicco to the felonious assault call. The County's CAD record logs a unit arrival at 1:38:00

a.m. Both deputies wrote that they went to 427 Allston Court, were let in, and interviewed Ms. Caddell and Mr. Cummings in their living room. Defendant TRIPP wrote that his body camera was on the whole time.

26. According to Defendant TRIPP's own report, Ms. Caddell told them there was one man in the van and no passengers; that she could not describe him; and that he "appeared to have something in his hand" and was "waiving/pointing it at her while yelling." She did not tell them she saw a gun.

27. Defendant TRIPP and Deputy DiCicco wrote that they then left the house and, "a few moments later," heard Defendant HEATH announce over the radio that he was behind the van. Based on that information, then by about 1:40 a.m., roughly twenty-seven minutes before the shooting, two Washtenaw County deputies knew and failed to inform Heath, and their other colleagues, that the only eyewitness did not see "two black males" or a "handgun."

28. Nothing in the County's CAD record between the 1:33 a.m. dispatch and 1:55 a.m., when deputies first broadcast that the van was reversing toward them, shows that any deputy broadcast to the pursuing units what the complainant had actually said, or confirmed that a crime had occurred. Neither TRIPP's nor Deputy DiCicco's report gives the time of the visit. Deputy DiCicco's report puts the dispatch at "approximately 0100 hours," a half-hour before the call came in. When Detective Austin Pearson went looking for the couple later

that morning, he had to run reverse searches in CLEMIS to find their phone numbers.

29. At about 1:56 a.m., with the pursuit already underway, a deputy in Defendants CUSO and BECHTOL's patrol car said, as recorded on Defendant BECHTOL's body camera, that "we have a good FA." That is the first and only point in the record where anyone purported to confirm that a felonious assault had happened, and it came from a moving patrol car in the middle of a chase.

30. Defendant TRIPP and Deputy DiCicco interviewed Ms. Caddell before the pursuit, learned that the broadcast was wrong and that no gun had been seen, and that information was never passed to, or was ignored by, the deputies who pursued, rammed, and shot JOHN JENUWINE.

31. After the shooting, while JOHN lay bleeding in the van, Defendant TRIPP went back to his patrol car and called Ms. Caddell "to get a better statement." The call is on his body camera. She told him again there was "only one in [the] car." Asked whether she thought the driver had a gun, she said: "it looked like he had something, like a gun or something." She said she "tried not to make eye contact because [she] was scared." Asked what color the object was: "Nope, wasn't trying to look." Asked whether she could identify the driver: "I did not get a good look, no."

32. Later that morning Detective Pearson interviewed her a third time. His report records that she "believes she saw a firearm, but she was not certain that she actually saw it," and that each time she described it she raised both arms "as if she would be shouldering a rifle or shotgun." Before that interview, no witness had said anything about a long gun. The 911 caller said "handgun." The dispatch broadcast said "handgun." The word "shotgun" entered this case at 2:07:34 a.m., from a deputy at the scene, after the shooting had stopped.

33. Prior to 2:07 a.m., no deputy ever said they saw a gun in JOHN JENUWINE's hand or in his van. Indeed, the evidence supports that JOHN JENUWINE never had a gun.

**B. John Jenuwine**

34. The man in the white van was JOHN JENUWINE. He was alone. He was a white man, 34 years old. He was driving a 2012 white Nissan NV cargo van registered to him, with a paper temporary plate in the back window. His driver's license was in his pocket.

35. At 1:32 a.m., JOHN pulled into the Circle K at Clark and Prospect and spoke with the clerk, who was outside on a break. JOHN told the clerk he was "waiting on police to come and get him" and that he had been wronged by a woman. He was upset, and he was not hiding. He was a man in crisis asking for the police.

**C. The deputies knew within a minute that JOHN did not match the description**

36. At 1:53 a.m., Defendant HEATH, with Deputy Ahmed in his passenger seat, came up behind JOHN's van near Prospect and Michigan Avenue. The van's headlights were off. Heath broadcast that he was behind a Nissan transit van with no plate and no lights.

37. At 1:54 a.m., Defendant HEATH broadcast that the driver was a "white male driver, yelling out the window." Dispatch logged "WM DRIVER" at 1:54:45 a.m. At 1:55 a.m., a deputy on Defendant CUSO's body camera said "older white male." At 1:56 a.m., a deputy reported the van was "occupied by one white male," and dispatch confirmed "one white male." At 1:58 a.m., a deputy said, "It's a heavy-set white male. I don't think he's going to get far."

38. At 1:55 a.m., JOHN backed his van and stopped next to a deputy standing in the roadway, giving that deputy a clear view of JOHN, his hands and his arms. No weapon was seen. Exhibit B.

39. Deputy Ahmed, in Defendant HEATH's passenger seat, wrote in his own report what he saw when the van pulled into the parking lot at 28 S. Prospect Street: "I got a good view of the driver. I identified the driver as a white male with black hair. ... I observed the driver flash what appeared to be a glass bottle at us." He later saw the driver smoking. Nowhere in his report does Deputy

Ahmed describe a gun, a shotgun, or anything in JOHN's hands other than a bottle.

40. Defendant HEATH was sitting next to Deputy Ahmed, looking through the same windshield at the same man from the same distance. Upon information and belief, what Deputy Ahmed saw, Defendant HEATH saw. Defendant HEATH started the stop, led the pursuit, and was the first of the three deputies who fired.

41. The bottle was real. Hotel surveillance video collected by Sheriff's detectives shows JOHN leaving his Canton hotel at 12:17 a.m., about an hour before Clark Road, carrying what appears to be a wine bottle. Based on information and belief, that bottle was what Ms. Caddell saw waved at her. A glass bottle was in the van. A gun was not.

42. In less than five minutes, it was confirmed at least four separate times, on the radio and on camera, that JOHN JENUWINE was one white man and not the "two black guys" with a "handgun" that dispatch had broadcast. The only thing connecting JOHN's van to the 911 call was that it was white and it was in Ypsilanti.

43. Despite this, the deputies continued their pursuit of JOHN JENUWINE, and no deputy or supervisor ever broadcast that the driver did not match the

description, that the "weapon" seen by the two deputies closest to him was a bottle, or that the felony basis for the pursuit should be re-examined.

**D. The pursuit**

44. The pursuit lasted about thirteen minutes, through residential neighborhoods around Prospect Road, mostly at 20 miles per hour, at most 45 miles per hour at limited times. Deputies broadcast "no traffic, no peds" repeatedly. JOHN repeatedly stopped, turned around in the road, and pulled into parking lots.

45. At 2:00 a.m., JOHN drove into the Dollar General parking lot on Ecorse Road and stopped. He was followed by two patrol cars. Five patrol cars were on Ecorse Road. Rather than contain the van in the lot, the deputies moved out of its path and let the pursuit continue. Exhibit C 0:00–0:40.[5]

46. At about 2:01 a.m., a different white van drove past the pursuit in the opposite direction. No officer made any attempt to investigate it, even though it was by then clear that JOHN was not "two black guys" and had shown no sign of a weapon. Exhibit D 0:00–0:11.[6]

---

[5] Dash camera footage: https://bit.ly/4v0Noeh (40 seconds of 4:43:49 combined in-car video)
[6] Dash camera footage: https://bit.ly/4v0mNOm (11 seconds of 5:55:06 combined in-car video)

47. At 1:56 a.m., Defendant CUSO got out of his patrol car holding an open knife, said "I'm going to stab his fucking tire," and walked toward JOHN's van. This was CUSO's first attempt to stab JOHN's tire. The van drove away.

48. Between about 2:01 and 2:05 a.m., Defendant EARLEY, riding in the passenger seat of Defendant GOMBOS's K-9 patrol car, repeatedly urged Gombos to ram the van, yelling "get him, get him." Gombos said he would do it "if it wasn't for the dog." Earley told him to "do it" the next time the van went into a parking lot.

49. At about 2:02 a.m., a Washtenaw County deputy told the Ypsilanti Police officers in the pursuit to "get behind them" so the Sheriff's deputies could take the lead. At 2:04 a.m., a deputy pleaded, "YPD! Please, please stop!" Exhibit E 0:00–0:22.[7]

50. Tire deflation, a tool that stops a vehicle without a collision, was available and was being used. Defendant WALLACE, the West Operations Command officer, wrote that earlier in the pursuit he threw stop sticks across the eastbound lanes of Ecorse Road as the van passed and that the van "swerved to the right, dodging the stop sticks." He collected them, paralleled the pursuit, and set up again at Maus Avenue and Emerick Street for a second deployment. By his own account, he was placing the stop sticks in the roadway there, on

[7] Dash camera footage: https://bit.ly/4rj1ree (22 seconds of a 4:08:30 video)

the van's path, when Defendant CUSO broadcast that the van had turned into the East Middle School parking lot at 510 Emerick Street. That is where, one block from a tire-deflation stop that required no collision, Defendant GOMBOS rammed it.

**E. The ramming**

51. At 2:05:20 a.m., in the parking lot of East Middle School at 510 Emerick Street in Ypsilanti, JOHN's van backed into a grassy hill at the edge of the lot and stopped. One second later, at 2:05:21 a.m., Defendant GOMBOS accelerated his patrol car into the driver's door of the stopped van. The van's side-curtain airbags deployed. Defendant EARLEY yelled, "fuck you, you piece of shit." Exhibit F (0:00–0:16).[8] Defendant CUSO, without fear, in a second attempt, ran up and stabbed at the van's front driver-side tire with his knife, only to hit the wheel rim. Exhibit G 0:00–0:21.[9]

52. The use of deadly force was not justified. JOHN had committed traffic offenses. He had not hurt anyone. He had no weapon. He did not match the description of the men the deputies were looking for, and every deputy on the radio knew it. And at the moment Defendant GOMBOS rammed him, the van was stopped.

---

[8] Dash camera footage: https://bit.ly/3Tb6PmS (16 seconds of a 34:32 video)
[9] Body camera footage: https://bit.ly/4yIcuQB (21 seconds of a 30:45 video)

53. Defendant GOMBOS's own words after the ramming were: "For the tape, it was my patrol vehicle that rammed him, we are all ok in my car." No supervisor had directed or authorized the ramming. No supervisor objected to it.

54. The van drove off, damaged, its airbags deployed, and its handling compromised. At 2:06:08 a.m., a deputy reported the van was "having some mechanical issues." Any resistance JOHN had offered was decreasing, and the deputies knew it.

55. The Sheriff's Office's Use of Force policy required the deputies to reduce their force as resistance decreased: "The level of force shall be de-escalated immediately as the level of resistance encountered decreases, provided that the employee remains in control and as safety permits." Exhibit A, pp. 3–4; Exhibit H, p. 3. The deputies did the opposite.

56. At 2:06:19 a.m., Defendant GOMBOS got on the radio and said: "I am going to take primary and finish this."

57. Defendant PENNINGTON, the supervising sergeant, was monitoring the pursuit on the radio and was paralleling it in his own patrol car. He heard the ramming reported. He heard "finish this." He did not order the pursuit terminated, forbid a second collision, or say anything at all. He later described what Gombos did, in a phone call recorded by his own body camera, as

"Gombos rams intentionally, fatal force," and in his own report he listed Defendant GOMBOS, with the three deputies who fired, as one of "the four deputies involved in the use of force."

58. Defendant WALLACE, the West Operations Command officer, was likewise on the radio, had left the station to join the pursuit area, and had positioned himself on the route with stop sticks. He heard the same broadcasts, including "he's been rammed and airbags deployed." He too said nothing.

59. The Sheriff's Office's Vehicle Pursuits policy is, in its own words, "a 'restrictive' policy" that "allows little or no deviation from its terms" and combines 1) "carefully defined constraints, 2) active supervision, 3) a qualitative review process, and 4) prohibits pursuits in certain circumstances." Exhibit I, p. 4.

60. This policy places "overall authority for the pursuit" in the on-duty command officer, who "shall be responsible for monitoring the pursuit including but not limited to 1) the reasons that led to the pursuit and 2) ensuring the pursuit's compliance with all agency policy and procedure," who "[m]ay at any time terminate the pursuit," and who "shall … [o]rder the termination of a pursuit when there is no immediate and/or apparent threat to public safety." Exhibit I, p. 18.

61. Further, the policy requires the employee and the on-duty supervisor to weigh "whether it is known, not merely suspected, that the individual being pursued [sic] committed the offense." Exhibit I, p. 9.

62. Importantly, the policy also requires that "[s]upervisors must monitor radio communications and assess the need to respond when aware of employees using de-escalation techniques." Exhibit H, p. 4.

63. The same policy limits a pursuit to a primary vehicle and no more than two secondary vehicles; provides that "[n]o other agency vehicles or personnel, other than the primary and secondary pursuit vehicles, shall become directly involved in the pursuit unless so authorized by the on-duty command officer"; and provides that a secondary vehicle "shall not … [p]ass the primary pursuit vehicle unless requested to do so by the primary vehicle." Exhibit I, pp. 14–15.

64. Defendant GOMBOS's K-9 unit joined the pursuit as the fourth Sheriff's Office vehicle, passed other units at 2:06:27 a.m. to move up, and then announced it would "take primary and finish this." Based on information and belief, no on-duty command officer authorized the K-9 unit to become involved in the pursuit, to pass the other units, to take the primary position, or to ram or PIT the van, and no on-duty command officer ordered the pursuit terminated.

**F. The PIT maneuver**

65. Twenty seconds after announcing that he would "finish this," at 2:06:39 a.m., on Prospect Street north of Michigan Avenue, with the van traveling about 40 miles per hour in a 25-mile-per-hour residential zone, Defendant GOMBOS steered his patrol car into the rear driver-side quarter of the van, a PIT maneuver. That attempt missed. At 2:06:47 a.m., his second attempt connected. The van spun, struck the curb at 2:06:50 a.m., and rolled onto its passenger side. Exhibit J (in-car video, patrol vehicle 74, occupied by Defendants CUSO and BECHTOL), 0:10–0:17[10] Exhibit K (clinic surveillance video), 0:00–0:39.[11]

66. A Nissan NV is a tall, high-roof cargo van. Every trained officer knows a vehicle of that kind is likely to roll over in a PIT maneuver, and that a rollover can kill the occupant. A PIT maneuver is an intentional collision of the patrol car with the fleeing vehicle to alter its course. Under the Sheriff's Office's own policies, that is "ramming," and it is prohibited "unless the use of deadly force is justified." Exhibit I, pp. 3, 6, 12; Exhibit A, p. 37.

67. Nothing justified deadly force. There was no traffic, and there were no pedestrians; the deputies had said so on the radio a minute earlier. The van

---

[10] Dash camera footage: https://bit.ly/4AhGyE9 (1:14 of a 4:08:30 video)
[11] Security footage: https://bit.ly/4ipLFfb (39 seconds of a 1:59:59 video)

was damaged and "having mechanical issues." Its driver was a lone man whose identity could be obtained from the temporary plate in his window. The only people near the van were deputies who had chosen to stay close to it.

68. The PIT maneuver did not merely end the pursuit. It created every condition that the deputies would, sixteen seconds later, treat as a reason to kill: a man thrown from his seat and out of view, a dark cabin, a wrecked vehicle that could not be seen into, and a fire under the van. Defendant GOMBOS manufactured the confrontation, and the shooting followed directly from it.

69. The van was now lying on its right side, partly in the northbound lane and partly on the snow-covered shoulder. It could not move. The passenger door and passenger windows were the floor of the cabin. The driver's seat was in the air. Whatever threat the van had posed as a moving vehicle was over. Exhibit J, 0:17–0:19.[12]

70. JOHN had just been in a rollover crash after being rammed. He was on the low side of the cabin, lying on his right side on the passenger door. His body would later show the bruises and scrapes of that crash on his right flank, right lower back, right buttock, both knees, both wrists and his left foot.

[12] Dash camera footage: https://bit.ly/4AhGyE9 (1:14 of a 4:08:30 video)

71. Two frames from the deputies' own cameras, taken from similar vantage points in front of the van's grille, show the van before and after the deputies fired. Exhibits L and M.



*Exhibit L — The van on its passenger side after the PIT maneuver, before shots were fired. The windshield is intact.*



*Exhibit M — The same van seconds later, after Defendants CUSO, HEATH, and BECHTOL fired. The windshield is perforated by a cluster of bullet holes.*

72. Exhibit L is what the deputies confronted: a cargo van lying on its side in the road, wheels off the ground, driver's door facing the sky, engine stalled, its driver thrown from his seat and no longer visible through the windshield. It could not move. Exhibit M is what they did to it. Nothing in either frame, and nothing in any video produced to date, shows a weapon or anything being pointed at any deputy from inside the van.

73. At about 2:06:57 a.m., seconds after the van overturned, a small fire ignited under it. Smoke was visible in and above the van. The deputies did not address the fire before rushing the van; they left their patrol cars and ran toward the front of the van with their pistols drawn. At about 2:10 a.m., after the shooting,

Defendant CUSO retrieved a fire extinguisher from a patrol car and put the fire out, walking close enough to the van to do so while no deputy would approach it to help the man inside.

**G. The shooting**

74. Defendants CUSO, HEATH, BECHTOL, and TRIPP ran toward the front of the overturned van with their pistols drawn and pointed at the windshield. Defendant BECHTOL moved to the right side of the van. Defendant TRIPP wrote that he "reached the engine block of the overturned van" as deputies announced "gun." Deputy DiCicco, who had driven Tripp's patrol car, wrote that she "ran to the van with my service weapon unholstered" and was at the front of Defendant CUSO's patrol car when the shooting began. Defendants GOMBOS and EARLEY, who had driven into the animal-clinic lot facing the van, were on scene with weapons drawn. Defendant PENNINGTON arrived at 2:07:05 a.m., as the shots were fired, and did not leave his patrol car until they stopped. Exhibit J, 0:19–0:28.[13]

75. The Sheriff's Office's de-escalation policy told the deputies what to do with a non-compliant subject in a disabled vehicle: "Attempt to isolate and contain the subject"; "Create time and distance from the subject by establishing a buffer zone (reactionary gap) and utilize cover to avoid creating an immediate

[13] Dash camera footage: https://bit.ly/4AhGyE9 (1:14 of a 4:08:30 video)

threat that may require the use of force"; "Request additional resources, such as Crisis Intervention Team (CIT) trained employees, or Crisis/Hostage Negotiation Team members"; and "take as much time as reasonably necessary to resolve the incident, without having to use force if possible." Exhibit H, p. 3. The deputies did none of that. They ran at the van.

76. The deputies knew exactly what that policy required, because they did it, forty seconds too late. At 2:07:40 a.m., after the three shooters had emptied or nearly emptied their magazines, Defendant GOMBOS got on the radio and told the deputies to "treat it like a barricade." Exhibit J, 1:08–1:14.[14] They pulled back behind their patrol cars. They drove a patrol vehicle up for cover. They called for a negotiator. They requested SWAT.

77. Every one of those steps was available at 2:06:50 a.m., when the van came to rest on its side and could not move. Nothing about JOHN JENUWINE's situation changed between 2:06:50 and 2:07:40 except that he had been shot seven times. The "barricade" the deputies declared at 2:07:40 protected no one from anything; JOHN was on the floor of the van bleeding. It was the containment that the Sheriff's Office's own policy required at 2:06:50, when it would have saved his life.

---

[14] Dash camera footage: https://bit.ly/4AhGyE9 (1:14 of a 4:08:30 video)

78. The deputy who called the barricade was the same deputy who, at 2:06:19 a.m., had announced "I am going to take primary and finish this," and who then flipped the van. Defendant GOMBOS created the situation, watched it end in gunfire, and only then applied the policy that would have prevented it.

79. At about 2:07:00 a.m., ten seconds after the van came to rest, as the deputies reached the front of the van, deputies shouted, "show me your fucking hands! Show me your fucking hands!"[15]

80. At 2:07:03 a.m., about three seconds later, in the dark, without pausing to assess, without waiting for any response, and without giving JOHN, who had just been through a rollover crash, any time to comply, a deputy shouted "He's got a gun! He's got a gun! He's got a gun! Gun! Gun! Gun!"

81. Within about one second of that shout, Defendants CUSO, HEATH and BECHTOL opened fire through the windshield and into the cabin. Deputy Ahmed, standing to the far left, described it as "multiple gun shots discharged by deputies at the front of the suspect vehicle through its windshield."

82. Defendant CUSO fired every round in his magazine, approximately seventeen rounds in all.

---

[15] Clock times in this Complaint are taken from the Michigan State Police review of the in-car camera recordings unless otherwise stated. The clocks on individual body-worn cameras, in-car cameras, the clinic surveillance camera and the County's dispatch system differ from one another by up to several seconds.

83. Defendant HEATH fired until he had two rounds left in his magazine, then swapped it for a full one, approximately fifteen or sixteen rounds.

84. Defendant BECHTOL fired approximately three rounds.

85. Deputy Ahmed ran to the front of the overturned van beside Defendants CUSO, HEATH and BECHTOL with his pistol drawn. His body camera captures the shouts of "gun" and the gunfire. Deputy Ahmed did not fire. The Michigan State Police confirmed that morning that every one of his magazines was still full. The one deputy who had actually looked at the driver and seen what he was holding, standing in the same place at the same moment with the same view, did not shoot. Neither did Defendants GOMBOS, EARLEY or TRIPP, each of whom had a weapon drawn and a view of the van, nor Defendant PENNINGTON, who arrived as the shots were fired.

86. In all, the three deputies fired approximately thirty-four rounds, based on the Michigan State Police's count of spent casings and the ammunition remaining in their pistols and magazines, from three 9mm Glock pistols, into a wrecked van lying on its side, in a matter of seconds, at one unarmed man.

87. The Michigan State Police documented where those rounds went. On January 6, 2026, MSP Traffic Crash Reconstructionist Spl/Sgt. Gregory Kamp surveyed the scene with survey-grade RTK GPS equipment while the MSP Aviation Unit photographed it from a drone, and produced scale diagrams of

the evidence. Exhibit N. His measurement log records thirty surveyed "HOLE" points in and around the van and two "HOLE_OUT" points where rounds exited.




*Exhibit N (detail) — MSP scale diagram, Prospect Street, 1:177. The van on its side at top center with surveyed holes marked; a cluster of evidence items "under vehicle" beneath patrol car WCSO-74 (Defendants CUSO and BECHTOL); items 23–27 on the roadway; patrol car WCSO-73 (Defendants HEATH and Deputy Ahmed).*

88. The diagram shows what the deputies' own cameras show: the holes are concentrated at the front of the van, where the deputies were standing, and the fired cartridge casings are clustered under and around the patrol car from which Defendants CUSO and BECHTOL had just emerged, a car's length or more from the van. The deputies were not being fired upon from the van. They were firing into it.

89. Defendant BECHTOL yelled "crossfire" while the shooting was going on. The deputies' shooting positions, two at the windshield and one to the side of the van, put them in each other's lines of fire and were dangerous and reckless. Deputy DiCicco, who had run past the shooters toward the van, wrote that she "heard several gunshots coming from behind me."

90. The Sheriff's Office's Use of Force policy provides that the circumstances justifying deadly force "apply to each discharge of a firearm or application of deadly force," that "[e]mployees shall reassess the situation, when safe, to determine whether the subject continues to pose an active threat," and that deadly force is to be used "only as a last resort when reasonable alternatives have been exhausted or are not possible." Exhibit A, pp. 7, 35. The deputies did not reassess after the ramming, after the PIT, before the first shot, or before any of the roughly thirty-four discharges of their weapons.

91. The Use of Force policy also requires that, "[i]f doing so would not increase the danger to the employee or another innocent person, an employee shall give a verbal warning to submit to the authority of the Sheriff's Office before discharging a firearm or using other deadly force," and that "[t]o the extent feasible, an employee shall take reasonable care when discharging his or her firearm so as not to jeopardize the safety of the employee or another person." Exhibit A, p. 35. No deputy warned JOHN JENUWINE that he would be shot. Three deputies fired from positions that put them in each other's lines of fire.

92. JOHN did not fire at anyone. No shot came from the van. No deputy has ever claimed to have been shot at.

93. JOHN JENUWINE did not have a gun or a weapon of any kind on his person or in his vehicle.

94. Within seconds of the shooting, as recorded on Defendant BECHTOL's body camera, BECHTOL asked another deputy where JOHN was, and the deputy answered that he was "in the back barely moving." Defendant TRIPP wrote that when the shooting stopped he moved toward Defendant CUSO "to see inside of the vehicle" and "observed the suspect laying down in the back of the van." From the first moment after the gunfire, the deputies knew that the man they had shot was down, wounded, and in the rear of the van, away from the windshield.

**H. How JOHN was shot: the autopsy and the findings of Plaintiff's expert**

95. Dr. Allecia Wilson, the medical examiner, performed an autopsy at Michigan Medicine and found seven gunshot wound paths through JOHN's body.

96. Six of the seven bullets traveled upward through his body. The bullets entered JOHN's body through his right buttock, his left buttock, his groin, the back of his right knee, the inside of his right thigh and the inside of his left thigh, and traveled from back to front and from low to high.

97. The full wound-trajectory chart, with the autopsy measurements for each entrance and exit, is attached as Exhibit O. The seven wound paths, as documented by the medical examiner, are as follows:

| Path | Entrance (autopsy label) | Exit/projectile | Direction (anatomic position) | Injury |
|---|---|---|---|---|
| 1 | Left upper chest (A) | None — bullet recovered behind the spleen | Front to back, right to left, DOWNWARD | Fatal: left lung, diaphragm, stomach, spleen; 1,400 mL blood in left chest |
| 2 | Right buttock, lateral (D) | Shored partial exits, right hip (B, C) — bullet recovered at B | Back to front, UPWARD | Hip was pressed against a hard surface when the bullet exited |
| 3 | Back of right knee (G) | Exit back of thigh (F); re-entry inner thigh (E); fragments recovered in thigh | Back to front, right to left, UPWARD | Entered behind the knee and traveled up the leg |

| Path | Entrance (autopsy label) | Exit/projectile | Direction (anatomic position) | Injury |
|---|---|---|---|---|
| 4 | Right groin, medial (H) | None — bullet recovered in right kidney | UPWARD | Fractured pelvis; right external iliac vein, bladder, psoas, kidney |
| 5 | Inner right thigh (J) | Exit front of right thigh (I) | Back to front, left to right, UPWARD | Through-and-through |
| 6 | Inner left thigh (L) | Exit front of left thigh (K) | Back to front, right to left, UPWARD | Through-and-through, about 27 cm up the thigh |
| 7 | Underside of left buttock (N) | Exit top of left buttock (M) | UPWARD | Short path through soft tissue |

*Wound paths per Michigan Medicine Autopsy Report AU-26-18 (Dr. Allecia Wilson). Labels A–N are the pathologist's and do not indicate sequence. Range of fire for every wound: distant/indeterminate. Five projectiles or fragments were recovered from the body.*

98. Read together, six of the paths describe one body position. Each of the six rounds entered JOHN's body from below and behind: through the back of the right knee, the underside of the buttocks, the inner thighs and the groin, and traveled upward. That is a man lying on his right side on the floor of an overturned van with his legs toward the windshield and his chest below the muzzles of the deputies standing at the front of it. When six of the bullets struck him, he was not standing up in a window with a shotgun.

99. One bullet entered the front of his left upper chest and traveled downward through his left lung, his diaphragm, his stomach, and his spleen. The position of the bullet suggests JOHN was moving to a standing position, in an attempt to exit the now wrecked vehicle. The fact remains JOHN was unarmed, and no shotgun was ever present, but HEATH, CUSO, and BECHTOL fired approximately thirty-four rounds. The remaining six bullets that punctured JOHN's body came when he was lying down. JOHN was never a threat.

100. The exit wound on JOHN's right hip was "shored," meaning his right hip was pressed against a hard surface when the bullet came out. He was lying on his right side, on the floor of the overturned van, when he was shot.

101. A man is not shot six times, in the buttocks, the groin and the backs and insides of his legs, from below, while standing up and pointing a gun out a window. That wound pattern belongs to a man lying on the floor of a wrecked van with his legs toward the windshield.

102. Based on information and belief, the moment six of the bullets struck JOHN JENUWINE, he was lying on his right side on the floor of the overturned van. That is, on the passenger door and windows, with his hips and legs toward the front of the van and toward the deputies who were shooting at him.

103. Based on the forensic pathologist's report: six of the seven wound paths travel upward through the body and enter from behind and below, through the

buttocks, the perineum, the back of the right knee, and the inner thighs; the exit wound on the right hip is shored, meaning the right hip was pressed against a hard surface when the bullet left the body; the rollover injuries are on the right side of the body.

104. Forensic pathologist, Dr. L. Dragovic, has opined that JOHN JENUWINE did not die instantly or quickly. He bled to death. That process is not instantaneous. It unfolds over an undetermined period of time, during which the victim remains conscious, aware, and in extreme pain. JOHN's recorded movements, kicks, and cries for help for at least twenty minutes after the shooting are consistent with the period of consciousness expected from this manner of death.

105. The pain JOHN JENUWINE experienced was extreme. In addition to the chest wound, he had a fractured pelvis, a perforated bladder, a lacerated iliac vein and kidney, and six additional gunshot wounds through the soft tissue of his buttocks, groin and thighs. He was conscious, moving, kicking and crying for help for at least twenty minutes after he was shot, and the deputies heard and saw him doing it.

106. Based on information and belief, JOHN JENUWINE's injuries were survivable. A penetrating chest wound with hemothorax, bleeding into the

chest cavity, is a wound that trauma surgeons at a Level I trauma center treat successfully with high frequency.

107. The University of Michigan Level I trauma center is approximately three miles and six minutes by ambulance from Prospect Street. Ambulances were dispatched at 2:07:08 a.m. and staged at Prospect and Maus by 2:20 a.m. Had JOHN JENUWINE been taken out of the van and transported to that trauma center within the first fifteen to twenty minutes after he was shot, he would, more likely than not, have survived. Instead, no paramedic reached him until SWAT operators entered the van at about 4:06 a.m., one hour and fifty-nine minutes after the shooting. The County's own dispatch notes show that HVA's tactical medics did not even approach the scene until 3:28:38 a.m.

**I. The shotgun that was never there**

108. Before the shooting, no deputy said anything about a shotgun. The 911 call said "handgun." The dispatch broadcast said "handgun."

109. At 2:07:34 a.m., after the shooting had stopped, a deputy put out over the radio that JOHN was "armed with a shotgun." Dispatch repeated it.

110. However, it is undisputed that JOHN never had a gun during this episode. And furthermore, there is no portion of the video that shows he had a gun.

111. Whatever movement JOHN made in the dark cabin in the seconds after the rollover, when six of the bullets struck him, the evidence points that JOHN

was on the floor, on his right side, with his legs toward the deputies. The evidence is not consistent with JOHN standing and raising a long gun towards the deputies.

112. The Michigan State Police searched the van under a warrant. The Sheriff's Office searched it. The Sheriff's Office's own detective wrote: "No firearm was located in the vehicle."

113. On January 7, 2026, the Sheriff's Community Action Team walked the entire pursuit route looking for anything thrown from the van. They found nothing.

**J. The deputies let him die**

114. At 2:07:08 a.m., five seconds after the first shots, a deputy radioed "PIT, PIT, PIT, start HVA," and a Huron Valley Ambulance unit was dispatched. By 2:20:47 a.m. dispatch logged that HVA was en route from St. Joseph Mercy Hospital to stage at Prospect and Maus, a few blocks from the van. By 2:30:36 a.m. fire and medical units were staged at Prospect and Maus. They stayed there. No Defendant ever allowed the medics to reach JOHN while he was alive.

115. After the shooting, the deputies pulled back behind their patrol cars. At 2:07:40 a.m., Defendant GOMBOS said on the radio, "just for the tape, shots

fired by police," and told the deputies to "treat it like a barricade." Exhibit J, 1:08–1:14.[16]

116. At 2:08:16 a.m., Defendant GOMBOS acknowledged on the radio that JOHN had likely been hit. Defendant CUSO, who had just fired at JOHN, did not answer over the radio, but his body camera records him answering the question aloud: "Ah ya." At 2:10:08 a.m., asked directly whether JOHN was hit, Gombos answered, "Yeah probably." Every Defendant on that scene knew, from the first minute, that the man in the van had been shot.

117. The deputies could see and hear JOHN. At 2:07:27 a.m. a deputy reported, "eyes on him, he's moving around a little bit." At about 2:08 a.m., Defendant BECHTOL said, "[he is] still kinda moving." Exhibit P, 0:00–0:30.[17] At about 2:12 a.m., Bechtol said "he's moving again" and "he's yelling," and yelling can be heard from the van. At 2:13:31 a.m., a deputy reported over the radio, "He is kicking around inside the vehicle right now," and dispatch logged it. Deputy Ahmed watched JOHN's "arms and legs being lifted in the air" in the back of the van. Defendant TRIPP, holding a ballistic shield at the front of the perimeter, wrote that he "observed the suspect kick his feet, turn over, hit the

[16] Dash camera footage: https://bit.ly/4AhGyE9 (1:14 of a 4:08:30 video)
[17] Footage: https://bit.ly/4hxaXai (5:22 of combined 4:30:48 body camera and in-car video)

interior of the van and yell for an extended period of time." Exhibit P, 0:30–1:51.

118. At 2:14:17 a.m. and 2:14:25 a.m., as recorded on the body-worn camera in Exhibit P, JOHN can be heard yelling "help" from inside the van. The deputies did not respond to him. Instead, one deputy said, "focus on the shotgun. Where is it?" Defendant PENNINGTON said "No idea." Exhibit P, 1:53–2:25.

119. At 2:15:19 a.m., JOHN cried "HELP" loudly enough to be heard clearly on the recording. No deputy responded, and no deputy acknowledged the cry, even to one another. Exhibit P, 2:37.

120. Defendant WALLACE, who had arrived at the crash location at 2:09:35 a.m., joined the deputies at the cover position at 2:15:50 a.m. No one told him that JOHN had been crying for help. When Wallace asked, "Have we seen any movement at all?", Defendant PENNINGTON answered, "Ya oh ya, he is kicking his feet." No one added that the man kicking his feet had been calling for help. Exhibit P, 3:13–3:25.

121. At 2:17:07 a.m., ten minutes after the shooting, deputies began addressing JOHN through a loudspeaker. Over the next five minutes they issued sixteen commands: to show his hands, to yell if he could hear them, to move his feet. At 2:22:15 a.m., a deputy announced, "if you need medical assistance, yell out to us now." JOHN yelled. Multiple deputies reported it: "He is yelling,"

"He is trying to get up," "He yelled, I can't hear what he said." The deputies' next words over the loudspeaker were not that help was coming. They were: "Keep your hands empty while you move." No deputy had seen anything in JOHN's hands. Another deputy said, "I heard him yell, but I didn't hear what it was." Exhibit P, 3:25–4:13.[18]

122. Having asked a man with seven gunshot wounds to yell if he needed medical help, and having heard him yell, the deputies did not send help. They told him, at 2:23:06 a.m., to "call into 911 right now." Exhibit P, 4:13–4:34.

123. After six more commands to raise his hands, move his feet or yell, a deputy announced at 2:26:20 a.m., "Keep your hands straight up. If you can't do that right now, start kicking your feet." JOHN moved his feet. The deputies dismissed it: "He is not moving on his commands"; "Naw, he's just flop... flopping his legs." Exhibit P, 4:40–5:06. The video paints the picture of pain that JOHN JENUWINE was going through.

124. At 2:27:15 a.m., a deputy announced, "If you can't move your hands, kick your feet." Three seconds later, at 2:27:18 a.m., JOHN kicked. JOHN followed the commands of the deputies to no avail. That is the last movement anyone recorded from JOHN JENUWINE. It came twenty minutes and fifteen

[18] Footage: https://bit.ly/4hxaXai (5:22 of combined 4:30:48 body camera and in-car video)

seconds after Defendants CUSO, HEATH and BECHTOL shot him. Exhibit P, 5:10–5:22.

125. At 2:37:10 a.m., a deputy radioed, “It’s been about six minutes since we had movement from the vehicle.” It was clear that JOHN was passing, and the deputies had let him die.

126. For the entire period in which JOHN was alive, moving and yelling, the deputies had everything they needed to reach him safely. They had ballistic shields on the scene and in use: Defendant WALLACE directed Defendant GOMBOS to take the shield from the back of Wallace’s patrol car, and Defendant TRIPP held a shield at the front of the perimeter. They had patrol rifles and shotguns for cover, patrol cars already positioned as cover, at least a dozen officers, two sergeants, and a fire crew and an ambulance staged blocks away. Nothing the SWAT operators used to approach the van at 3:57 a.m., shields, cover and a team of officers, was missing at 2:15 a.m. What the deputies on the scene lacked was not the means to go to the van. It was any intention of going to it while the man inside was still alive.

127. Defendant PENNINGTON, from a position with a clear view of the van, watched JOHN move and heard him call for help, and repeatedly refused to let anyone go to him. At 2:13:44 a.m., as JOHN flailed his legs, PENNINGTON said, “We are in a no move situation,” and then

acknowledged, “ya he is injured.” After JOHN cried “help” at 2:15:19 a.m., PENNINGTON told Defendant WALLACE, “I am not going to move, I have him at shotgun point.” Three seconds later, at 2:15:22 a.m., dispatch logged his unit: “630 HAS 1 AT GUN POINT.” At 2:16:50 a.m. he said, “Ya, there is nothing we can do to move at this point fellas.” At about 2:31 a.m., after four minutes without movement from the van, when a deputy suggested that JOHN was injured and that a different approach might be needed, PENNINGTON answered, “We are in a standoff now, we can’t approach,” and, when it was suggested that someone get a better view of the van, “We got two shotguns and a rifle that is perfect cover, I am not going to give that up.” By about 2:36 a.m., Pennington’s own body camera records him saying, “I think he is a K,” police shorthand for dead, “no movement in last 9 minutes.”

128. Defendant WALLACE, the command officer, arrived at the crash location at 2:09:35 a.m. but did not come to the cover position until 2:15:50 a.m. His first act there was to reassign the deputies who had been watching JOHN, not to ask about JOHN’s condition. He then asked, “have we seen any movement at all,” was told that there had been, and asked nothing more. No one told him that JOHN had been crying for help, and he did not ask. At 2:26:25 a.m., after ten more minutes of loudspeaker commands and of yelling and movement

from the van, WALLACE asked the same question again, and again asked nothing more. After JOHN's last recorded movement, WALLACE ordered the deputies to "continue to hold him down, continue to communicate with him." At 2:30:28 a.m., when a deputy pointed out that the loudspeaker commands were not working and that JOHN might be seriously injured, WALLACE answered, "this is all we got."

129. At 3:57 a.m., ninety minutes after JOHN was last seen moving, a group of at least seven SWAT operators approached the van with ballistic shields, fired two 40mm sponge rounds into the rear window, and used a "New York Hook," a long pole with bent ends, to punch a hole in the front windshield and prod JOHN's body to elicit a response. Exhibit Q 0:00–4:13.[19] There was none.

130. SWAT operators then entered the back of the van and found JOHN dead. A Huron Valley Ambulance paramedic attached monitor leads and confirmed death at 4:06 a.m., one hour and fifty-nine minutes after he was shot.

131. The deputies knew JOHN JENUWINE was alive and had been shot from the moment the shooting stopped. For more than twenty minutes after that, while he was moving, kicking and yelling for help, no deputy made any attempt to reach him, and no deputy called the medics forward. Twenty minutes was long

[19] Dash camera footage: https://bit.ly/4xZjR67 (4:13 of a 4:08:30 video)

enough to put him in an ambulance and on an operating table. Instead, the deputies stood behind their cars and watched him die.

132. Based on information and belief, experts will opine that the death was preventable with prompt medical care.

133. The Sheriff's Office's own policies required the deputies to obtain medical aid for a person they had shot: "Following the use of deadly force, employees shall render or request medical aid as soon as practical." Exhibit A, p. 35. Medical evaluation is "mandatory" for any subject exposed to deadly force. Exhibit A, p. 7. Deputies who witness excessive force "have a duty to provide aid to the victim of such force." Exhibit H, p. 6. They did not. They watched him bleed, in the dark, until he died.

**K. The deputies' silence**

134. The Michigan State Police were called in to investigate. That morning an MSP detective went to the Sheriff's Office to count the rounds left in each deputy's pistol and magazines. He asked, through the deputies' union president, whether the deputies would tell him if they carry their magazines full, so he could determine how many shots were fired. The union president consulted Washtenaw County's Corporation Counsel and reported that the attorney had said the deputies "would not share that information."

135. Defendants CUSO, HEATH and BECHTOL, the three shooters, and Defendant GOMBOS, who rammed and flipped the van, each filed a report in the Sheriff's Office case file that reads, in its entirety, "No Narrative." Every other involved deputy submitted a report only "under threat of discipline" and invoking *Garrity*. Through counsel, the involved deputies declined to be interviewed by the Michigan State Police.

136. Eight months later, the Sheriff's Office has never produced, and its deputies have never given, any written or recorded account of why they shot JOHN JENUWINE.

137. Based on information and belief, the physical evidence has been left untested. The four pistols seized from CUSO, HEATH, BECHTOL and Deputy DiCicco went to the Michigan State Police crime laboratory in Lansing on January 20, 2026 and came back to the MSP property room on May 19, 2026. The property record for each shows no laboratory number and no report. The five bullets and fragments the medical examiner recovered from JOHN's body, including the intact bullet from the fatal chest wound, were logged into the MSP property room on January 20, 2026 and were still sitting there at a property audit on July 7, 2026.

138. The first public account of the shooting, attributed by a Detroit television station on January 6, 2026 to a Sheriff's Office commander, stated that after

the crash "the driver pulled out a shotgun and started shooting." That was false. When the Michigan State Police asked the commander about it a month later, he said the station's account "was not what his press release said." The Sheriff's Office did not publicly correct the account until after a gun had been searched for and not found.

**L. Washtenaw County**

139. Everything the deputies did that night they did in uniform, in marked cars, on the County radio, under County sergeants, and according to the training, customs and practices Washtenaw County gave them.

140. The County's written pursuit rules were in the deputies' hands that night. When Defendant HEATH began the pursuit, Defendant PENNINGTON, the east-side patrol supervisor, "pulled up the most recent directive on Vehicle Pursuits issued by Undersheriff Matthew Harshberger on 11/13/2025." That directive authorizes a pursuit only where there is probable cause that an occupant has committed a life-threatening felony, a violent felony, an aggravated assault and battery, or a domestic assault with injury. Pennington and Defendant WALLACE were together in the sergeant's office at Sheriff Station 2 when the pursuit began. Pennington's own account is that once deputies broadcast that the van had "attempted to ram" a patrol car, "per

departmental directive, the pursuit was allowed to continue," and that he then "paralleled" the pursuit, "not directly involved."

141. That is the County's system of pursuit supervision as it actually operated: a supervisor consults a directive to decide whether a pursuit may begin, and from that point forward exercises no control over it. No supervisor evaluated whether the felony that justified the pursuit had actually occurred, whether the driver matched the description, whether the vehicle could be identified without a chase, or whether the pursuit should be terminated. No supervisor authorized or forbade a single tactical decision. A line deputy who was not even a primary pursuit vehicle announced on the County radio that he would "finish this," rammed a stopped van and then flipped a moving one, and neither sergeant said a word. The County's written policy classifies what he did as deadly force. In practice, the County permitted deadly force by vehicle to be self-authorized by whichever deputy chose to use it.

142. Washtenaw County has written policies that forbid ramming absent justification for deadly force, that treat any intentional vehicle-to-vehicle contact, including a PIT maneuver, as ramming, that require de-escalation as resistance decreases, that require containment and time and distance before force, that require justification for each discharge of a firearm, and that require medical aid for persons subjected to force. Exhibit A, pp. 3–4, 7, 35, 37;

Exhibit I, pp. 3, 6, 12, 15, 18; Exhibit H, pp. 3–4, 6. On January 6, 2026, six deputies and two sergeants violated every one of those policies, in sequence, over thirteen minutes and then over two hours, and no one, including either supervising sergeant, objected. That is not the conduct of officers who have been trained in and held to those policies. It is the conduct of officers whose actual custom and practice is different from what is written down.

143. Based on information and belief, Washtenaw County failed to train its deputies that a suspect description that does not match the driver ends the justification for a felony-level pursuit; that a low-speed pursuit for traffic offenses does not justify ramming or a PIT maneuver; that a PIT maneuver on a high-roof cargo van is likely to roll it and kill the occupant; that a disabled, overturned vehicle is to be contained from cover and not rushed on foot with pistols drawn; that a shout of "gun" by one deputy, without any independent perception of a weapon, does not justify the others in firing; that firing must stop, and each deputy must reassess, when the perceived threat stops; and that a person they have shot must be given medical aid, using the cover, armor and tactics available to them, rather than left in a "barricade" until he stops moving.

144. Every one of those situations is one that Washtenaw County deputies meet as a matter of course: a pursuit of a vehicle whose driver may not match a

secondhand description; a decision whether to end a pursuit by vehicle contact; an approach to a stopped or wrecked vehicle on a report of a gun; a fellow deputy's shout of "gun"; and a wounded person after a police shooting. The need for training on each is obvious, and the consequence of failing to train, an unjustified shooting and death, is highly predictable. The County's deputies had the tools for each situation, stop sticks that were already in play, ballistic shields, rifles, patrol cars for cover, negotiators and staged medics, and, apart from one stop-stick attempt that a line deputy then abandoned in favor of ramming, used none of them until JOHN JENUWINE was dead.

145. Based on information and belief, Washtenaw County either had no policy, practice or training requiring that corrected suspect information obtained from a complainant or eyewitness by responding deputies be broadcast to pursuing units before a stop, pursuit, or use of force is undertaken on the strength of the original dispatch description, or they do and did not follow such a policy.

146. Based on information and belief, Washtenaw County had no policy, practice or training that required a supervisor to take command of a scene after a police shooting and direct that a wounded person receive medical aid. The County's response to a man its deputies had shot was to activate SWAT and a negotiation team, notify the Undersheriff, who authorized the SWAT activation, and wait. No one in the County's chain of command, from the

sergeants on the scene to the Undersheriff who was consulted that night, directed that the wounded man be reached.

147. Based on information and belief, the events of January 6, 2026 were not the first time that Washtenaw County deputies inappropriately engaged a suspect and Washtenaw County's practice has been not to investigate or discipline such conduct.

148. After the shooting, Washtenaw County, through its Corporation Counsel, instructed the deputies not to answer the Michigan State Police's question about their magazines. Washtenaw County accepted "No Narrative" reports from the three deputies who fired and from the deputy who flipped the van. Washtenaw County has not disciplined any of them, has not disciplined, retrained or counseled any deputy for failing to relay what Ms. Caddell said or what Deputy Ahmed saw, has not sought a ballistics comparison, and has changed no policy. On information and belief, Washtenaw County's final policymakers for law enforcement, the Sheriff and Undersheriff, have reviewed the deputies' conduct and approved it, and have thereby ratified it.

149. Washtenaw County's policies, customs, training and supervision failures were the moving force behind the violation of JOHN JENUWINE's constitutional rights and his death.

**M. The video record**

150. The ramming, the PIT maneuver, the rollover, the deputies' approach to the overturned van, the shooting, the deputies' retreat, and the hour and fifty-nine minutes that followed were recorded by in-car and body-worn cameras in the Sheriff's Office's own patrol vehicles and on its own deputies, and by a surveillance camera at an animal clinic on Prospect Street. The following recordings are attached to and incorporated in this Complaint: Exhibit C (40 seconds of 4:43:49 combined in-car video, showing stop in Dollar General lot); Exhibit D (11 seconds of 5:55:06 combined in-car video, showing second white van); Exhibit E (22 second clip of the 4:08:30 in-car video, Ypsilanti Police units); Exhibit F, 16 seconds of a 34:32 in-car video from the K-9 patrol vehicle driven by Defendant GOMBOS, showing the ramming; Exhibit G (21 seconds of a 30:45 body-worn camera video, Defendant CUSO stabbing the tire rim); Exhibit J, 1:14 of 4:08:30 in-car video from patrol vehicle 74, occupied by Defendants CUSO and BECHTOL, showing the PIT maneuver, the rollover, the approach, the shooting and the retreat; Exhibit K, 39 seconds of a 1:59:59 surveillance video from the animal clinic parking lot into which Defendant GOMBOS drove after the PIT maneuver, showing the PIT maneuver and rollover on a camera with a date-and-time stamp; Exhibit P ( 5:22 of 4:30:35 of combined body-worn camera, and in-car video capturing

the twenty minutes after the shooting); and Exhibit Q (4:13 of a 4:08:30 in-car video, the SWAT approach). Each is an excerpt of a longer recording. The Michigan State Police reviewed the full in-car recordings, and its review is cited in this Complaint for clock times. Courtesy links to the same recordings are provided in the footnotes and index.

151. Exhibits L and M are still frames from the deputies' in-car and body-worn cameras showing the overturned van immediately before and immediately after the shooting.

152. Exhibit O is the wound-trajectory chart prepared from the medical examiner's autopsy report. Exhibit N consists of the three scale diagrams produced by MSP Spl/Sgt. Gregory Kamp (Report No. 01-010-26): an area overview, the Prospect Street overview, and the Prospect Street detail reproduced in part above.

153. Exhibit F, the ramming. Exhibit F opens with JOHN JENUWINE's van ahead of the K-9 patrol car in the school parking lot, moving slowly, with patrol cars converging on it from two directions with their emergency lights activated (0:00-0:06). The van turns across the lot toward the grass at its edge. At about nine seconds into the recording, Defendant GOMBOS drives the front of his patrol car into the driver's side of the van; the driver's door and driver's window fill the frame (0:07-0:11). The patrol car stays pressed against the

side of the van for about two to three seconds, with the shadow of the patrol car's passenger, Defendant EARLEY, cast on the van's side panel (0:11-0:13). The van then pulls away onto the grass and drives out of the lot, and the patrol car follows (0:13-0:16). The Michigan State Police review of the full recording states that the "[s]uspect vehicle backs into grassy hill and stops at 02:05:20" and that the "WCSO K9 patrol vehicle intentionally rams driver's side of suspect vehicle, deploying the side curtain airbags in suspect vehicle at 02:05:21." Defendant GOMBOS rammed a van that had just stopped.

154. No supervisor directed or authorized the ramming. The radio traffic and body-camera recordings reviewed by the Michigan State Police contain no order or authorization from Defendant PENNINGTON, Defendant WALLACE or anyone else to ram the van. The only radio traffic about the ramming came after it, when Defendant GOMBOS announced: "For the tape, it was my patrol vehicle that rammed him, we are all ok in my car."

155. Exhibit J, the PIT maneuver and rollover. Exhibit J is recorded from patrol vehicle 74, occupied by Defendants CUSO and BECHTOL, as it follows the K-9 patrol car north on Prospect Street (0:00-0:10). At about ten seconds into the recording, the K-9 patrol car driven by Defendant GOMBOS moves up on the left rear of the van and the van begins to rotate (0:10-0:12). Between about thirteen and fifteen seconds, the van spins, leaves the roadway and rolls onto

its passenger side, coming to rest with its undercarriage toward the pursuing patrol cars, partly in the northbound lane and partly on the snow-covered shoulder (0:13-0:17). The Michigan State Police review of the full recording states that the second PIT maneuver connected at 2:06:47 a.m. and that the "[s]uspect vehicle rotates from the PIT maneuver and strikes the curb at 02:06:50, causing it to roll over onto the passenger side."

156. Exhibit K, the same event, on a clock. Exhibit K shows the PIT maneuver and rollover from the animal clinic parking lot on a camera with a date-and-time stamp. At 2:06:49 a.m., the van comes into view northbound on Prospect Street with patrol cars alongside it (0:06). At 2:06:50 a.m., the van rotates. By 2:06:53 a.m., the van has overturned and come to rest (0:11-0:13). Between 2:06:55 and 2:06:59 a.m., the K-9 patrol car drives through the clinic parking lot and stops facing the overturned van (0:14-0:23). By 2:07:01 a.m., figures are visible at the van (0:22). The recording continues to 2:07:18 a.m. The Michigan State Police review of the in-car recordings places the first shots at 2:07:03 a.m., about ten seconds after the van came to rest (0:25).

157. Exhibit J, the approach. For about two to three seconds after the van comes to rest (0:13 to 0:17 of Exhibit J), the van lies motionless on its side in the headlights of the patrol car. Nothing moves in or around it. No door opens. Nothing is thrown or fired from it. At about 0:19 to 0:20, the first deputy is on

foot toward the van, and a deputy crosses directly in front of the camera toward the van with his pistol extended in both hands (0:19-0:20). By about 0:24 to 0:28, deputies are at the front of the van (0:24-0:28).

158. Exhibit J, the shooting and the retreat. The Michigan State Police review of this recording places the first shots at 2:07:03 a.m. (0:27). Between about 0:24 and 0:28 of Exhibit J, smoke is visible above the van (0:24-0:28). Between about 0:28 and 0:36, deputies back away from the van toward the patrol cars with their pistols still extended toward it; one deputy backs up until he is directly in front of the camera (0:28-0:36). From about 0:36 to the end of the recording at 1:14, deputies stand in front of the van and behind the patrol cars with their pistols aimed at the van (0:36-1:14). From the moment the van comes to rest to the end of the recording, the van does not move, no one emerges from it, and nothing is fired from it.

159. Exhibits F (0:00-0:16), J (0:00-1:14) and K (0:00-0:39) do not show any supervisor directing, authorizing or terminating the ramming or the PIT maneuver; any deputy taking cover or waiting for a response to commands before advancing on the overturned van; any weapon; any muzzle flash or shot from the van; or any deputy approaching the van to render aid after the shooting.

160. The recordings, the radio traffic, the Computer-Aided Dispatch notes and the in-car and body-camera clocks reviewed by the Michigan State Police establish the following sequence on January 6, 2026: 2:05:20 a.m., the van stops against the grass in the school lot; 2:05:21 a.m., Defendant GOMBOS rams it; 2:06:08 a.m., a deputy radios that the van is "having some mechanical issues"; 2:06:19 a.m., Defendant GOMBOS radios, "I am going to take primary and finish this"; 2:06:39 a.m., the first PIT attempt misses; 2:06:47 a.m., the second PIT attempt connects; 2:06:50 a.m., the van strikes the curb and rolls onto its passenger side; 2:07:00 a.m., deputies reach the front of the van; 2:07:03 a.m., "gun" and the first shots; 2:07:05 a.m., Defendant PENNINGTON arrives; 2:07:08 a.m., a deputy radios "PIT, PIT, PIT, start HVA"; 2:07:34 a.m., a deputy radios "[a]rmed with a shotgun"; 2:07:40 a.m., Defendant GOMBOS radios "[j]ust for the tape, shots fired by police" and that the deputies will "treat it like a barricade"; 2:09:35 a.m., Defendant WALLACE arrives; 2:10:08 a.m., asked whether JOHN JENUWINE was hit, Defendant GOMBOS answers, "Yeah probably"; 2:13:31 a.m., a deputy radios, "He is kicking around inside the vehicle right now"; 2:14:17, 2:14:25 and 2:15:19 a.m., JOHN cries "help"; 2:22:15 a.m., deputies ask JOHN to yell if he needs medical assistance, and he yells; 2:27:18 a.m., JOHN's last recorded movement; 2:37:10 a.m., a deputy radios, "It's been about six

minutes since we had movement from the vehicle"; 3:28:38 a.m., according to the Computer-Aided Dispatch notes, Huron Valley Ambulance's tactical medics approach the scene; 3:57 a.m., SWAT operators approach the van; about 4:06 a.m., SWAT operators enter the van, a paramedic attaches monitor leads, and death is confirmed.

161. The recordings show what Washtenaw County's training and supervision produced on the street: a line deputy who announced on the County radio that he would "finish" a low-speed pursuit and, without a word from either sergeant on duty, rammed and then flipped a van that the County's own policies told him he could not ram unless deadly force was justified; deputies who advanced on an overturned, motionless vehicle within seconds rather than containing it from cover; three deputies who fired approximately thirty-four shots within about a second of a single shout; and a perimeter that held for more than an hour, with medics staged blocks away, while the man inside cried for help and bled to death.

## COUNT I
## UNLAWFUL USE OF EXCESSIVE AND DEADLY FORCE — 42 U.S.C. § 1983
## DEFENDANT DEPUTY JACOB GOMBOS (Ramming, 2:05:21 a.m.)

162. Plaintiff incorporates all prior allegations by reference.

163. Plaintiff brings this Count under 42 U.S.C. § 1983 for excessive force in violation of the Fourth Amendment, applied to the States through the Fourteenth Amendment.

164. JOHN JENUWINE had a clearly established right under the Fourth Amendment to be free from unreasonable seizure and from excessive and deadly force.

165. Defendant GOMBOS is a "person" under 42 U.S.C. § 1983 and at all relevant times acted under color of state law within the scope of his employment with the Washtenaw County Sheriff's Office.

166. Defendant GOMBOS intentionally drove his patrol car into the driver's door of JOHN JENUWINE's van while the van was stopped. Intentionally ramming an occupied vehicle with a patrol car is a use of deadly force; the Sheriff's Office's own policy says so. Gombos did it to end a low-speed pursuit of a lone driver for traffic offenses, based on a report that the deputies already knew did not match him, in an empty school parking lot at 2:05 in the morning, with no traffic and no pedestrians.

167. At the moment of the ramming, JOHN JENUWINE posed no immediate threat of death or serious injury to Defendant GOMBOS or to anyone else. His van was stopped. The only persons anywhere near it were deputies who had driven up to it. The severity of the crime at issue was minor, and the

deputies knew that the felony report that had started the pursuit did not describe him.

168. The ramming was not a split-second judgment. Defendant EARLEY had been urging it for four minutes, and Defendant GOMBOS had discussed when to do it. It was a deliberate choice to use deadly force where none was justified.

169. The ramming violated the Sheriff's Office's own policies, including "Subject Control/Use of Force" (3.04 GO) and "Vehicle Pursuits" (3.05 RR). Exhibit A, p. 37; Exhibit I, pp. 3, 6, 12. No supervisor authorized it.

170. It was clearly established long before January 6, 2026, that stopping a moving vehicle by intentionally colliding with it is a seizure under the Fourth Amendment, *Brower v. County of Inyo*, 489 U.S. 593, 597–99 (1989); *Scott v. Harris*, 550 U.S. 372, 381 (2007); that a seizure by deadly force is reasonable only where the officer has probable cause to believe that the person poses a significant threat of death or serious physical injury to the officer or others, *Tennessee v. Garner*, 471 U.S. 1, 11 (1985); *Graham v. Connor*, 490 U.S. 386, 396–97 (1989); and that the reasonableness of force used to end a pursuit turns on the danger the fleeing driver actually posed to others, *Scott, 550* U.S. at 383–86. A van stopped against a hill in an empty school parking lot at 2:05 in the morning posed no such danger to anyone.

171. No reasonable officer would have used that force under those circumstances. Defendant GOMBOS acted intentionally, maliciously, and with reckless disregard for JOHN JENUWINE's clearly established rights.

172. The ramming injured JOHN JENUWINE, deployed the airbags in his cabin, damaged his van, and was the first act in an unbroken sequence of escalating force by Defendant GOMBOS that ended, one minute and forty-two seconds later, with JOHN JENUWINE trapped in an overturned van and shot.

173. The misconduct of Defendant GOMBOS directly and proximately caused JOHN JENUWINE to suffer injuries and damages including:

a. Violation of his Fourth Amendment rights (applied through the Fourteenth Amendment), including the right to be free from unreasonable seizure and excessive force;

b. Death;

c. Conscious pain and suffering, including the pain and terror of lying wounded and alone in the van, calling for help before he died;

d. Fright and shock;

e. Mental anguish and emotional distress;

f. Loss of family, society, companionship, love and support, and the family's grief;

g. Medical, funeral and burial expenses;

h. Economic loss;

i. Punitive damages (individual Defendants only);

j. Attorney fees and costs under 42 U.S.C. § 1988;

k. Any other damages allowed by law or identified through discovery.

WHEREFORE, Plaintiff, ESTATE OF JOHN JENUWINE, deceased, by LARRY JENUWINE, Personal Representative, asks the Court to enter judgment in his favor and against Defendants, jointly and severally, for damages exceeding $75,000, exclusive of costs, interest, and attorney fees, plus punitive damages against the individual Defendants and costs and attorney fees under 42 U.S.C. § 1988.

**COUNT II**

**UNLAWFUL USE OF EXCESSIVE AND DEADLY FORCE — 42 U.S.C. § 1983**

**DEFENDANT DEPUTY JACOB GOMBOS (PIT Maneuver, 2:06:47 a.m.)**

174. Plaintiff incorporates all prior allegations by reference.

175. Plaintiff brings this Count under 42 U.S.C. § 1983 for excessive force in violation of the Fourth Amendment, applied to the States through the Fourteenth Amendment.

176. JOHN JENUWINE had a clearly established right under the Fourth Amendment to be free from unreasonable seizure and from excessive and deadly force.

177. Defendant GOMBOS is a "person" under 42 U.S.C. § 1983 and at all relevant times acted under color of state law within the scope of his employment with the Washtenaw County Sheriff's Office.

178. Less than ninety seconds after ramming the van, Defendant GOMBOS announced on the County radio that he was going to "finish this," and performed a PIT maneuver at about 40 miles per hour on a high-roof cargo van that he knew was already damaged, had its airbags deployed, and was "having mechanical issues." The van flipped onto its side.

179. Under the Sheriff's Office's own policies, the PIT maneuver was an intentional collision with the fleeing vehicle, ramming, and was prohibited unless the use of deadly force was justified. Exhibit I, pp. 3, 6, 12; Exhibit A, p. 37. Defendant GOMBOS knew JOHN JENUWINE's resistance had decreased and was required to de-escalate. Exhibit A, pp. 3–4; Exhibit H, pp. 3–4. Instead, he escalated to a maneuver that any trained officer knows is likely to roll a van of that kind and injure or kill its occupant.

180. JOHN JENUWINE posed no immediate threat of death or serious injury to anyone when Gombos flipped his van. The deputies had broadcast "no traffic, no peds." The pursuit was at low speed through empty residential streets. The van was faltering. The driver's identity was available from the plate in his window. A command officer was laying stop sticks on the van's path a block

from the school lot. Every deputy in the pursuit could have backed off at any moment, and the Sheriff's Office's policy required the supervisor to order exactly that where there was no "immediate and/or apparent threat to public safety." The only danger the PIT maneuver addressed was the deputies' frustration that the chase had not ended.

181. The intent behind the PIT maneuver is on the County's own radio recording: "I am going to take primary and finish this." That is not the language of an officer protecting the public from a fleeing vehicle. It is the language of an officer who has decided to end a chase by force, whatever the consequence to the man in the van.

182. It was clearly established long before January 6, 2026, that intentionally colliding with a moving vehicle to stop it is a seizure, *Brower v. County of Inyo*, 489 U.S. 593, 597–99 (1989); *Scott v. Harris*, 550 U.S. 372, 381 (2007), and that deadly force may be used to seize a person only where the officer has probable cause to believe the person poses a significant threat of death or serious physical injury to the officer or others, *Tennessee v. Garner*, 471 U.S. 1, 11 (1985); *Graham v. Connor*, 490 U.S. 386, 396–97 (1989). The Sixth Circuit had held repeatedly before 2026 that an officer who uses deadly force against the driver of a vehicle that poses no immediate threat to anyone violates clearly established law, and that "[w]here a police officer

unreasonably places himself in harm's way, his use of deadly force may be deemed excessive." *Kirby v. Duva*, 530 F.3d 475, 482 (6th Cir. 2008); *Smith v. Cupp*, 430 F.3d 766, 776–77 (6th Cir. 2005); *Godawa v. Byrd*, 798 F.3d 457 (6th Cir. 2015); *Sigley v. City of Parma Heights*, 437 F.3d 527 (6th Cir. 2006). The Sheriff's Office's own policy told Defendant GOMBOS the same thing: a PIT maneuver is ramming, ramming is deadly force, and deadly force was not justified.

183. No reasonable officer would have used that force under those circumstances.

184. The PIT maneuver left JOHN JENUWINE injured, disoriented and helpless on the floor of an overturned van, in the dark, with a fire under it, and set in motion the shooting that followed sixteen seconds later. The shooting was the direct, foreseeable and intended consequence of Defendant GOMBOS's decision to "finish this," and Defendant GOMBOS is liable for the injuries and death that resulted from it.

185. The misconduct of Defendant GOMBOS directly and proximately caused JOHN JENUWINE to suffer injuries and damages including:

a. Violation of his Fourth Amendment rights (applied through the Fourteenth Amendment), including the right to be free from unreasonable seizure and excessive force;

b. Death;

c. Conscious pain and suffering, including the pain and terror of lying wounded and alone in the van, calling for help before he died;

d. Fright and shock;

e. Mental anguish and emotional distress;

f. Loss of family, society, companionship, love and support, and the family's grief;

g. Medical, funeral and burial expenses;

h. Economic loss;

i. Punitive damages (individual Defendants only);

j. Attorney fees and costs under 42 U.S.C. § 1988;

k. Any other damages allowed by law or identified through discovery.

WHEREFORE, Plaintiff, ESTATE OF JOHN JENUWINE, deceased, by LARRY JENUWINE, Personal Representative, asks the Court to enter judgment in his favor and against Defendants, jointly and severally, for damages exceeding $75,000, exclusive of costs, interest and attorney fees, plus punitive damages against the individual Defendants and costs and attorney fees under 42 U.S.C. § 1988.

**COUNT III**

**UNLAWFUL USE OF EXCESSIVE AND DEADLY FORCE — 42 U.S.C. § 1983**

**DEFENDANT DEPUTY JACOB CUSO (Shooter)**

186. Plaintiff incorporates all prior allegations by reference.

187. Plaintiff brings this Count under 42 U.S.C. § 1983 for excessive force in violation of the Fourth Amendment, applied to the States through the Fourteenth Amendment.

188. JOHN JENUWINE had a clearly established right under the Fourth Amendment to be free from unreasonable seizure and from excessive and deadly force.

189. Defendant JACOB CUSO is a "person" under 42 U.S.C. § 1983 and at all relevant times acted under color of state law within the scope of his employment with the Washtenaw County Sheriff's Office.

190. Defendant CUSO ran at JOHN JENUWINE's disabled, overturned van with his pistol drawn and, within about a second of a deputy shouting "gun," fired approximately seventeen rounds, emptying one magazine through the windshield and into the van at JOHN JENUWINE.

191. It was clearly established in the Sixth Circuit long before January 6, 2026, that a person has the right not to be shot unless he is perceived to pose a threat of death or serious physical harm to the officer or others, *Sample v. Bailey*, 409 F.3d 689, 699 (6th Cir. 2005); *Bletz v. Gribble*, 641 F.3d 743, 752 (6th Cir. 2011); *Bouggess v. Mattingly*, 482 F.3d 886 (6th Cir. 2007); that the same rule protects the occupant of a vehicle that no longer poses a danger to anyone, *Smith v. Cupp*, 430 F.3d 766, 776–77 (6th Cir. 2005); *Godawa v. Byrd*, 798

F.3d 457 (6th Cir. 2015); and that deadly force is justified, if at all, only for as long as the threat that justified it continues, *Plumhoff v. Rickard*, 572 U.S. 765, 777 (2014); *Tennessee v. Garner*, 471 U.S. 1, 11 (1985); *Graham v. Connor*, 490 U.S. 386, 396–97 (1989).

192. JOHN JENUWINE was unarmed, alone, injured, and for most of the interaction lying dying on his right side on the floor of a wrecked van. He posed no threat to anyone, and he never had a gun. No reasonable officer in Defendant CUSO's position could have believed otherwise.

193. There was no weapon in the van for Defendant CUSO to see. To the extent he claims to have perceived one, that perception was not reasonable. Defendant CUSO had been told on the radio, minutes earlier, that the driver was one white man and not the "two black males" with a "handgun" dispatched; he had been within feet of the van at 1:55 a.m. and seen no weapon; he had run to the van at 2:05 a.m. to stab at its tire and seen no weapon; and he reached the overturned van in the dark, seconds after a rollover, and fired within a second of another deputy's shout, without pausing to look, to wait for a response to commands, or to take cover. A shout of "gun" is not probable cause to kill a man. Each officer who fires must himself have probable cause to believe that the person poses an immediate threat; another deputy's shout is not a substitute for that judgment.

194. Even if a reasonable officer could have believed for an instant that JOHN JENUWINE had a weapon, no reasonable officer would have continued firing approximately seventeen rounds, emptying one magazine into a man who was down, who had not fired, and who posed no ongoing threat. Each discharge of Defendant CUSO's pistol was a separate use of deadly force requiring separate justification, and a reassessment "to determine whether the subject continues to pose an active threat." Exhibit A, p. 35.

195. Defendant CUSO's actions constituted excessive and deadly force in violation of the Fourth Amendment. He acted intentionally, maliciously, and with reckless disregard for JOHN JENUWINE's clearly established rights.

196. The misconduct of Defendant CUSO directly and proximately caused JOHN JENUWINE to suffer injuries and damages including:

a. Violation of his Fourth Amendment rights (applied through the Fourteenth Amendment), including the right to be free from unreasonable seizure and excessive force;

b. Death;

c. Conscious pain and suffering, including the pain and terror of lying wounded and alone in the van, calling for help before he died;

d. Fright and shock;

e. Mental anguish and emotional distress;

f. Loss of family, society, companionship, love and support, and the family's grief;

g. Medical, funeral and burial expenses;

h. Economic loss;

i. Punitive damages (individual Defendants only);

j. Attorney fees and costs under 42 U.S.C. § 1988;

k. Any other damages allowed by law or identified through discovery.

WHEREFORE, Plaintiff, ESTATE OF JOHN JENUWINE, deceased, by LARRY JENUWINE, Personal Representative, asks the Court to enter judgment in his favor and against Defendants, jointly and severally, for damages exceeding $75,000, exclusive of costs, interest and attorney fees, plus punitive damages against the individual Defendants and costs and attorney fees under 42 U.S.C. § 1988.

**COUNT IV**

**UNLAWFUL USE OF EXCESSIVE AND DEADLY FORCE — 42 U.S.C. § 1983**

**DEFENDANT DEPUTY VON HEATH (Shooter)**

197. Plaintiff incorporates all prior allegations by reference.

198. Plaintiff brings this Count under 42 U.S.C. § 1983 for excessive force in violation of the Fourth Amendment, applied to the States through the Fourteenth Amendment.

199. JOHN JENUWINE had a clearly established right under the Fourth Amendment to be free from unreasonable seizure and from excessive and deadly force.

200. Defendant VON HEATH is a "person" under 42 U.S.C. § 1983 and at all relevant times acted under color of state law within the scope of his employment with the Washtenaw County Sheriff's Office.

201. Defendant HEATH ran at JOHN JENUWINE's disabled, overturned van with his pistol drawn and, within about a second of a deputy shouting "gun," fired approximately fifteen or sixteen rounds through the windshield and into the van at JOHN JENUWINE.

202. It was clearly established in the Sixth Circuit long before January 6, 2026, that a person has the right not to be shot unless he is perceived to pose a threat of death or serious physical harm to the officer or others, *Sample v. Bailey*, 409 F.3d 689, 699 (6th Cir. 2005); *Bletz v. Gribble*, 641 F.3d 743, 752 (6th Cir. 2011); *Bouggess v. Mattingly*, 482 F.3d 886 (6th Cir. 2007); that the same rule protects the occupant of a vehicle that no longer poses a danger to anyone, *Smith v. Cupp*, 430 F.3d 766, 776–77 (6th Cir. 2005); *Godawa v. Byrd*, 798 F.3d 457 (6th Cir. 2015); and that deadly force is justified, if at all, only for as long as the threat that justified it continues, *Plumhoff v. Rickard*, 572 U.S.

765, 777 (2014); *Tennessee v. Garner*, 471 U.S. 1, 11 (1985); *Graham v. Connor*, 490 U.S. 386, 396–97 (1989).

203. JOHN JENUWINE was unarmed, alone, injured, and for most of the interaction lying dying on his right side on the floor of a wrecked van. He posed no threat to anyone, and he never had a gun. No reasonable officer in Defendant HEATH's position could have believed otherwise.

204. Of all the deputies on that scene, Defendant HEATH had the least basis to believe JOHN JENUWINE was armed. He had found the van. He had broadcast that the driver was one white man. He had sat beside Deputy Ahmed as they both got "a good view of the driver" and watched him "flash what appeared to be a glass bottle." He had followed the van for thirteen minutes without seeing a weapon. There was no weapon in the van for him to see, and to the extent he claims to have perceived one in the second before he fired, that perception was not reasonable in light of what he already knew. A shout of "gun" by another deputy is not probable cause to kill a man, least of all for a deputy who has already seen with his own eyes that the object in the man's hand was a bottle. Each officer who fires must himself have probable cause to believe that the person poses an immediate threat; another deputy's shout is not a substitute for that judgment.

205. Even if a reasonable officer could have believed for an instant that JOHN JENUWINE had a weapon, no reasonable officer would have continued firing approximately fifteen or sixteen rounds into a man who was down, who had not fired, and who posed no ongoing threat. Each discharge of Defendant HEATH's pistol was a separate use of deadly force requiring separate justification, and a reassessment "to determine whether the subject continues to pose an active threat." Exhibit A, p. 35.

206. Defendant HEATH's actions constituted excessive and deadly force in violation of the Fourth Amendment. He acted intentionally, maliciously, and with reckless disregard for JOHN JENUWINE's clearly established rights.

207. The misconduct of Defendant HEATH directly and proximately caused JOHN JENUWINE to suffer injuries and damages including:

   a. Violation of his Fourth Amendment rights (applied through the Fourteenth Amendment), including the right to be free from unreasonable seizure and excessive force;

   b. Death;

   c. Conscious pain and suffering, including the pain and terror of lying wounded and alone in the van, calling for help, for the nearly two hours before he died;

   d. Fright and shock;

e. Mental anguish and emotional distress;

f. Loss of family, society, companionship, love and support, and the family's grief;

g. Medical, funeral and burial expenses;

h. Economic loss;

i. Punitive damages (individual Defendants only);

j. Attorney fees and costs under 42 U.S.C. § 1988;

k. Any other damages allowed by law or identified through discovery.

WHEREFORE, Plaintiff, ESTATE OF JOHN JENUWINE, deceased, by LARRY JENUWINE, Personal Representative, asks the Court to enter judgment in his favor and against Defendants, jointly and severally, for damages exceeding $75,000, exclusive of costs, interest and attorney fees, plus punitive damages against the individual Defendants and costs and attorney fees under 42 U.S.C. § 1988.

**COUNT V**
**UNLAWFUL USE OF EXCESSIVE AND DEADLY FORCE — 42 U.S.C. § 1983**
**DEFENDANT DEPUTY GABRIEL BECHTOL (Shooter)**

208. Plaintiff incorporates all prior allegations by reference.

209. Plaintiff brings this Count under 42 U.S.C. § 1983 for excessive force in violation of the Fourth Amendment, applied to the States through the Fourteenth Amendment.

210. JOHN JENUWINE had a clearly established right under the Fourth Amendment to be free from unreasonable seizure and from excessive and deadly force.

211. Defendant GABRIEL BECHTOL is a "person" under 42 U.S.C. § 1983 and at all relevant times acted under color of state law within the scope of his employment with the Washtenaw County Sheriff's Office.

212. Defendant BECHTOL ran at JOHN JENUWINE's disabled, overturned van with his pistol drawn, moved to the right side of the van, and, within about a second of a deputy shouting "gun," fired approximately three rounds into the van at JOHN JENUWINE from a position that put his fellow deputies in his line of fire, as he himself acknowledged by yelling "crossfire."

213. It was clearly established in the Sixth Circuit long before January 6, 2026, that a person has the right not to be shot unless he is perceived to pose a threat of death or serious physical harm to the officer or others, *Sample v. Bailey*, 409 F.3d 689, 699 (6th Cir. 2005); *Bletz v. Gribble*, 641 F.3d 743, 752 (6th Cir. 2011); *Bouggess v. Mattingly*, 482 F.3d 886 (6th Cir. 2007); that the same rule protects the occupant of a vehicle that no longer poses a danger to anyone, *Smith v. Cupp*, 430 F.3d 766, 776–77 (6th Cir. 2005); *Godawa v. Byrd*, 798 F.3d 457 (6th Cir. 2015); and that deadly force is justified, if at all, only for as long as the threat that justified it continues, *Plumhoff v. Rickard*, 572 U.S.

765, 777 (2014); *Tennessee v. Garner*, 471 U.S. 1, 11 (1985); *Graham v. Connor*, 490 U.S. 386, 396–97 (1989).

214. JOHN JENUWINE was unarmed, alone, injured, and for most of the interaction lying dying on his right side on the floor of a wrecked van. He posed no threat to anyone, and he never had a gun. No reasonable officer in Defendant BECHTOL's position could have believed otherwise.

215. Defendant BECHTOL claimed to have seen a weapon, and his account is refuted by the physical evidence. Three minutes after the shooting, he told a fellow officer that JOHN "stood up with the shotgun in the window after he got up off the ground." When most of the bullets struck him, JOHN was not standing in a window. Six of the seven bullets that struck him entered from below and behind, through the buttocks, groin, back of the knee and inner thighs, and traveled upward; his right hip was pressed against the floor of the van when a bullet exited it; and no wound on his hands, arms, shoulders, head or face is consistent with a man raising a long gun toward the deputies. There was no shotgun. There was no gun. Defendant BECHTOL's account is false, and to the extent he perceived anything at all in the dark cabin of an overturned van, seconds after a rollover and in the second between a shout and his own shots, that perception was not a reasonable basis for deadly force. Each officer who fires must himself have probable cause to believe that the person poses

an immediate threat; another deputy's shout is not a substitute for that judgment.

216. Defendant BECHTOL's false statements were the basis on which the scene was run as a barricade and medical aid was withheld from JOHN JENUWINE for the rest of his life.

217. Defendant BECHTOL's actions constituted excessive and deadly force in violation of the Fourth Amendment. He acted intentionally, maliciously, and with reckless disregard for JOHN JENUWINE's clearly established rights.

218. The misconduct of Defendant BECHTOL directly and proximately caused JOHN JENUWINE to suffer injuries and damages including:

a. Violation of his Fourth Amendment rights (applied through the Fourteenth Amendment), including the right to be free from unreasonable seizure and excessive force;

b. Death;

c. Conscious pain and suffering, including the pain and terror of lying wounded and alone in the van, calling for help, for the nearly two hours before he died;

d. Fright and shock;

e. Mental anguish and emotional distress;

f. Loss of family, society, companionship, love and support, and the family's grief;

g. Medical, funeral and burial expenses;

h. Economic loss;

i. Punitive damages (individual Defendants only);

j. Attorney fees and costs under 42 U.S.C. § 1988;

k. Any other damages allowed by law or identified through discovery.

WHEREFORE, Plaintiff, ESTATE OF JOHN JENUWINE, deceased, by LARRY JENUWINE, Personal Representative, asks the Court to enter judgment in his favor and against Defendants, jointly and severally, for damages exceeding $75,000, exclusive of costs, interest and attorney fees, plus punitive damages against the individual Defendants and costs and attorney fees under 42 U.S.C. § 1988.

**COUNT VI**
**FAILURE TO INTERVENE — 42 U.S.C. § 1983**
**DEFENDANTS EARLEY, PENNINGTON, WALLACE, GOMBOS AND TRIPP**

219. Plaintiff incorporates all prior allegations by reference.

220. An officer who observes or has reason to know that another officer is using excessive force, or is denying a person needed medical care, and who has a realistic opportunity and the means to prevent the harm, has a duty to intervene. An officer who fails to do so is liable under 42 U.S.C. § 1983 where

he "observed or had reason to know that excessive force would be or was being used" and "had both the opportunity and the means to prevent the harm from occurring." *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997); see *Bruner v. Dunaway*, 684 F.2d 422, 426 (6th Cir. 1982).

221. There were three opportunities to intervene on January 6, 2026, and each of the Defendants named in this Count had at least one of them. The first was the twenty-eight seconds between Defendant GOMBOS's announcement at 2:06:19 a.m. that he would "take primary and finish this" and his PIT maneuver at 2:06:47 a.m., during which a word from the deputy beside him or from either sergeant on the radio would have stopped it. The second was the shooting itself, which lasted long enough for Defendant CUSO to empty a magazine while four other armed Defendants stood at or within sight of the van and did not fire. The third, and the longest, was the twenty minutes after the shooting during which JOHN JENUWINE was moving, kicking and crying for help, and the hour after that, during which every Defendant on the scene could have insisted that the medics staged blocks away be brought forward, proposed a rescue under cover with the shields and armor on scene, or simply told the sergeants that the man in the van was calling for help.

222. Defendant EARLEY sat beside Defendant GOMBOS for the entire pursuit. He knew JOHN JENUWINE was one white man and not the "two black

males" with a "handgun" that dispatch had broadcast; he knew no weapon had been seen; he knew the van had been rammed, was damaged, and was "having mechanical issues"; and he knew a PIT maneuver on a high-roof van was likely to roll it. Rather than stopping Gombos, he urged him to ram the van, "get him, get him," told him when to do it, and then rode beside him for the twenty-eight seconds between "finish this" and the PIT maneuver without a word of objection. He was facing the van with his weapon drawn when the shooting began and did not call a cease-fire. He was on the scene for the twenty minutes during which JOHN was moving and calling for help, and did nothing to get him aid.

223. Defendant PENNINGTON was the east-side patrol supervisor and was monitoring the pursuit by radio. He heard the deputies confirm that the driver was one white man who did not match the description. He heard the ramming reported. He heard "finish this." Under the Sheriff's Office's own policy, he had the authority to order the pursuit terminated and to forbid any vehicle contact, and he had twenty-eight seconds in which to key a microphone and do so. He said nothing. He arrived at the scene as the shots were fired. For the next two hours he directed a "barricade" against a man he knew was wounded and alive, saying "ya he is injured," "he is kicking his feet," and "I am not going to move," and never ordered anyone to reach him.

224. Defendant WALLACE was the West Operations Command officer. He monitored the pursuit by radio, positioned himself on its route, and heard the same broadcasts Defendant PENNINGTON heard. He had the same authority to terminate the pursuit and forbid vehicle contact, and the same twenty-eight seconds. He gave no order. He arrived at the scene at 2:09:35 a.m., while JOHN JENUWINE was alive and moving, and as the command officer requested a SWAT and negotiation response rather than directing medical aid. He asked twice whether there had been "any movement," was told there had, and both times asked nothing more and directed no one to reach the wounded man.

225. Defendant GOMBOS created the conditions that led to the shooting by ramming and then flipping the van. He was at the scene with his weapon drawn when the shooting began and did not call a cease-fire. He acknowledged on the radio within a minute that JOHN had likely been hit, and again at 2:10:08 a.m., "Yeah probably." He declared the scene a "barricade" rather than calling the medics forward, and for the next two hours did nothing to get aid to the man in the van.

226. Defendant TRIPP interviewed the only eyewitness with his body camera running and learned that there was one man in the van, that he could not be described, and that no gun had been seen. He never broadcast that to the

pursuing units. By his own account, he was at the engine block of the overturned van with his weapon drawn when "gun" was shouted and the shooting began, and did not call a cease-fire.

227. Defendant TRIPP saw JOHN "laying down in the back of the van" when the shooting stopped, held a ballistic shield at the front of the perimeter while JOHN kicked, turned over, hit the interior of the van and yelled, and, instead of getting aid to him, went back to his patrol car to call the eyewitness "to get a better statement" while JOHN lay bleeding.

228. Each of these Defendants observed or had reason to know that excessive force was being used against JOHN JENUWINE and that he was being denied needed medical care, and each had a realistic opportunity and the means to prevent the harm. None did. Their failures to intervene directly and proximately caused JOHN JENUWINE's injuries and death.

229. The misconduct of Defendants EARLEY, PENNINGTON, WALLACE, GOMBOS, and TRIPP directly and proximately caused JOHN JENUWINE to suffer injuries and damages including:

a. Violation of his Fourth Amendment rights (applied through the Fourteenth Amendment), including the right to be free from unreasonable seizure and excessive force;

b. Death;

c. Conscious pain and suffering, including the pain and terror of lying wounded and alone in the van, calling for help, for the nearly two hours before he died;

d. Fright and shock;

e. Mental anguish and emotional distress;

f. Loss of family society, companionship, love and support, and the family's grief;

g. Medical, funeral and burial expenses;

h. Economic loss;

i. Punitive damages (individual Defendants only);

j. Attorney fees and costs under 42 U.S.C. § 1988;

k. Any other damages allowed by law or identified through discovery.

WHEREFORE, Plaintiff, ESTATE OF JOHN JENUWINE, deceased, by LARRY JENUWINE, Personal Representative, asks the Court to enter judgment in his favor and against Defendants, jointly and severally, for damages exceeding $75,000, exclusive of costs, interest and attorney fees, plus punitive damages against the individual Defendants and costs and attorney fees under 42 U.S.C. § 1988.

## COUNT VII

## DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEED — 42 U.S.C. § 1983

## FOURTH AND FOURTEENTH AMENDMENTS — ALL INDIVIDUAL DEFENDANTS

230. Plaintiff incorporates all prior allegations by reference.

231. Officers who shoot a person, or who seize a person they know has been shot, must take reasonable steps to obtain medical care for him. *Estate of Owensby v. City of Cincinnati*, 414 F.3d 596, 602–04 (6th Cir. 2005); *Estate of Carter v. City of Detroit*, 408 F.3d 305, 312–13 (6th Cir. 2005). A serious medical need is one "so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Carter, 408* F.3d at 312. A person who has been shot seven times has an obvious and serious medical need, and every Defendant knew it.

232. Every individual Defendant knew JOHN JENUWINE had been shot; Defendant GOMBOS said so on the radio within a minute. Every one of them could see or hear, or was told, that he was alive, moving, kicking and yelling inside the van. At 2:22:15 a.m., the deputies asked him to yell if he needed medical assistance, and he yelled.

233. The van was on its side and could not move. JOHN was on the floor in the rear of the cabin, "barely moving," as the deputies said to one another within seconds of the shooting. He was unarmed and had fired no shots. No shot had

ever come from the van. The two deputies who had looked at him closest had seen a bottle in his hand, not a gun. Ambulances were dispatched at 2:07:08 a.m. and staged blocks away, and a Level I trauma center was minutes away.

234. The Defendants' stated reason for withholding aid, that JOHN was a "barricaded gunman" with a "shotgun," was unreasonable from the first minute. It rested on a single shout in the dark, contradicted by everything the deputies knew before it, and on a statement by Defendant BECHTOL that the physical evidence proves false. Deputy Ahmed and, upon information and belief, Defendant HEATH, knew the object in the van was a bottle and said nothing.

235. Even on their own theory, the Defendants had every means to reach a wounded man safely and quickly: ballistic shields, rifles for cover, armored patrol vehicles, a fire crew and medics staged at Prospect and Maus, and at least a dozen officers on scene. Those means were used, eventually, to approach the van with shields at 3:57 a.m., after JOHN had been motionless for ninety minutes. They could have been used at 2:15 a.m. Nothing changed between 2:15 a.m. and 3:57 a.m. except that JOHN JENUWINE stopped moving and died.

236. For more than twenty minutes while he was moving and calling for help, and for an hour after that, no Defendant approached JOHN, sent medics to him, or

made any attempt to render or obtain medical aid. They chose to wait for him to stop moving.

237. That choice was objectively unreasonable and deliberately indifferent to JOHN JENUWINE's obvious and serious medical need, whether measured under the Fourth Amendment's standard of objective reasonableness or the Fourteenth Amendment's standard for persons in custody, *Brawner v. Scott County*, 14 F.4th 585 (6th Cir. 2021); *Owensby, 414* F.3d at 602–04, and it violated both.

238. Based on information and belief JOHN JENUWINE's chest wound was survivable with prompt care. JOHN bled to death over an undetermined period of time from a gunshot wound. He was conscious for at least twenty minutes after the shooting, as his recorded movements, kicks and cries for help show; and that had he been taken out of the van and transported to the University of Michigan Level I trauma center, three miles and six minutes away, within fifteen to twenty minutes of being shot, he would, more likely than not, have survived. Ambulances were dispatched at 2:07:08 a.m. and staged at Prospect and Maus by 2:20 a.m. No paramedic reached JOHN until SWAT operators entered the van at about 4:06 a.m. The Defendants' failure to provide or summon care caused his death and caused him to suffer, alone and in pain, for the last moments of his life.

239. The misconduct of the individual Defendants directly and proximately caused JOHN JENUWINE to suffer injuries and damages including:

a. Violation of his constitutional rights under the Fourth and Fourteenth Amendments to the United States Constitution, including the right to be free from deliberate indifference to his obvious and serious medical needs while seized and in the custody of the Defendants;

b. Death;

c. Conscious pain and suffering, including the pain and terror of lying wounded and alone in the van, calling for help before he died;

d. Fright and shock;

e. Mental anguish and emotional distress;

f. Loss of family society, companionship, love and support, and the family's grief;

g. Medical, funeral and burial expenses;

h. Economic loss;

i. Punitive damages (individual Defendants only);

j. Attorney fees and costs under 42 U.S.C. § 1988;

k. Any other damages allowed by law or identified through discovery.

WHEREFORE, Plaintiff, ESTATE OF JOHN JENUWINE, deceased, by LARRY JENUWINE, Personal Representative, asks the Court to enter judgment in

his favor and against Defendants, jointly and severally, for damages exceeding $75,000, exclusive of costs, interest and attorney fees, plus punitive damages against the individual Defendants and costs and attorney fees under 42 U.S.C. § 1988.

**COUNT VIII**
**SUPERVISORY LIABILITY — 42 U.S.C. § 1983**
**DEFENDANTS SERGEANT THOMAS PENNINGTON AND SERGEANT SAMUEL WALLACE**

240. Plaintiff incorporates all prior allegations by reference.

241. Defendant PENNINGTON was the east-side patrol supervisor for the deputies involved in the pursuit and shooting. Defendant WALLACE was the West Operations Command officer. Under the Sheriff's Office's Vehicle Pursuits policy, "overall authority for the pursuit" rested in the on-duty command officer, who was required to monitor the pursuit, ensure its compliance with policy, and order its termination when there was no immediate threat to public safety. Exhibit I, p. 18. Both sergeants were together at Sheriff Station 2 when the pursuit began, both left to respond to it, and both monitored it on the radio throughout.

242. Defendant PENNINGTON's own account is that when the pursuit began he consulted the Undersheriff's November 13, 2025 pursuit directive, concluded that the pursuit was "allowed to continue," and thereafter "paralleled" it, "not directly involved." That is an admission that he exercised no supervision at

all. He heard the deputies confirm that JOHN JENUWINE did not match the dispatched description, heard the ramming reported, heard Defendant GOMBOS announce he would "finish this," and did not terminate the pursuit, forbid the ramming or PIT maneuver, or direct the deputies to contain rather than confront. He arrived at the scene as the shots were fired, went to his car for a shotgun, and then, for nearly two hours, participated in directing a "barricade" operation against a wounded, unarmed man rather than directing medical aid to him. He knew, and said, that JOHN was "kicking his feet," and did not send anyone to him.

243. Defendant WALLACE was on the radio for the entire pursuit, deployed stop sticks once and was laying them a second time on the van's path when it was rammed a block away, heard the same broadcasts, and gave no order to terminate the pursuit or forbid vehicle contact. He arrived at the scene at 2:09:35 a.m., within three minutes of the shooting, while JOHN JENUWINE was moving and alive. As a command officer he directed, in his own words, that "due to the suspect being armed with a shotgun" the situation be treated "as a barricaded gunman," requested the activation of SWAT and a negotiation team, and the scene was thereafter run as a barricade under his and Defendant PENNINGTON's direction. He asked whether there had been "any

movement," was told there had been, and did not direct that the wounded man be reached.

244. Defendants PENNINGTON and WALLACE each, at a minimum, implicitly authorized, approved and knowingly acquiesced in the unconstitutional conduct of the deputies under their command, and each, by his own conduct in directing the barricade rather than medical aid, was a direct cause of JOHN JENUWINE's death. That is sufficient for supervisory liability under 42 U.S.C. § 1983. *Peatross v. City of Memphis*, 818 F.3d 233 (6th Cir. 2016); *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999) (quoting *Hays v. Jefferson County*, 668 F.2d 869, 874 (6th Cir. 1982)).

245. The misconduct of Defendants PENNINGTON and WALLACE directly and proximately caused JOHN JENUWINE to suffer injuries and damages including:

a. Violation of his Fourth Amendment rights (applied through the Fourteenth Amendment), including the right to be free from unreasonable seizure and excessive force;

b. Death;

c. Conscious pain and suffering, including the pain and terror of lying wounded and alone in the van, calling for help, for the nearly two hours before he died;

d. Fright and shock;

e. Mental anguish and emotional distress;

f. Loss of family society, companionship, love and support, and the family's grief;

g. Medical, funeral and burial expenses;

h. Economic loss;

i. Punitive damages (individual Defendants only);

j. Attorney fees and costs under 42 U.S.C. § 1988;

k. Any other damages allowed by law or identified through discovery.

WHEREFORE, Plaintiff, ESTATE OF JOHN JENUWINE, deceased, by LARRY JENUWINE, Personal Representative, asks the Court to enter judgment in his favor and against Defendants, jointly and severally, for damages exceeding $75,000, exclusive of costs, interest and attorney fees, plus punitive damages against the individual Defendants and costs and attorney fees under 42 U.S.C. § 1988.

**COUNT IX**
**MONELL LIABILITY — 42 U.S.C. § 1983**
**DEFENDANT WASHTENAW COUNTY**

246. Plaintiff incorporates all prior allegations by reference.

247. The individual Defendants acted under color of law to violate JOHN JENUWINE's constitutional rights.

248. A municipality is liable under 42 U.S.C. § 1983 when its own policy or custom, including a failure to train or supervise that amounts to deliberate indifference to the rights of the people its officers encounter, is the moving force behind a constitutional violation. *Monell v. Department of Social Services*, 436 U.S. 658, 690–94 (1978); *City of Canton v. Harris*, 489 U.S. 378, 388–90 (1989). Where the need for training or supervision is so obvious, and the violation so highly predictable a consequence of its absence, that the municipality's inaction amounts to deliberate indifference, a single incident is enough. *Canton, 489* U.S. at 390 & n.10; *Board of County Commissioners v. Brown*, 520 U.S. 397, 409 (1997); *Connick v. Thompson*, 563 U.S. 51, 63–64 (2011). A municipality is also liable when its final policymakers approve a subordinate's unconstitutional decision and the basis for it. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (plurality opinion); *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480–81 (1986).

249. Those violations were caused by Washtenaw County's own policies, customs, practices, training and supervision, and by its deliberate indifference to the rights of the people its deputies encounter, including:

a. a failure to supervise vehicle pursuits, under which the County's actual practice was for a supervisor to decide only whether a pursuit could begin and thereafter to "parallel" it while line deputies, including

deputies who were not primary or secondary units, decided for themselves whether to ram, PIT or otherwise use deadly force by vehicle, with no supervisory authorization required in practice, no termination criteria applied, and no coordination between a command officer laying stop sticks and a line deputy choosing to ram;

b. a custom and practice, contrary to the County's written policy, of permitting deputies to ram vehicles and to perform PIT maneuvers on rollover-prone vehicles, including high-roof cargo vans like the Nissan NV, in order to end low-speed pursuits for non-violent offenses, and a failure to train deputies that such a maneuver is likely to roll the vehicle and is deadly force;

c. a failure to train deputies to terminate or downgrade a pursuit when the driver does not match the dispatched suspect description, and a failure to have any policy or practice requiring corrected suspect information obtained from a complainant or eyewitness by responding deputies to be broadcast to pursuing units before a stop, pursuit or use of force is undertaken on the strength of the original dispatch description;

d. a failure to train deputies to contain a disabled, occupied vehicle from cover, using time and distance, rather than rushing it on foot with pistols drawn within seconds of a rollover;

e. a failure to train deputies that one deputy's shout of "gun," without an independent perception of a weapon by the firing officer, does not give each shooter probable cause to use deadly force; that each discharge of a firearm requires its own justification; and that firing must stop, and reassessment must occur, when the perceived threat stops and at every reload;

f. a failure to train deputies and supervisors on the duty to render and obtain medical aid for a person they have shot, including how to reach a wounded person under cover using the shields, armor and personnel available, and a failure to have any policy or practice requiring a supervisor to take command of a post-shooting scene for the purpose of getting medical aid to the wounded person rather than declaring a "barricade" and waiting;

g. a failure to train and supervise sergeants in controlling pursuits, terminating escalation, and directing post-shooting scenes; and

h. a custom of tolerating and ratifying deadly force by accepting "No Narrative" reports from the deputies who use it, directing deputies through County counsel not to cooperate with outside investigation, and imposing no discipline, retraining or policy change.

250. Washtenaw County's deputies are routinely required to decide whether and how much force to use in vehicle pursuits and in confrontations with people they believe may be armed, and are routinely required to deal with people they have injured. The need for training and supervision on those decisions is obvious, and the consequences of failing to provide it, unjustified shootings and deaths like JOHN JENUWINE's, are so highly predictable that the County's failure amounts to deliberate indifference. That is so whether or not the County can point to written materials on those subjects, because training that exists on paper but is not enforced, evaluated, or reflected in what deputies actually do on the street is no training at all. On January 6, 2026, six deputies and two sergeants violated every one of the County's written policies, in sequence, in the same direction, at the same time, and no one, including either supervising sergeant, objected or recognized that anything was being done wrong. That is not the failure of eight individual officers. It is the failure of a training and supervision system that never instilled the written rules, and of a pursuit-supervision practice that, as Defendant PENNINGTON's own account admits, consisted of consulting a directive to decide whether a pursuit could begin and thereafter exercising no control at all.

251. Had the individual Defendants been adequately trained and supervised, they would have downgraded or terminated the pursuit once they confirmed JOHN JENUWINE did not match the description; would not have rammed his van or performed a PIT maneuver on it; would have contained the overturned van from cover and de-escalated; would not have fired, or would have stopped firing, at a man who posed no threat; and would have obtained medical care for him after the shooting.

252. Washtenaw County's final policymakers for law enforcement, the Sheriff and Undersheriff, knew of these deficiencies. The Undersheriff was consulted during the incident itself and authorized the SWAT activation without directing that the wounded man be reached.

253. Independently, the County ratified the deputies' conduct and the basis for it after the fact. Through its Corporation Counsel, the County instructed the deputies not to answer the Michigan State Police investigator's question about whether they carry full magazines. The County accepted "No Narrative" reports from the three deputies who fired and from the deputy who flipped the van. The County has not disciplined, retrained or counseled any deputy, has not sought a ballistics comparison of the bullets recovered from JOHN JENUWINE's body to the pistols that fired them, and has changed no policy. On information and belief, the Sheriff and Undersheriff have reviewed the

deputies' conduct and approved it, and have thereby ratified both the conduct and the reasons the deputies have given for it.

254. Washtenaw County's policies, customs, training and supervision failures were the moving force behind the violation of JOHN JENUWINE's constitutional rights and his death.

255. Washtenaw County is liable to the Estate of JOHN JENUWINE, and to Plaintiff LARRY JENUWINE as Personal Representative on behalf of those entitled to recover under M.C.L. § 600.2922, for all damages allowed under 42 U.S.C. §§ 1983 and 1988 and the Michigan Wrongful Death Act.

256. The misconduct of Defendant WASHTENAW COUNTY directly and proximately caused JOHN JENUWINE to suffer injuries and damages including:

a. Violation of his Fourth Amendment rights (applied through the Fourteenth Amendment), including the right to be free from unreasonable seizure and excessive force;

b. Death;

c. Conscious pain and suffering, including the pain and terror of lying wounded and alone in the van, calling for help, for the nearly two hours before he died;

d. Fright and shock;

e. Mental anguish and emotional distress;

f. Loss of family society, companionship, love and support, and the family's grief;

g. Medical, funeral and burial expenses;

h. Economic loss;

i. Attorney fees and costs under 42 U.S.C. § 1988;

j. Any other damages allowed by law or identified through discovery.

WHEREFORE, Plaintiff, ESTATE OF JOHN JENUWINE, deceased, by LARRY JENUWINE, Personal Representative, asks the Court to enter judgment in his favor and against Defendant WASHTENAW COUNTY, jointly and severally with the individual Defendants, for damages exceeding $75,000, exclusive of costs, interest and attorney fees, plus costs and attorney fees under 42 U.S.C. § 1988.

**COUNT X**
**STATE LAW — GROSS NEGLIGENCE AND WILLFUL AND WANTON MISCONDUCT**
**DEFENDANT DEPUTY JACOB GOMBOS**

257. Plaintiff incorporates all prior allegations by reference.

258. Defendant GOMBOS owed JOHN JENUWINE a duty to act reasonably and lawfully, to operate his patrol vehicle with due care, to avoid unnecessary, excessive and deadly force, and to render and obtain medical aid for a person subjected to force.

259. Defendant GOMBOS breached those duties, including by:

a. Joining and continuing a felony-level pursuit as an unauthorized fourth vehicle after the deputies had confirmed JOHN JENUWINE did not match the dispatched description;

b. Passing other pursuit vehicles and taking the primary position without authorization;

c. Intentionally ramming an occupied, stopped van with his patrol car;

d. Announcing he would "finish this" and performing a PIT maneuver at about 40 miles per hour on a damaged, high-roof cargo van that he knew was likely to roll;

e. Failing to de-escalate as resistance decreased, in violation of Sheriff's Office policy;

f. Directing that a shot, unarmed, wounded man be treated as a "barricade" rather than obtaining medical aid for him;

g. Failing to intervene to stop fellow deputies from using excessive and deadly force;

h. Any additional acts or omissions revealed in discovery.

260. Defendant GOMBOS's conduct was so reckless as to demonstrate a substantial lack of concern for whether an injury resulted. It was gross negligence and willful and wanton misconduct within the meaning of M.C.L.

§ 691.1407(2), and it was the proximate cause, the one most immediate, efficient and direct cause, of JOHN JENUWINE's injuries and death: it was Defendant GOMBOS who put JOHN JENUWINE on the floor of an overturned van in front of deputies with drawn pistols, and who then declared the van a "barricade." Defendant GOMBOS is not entitled to governmental immunity.

261. Plaintiff is entitled to all damages allowed under the Michigan Wrongful Death Act, M.C.L. § 600.2922, including conscious pain and suffering, loss of society and companionship, medical, funeral and burial expenses, and loss of financial support.

WHEREFORE, Plaintiff, ESTATE OF JOHN JENUWINE, deceased, by LARRY JENUWINE, Personal Representative, asks the Court to enter judgment in his favor and against Defendants, jointly and severally, for all damages recoverable under the Michigan Wrongful Death Act, M.C.L. § 600.2922, in an amount exceeding $75,000, plus interest, costs, and attorney fees.

**COUNT XI**

**STATE LAW — GROSS NEGLIGENCE AND WILLFUL AND WANTON MISCONDUCT**

**DEFENDANT DEPUTY JACOB CUSO**

262. Plaintiff incorporates all prior allegations by reference.

263. This Count is directed to Defendant CUSO's grossly negligent conduct apart from the intentional shooting of JOHN JENUWINE, which is pleaded as assault and battery in Count XVIII.

264. Defendant CUSO owed JOHN JENUWINE a duty to act reasonably and lawfully, to avoid unnecessary, excessive and deadly force, and to render and obtain medical aid for a person subjected to force.

265. Defendant CUSO breached those duties, including by:

a. Rushing a disabled, overturned van on foot with his pistol drawn, in the dark, seconds after a rollover, instead of containing it from cover as required by Sheriff's Office policy;

b. Failing to give JOHN JENUWINE any time to respond to commands before firing;

c. Taking a firing position that put fellow deputies in a crossfire;

d. Failing to render or obtain medical aid for JOHN JENUWINE after shooting him, and for the twenty minutes during which he was heard calling for help, while walking close enough to the van to extinguish a fire under it;

e. Failing to intervene to stop fellow deputies from using excessive and deadly force;

f. Any additional acts or omissions revealed in discovery.

266. Defendant CUSO's conduct was so reckless as to demonstrate a substantial lack of concern for whether an injury resulted. It was gross negligence and willful and wanton misconduct within the meaning of M.C.L. § 691.1407(2), and it was the proximate cause of JOHN JENUWINE's injuries and death. Plaintiff pleads in the alternative, as permitted by Fed. R. Civ. P. 8(d), that Defendant CUSO's conduct was the proximate cause of JOHN JENUWINE's death, in that the bullet that killed him was, on information and belief, fired by Defendant CUSO, who fired more rounds than any other deputy, and in that Defendant CUSO's failure to obtain medical aid was the one most immediate, efficient and direct cause of a death that prompt care would have prevented. Defendant CUSO is not entitled to governmental immunity.

267. Plaintiff is entitled to all damages allowed under the Michigan Wrongful Death Act, M.C.L. § 600.2922, including conscious pain and suffering, loss of society and companionship, medical, funeral and burial expenses, and loss of financial support.

WHEREFORE, Plaintiff, ESTATE OF JOHN JENUWINE, deceased, by LARRY JENUWINE, Personal Representative, asks the Court to enter judgment in his favor and against Defendants, jointly and severally, for all damages recoverable under the Michigan Wrongful Death Act, M.C.L. § 600.2922, in an amount exceeding $75,000, plus interest, costs, and attorney fees.

## COUNT XII

## STATE LAW — GROSS NEGLIGENCE AND WILLFUL AND WANTON MISCONDUCT

## DEFENDANT DEPUTY VON HEATH

268. Plaintiff incorporates all prior allegations by reference.

269. This Count is directed to Defendant HEATH's grossly negligent conduct apart from the intentional shooting of JOHN JENUWINE, which is pleaded as assault and battery in Count XVIII.

270. Defendant HEATH owed JOHN JENUWINE a duty to act reasonably and lawfully, to avoid unnecessary, excessive and deadly force, and to render and obtain medical aid for a person subjected to force.

271. Defendant HEATH breached those duties, including by:

a. Initiating and continuing a felony-level pursuit after personally confirming and broadcasting that the driver was one white male, and after seeing that the object in the driver's hand was a bottle;

b. Failing to broadcast to the other deputies, the supervisors or dispatch that the driver did not match the description and that the object he had seen was a bottle;

c. Rushing a disabled, overturned van on foot with his pistol drawn, in the dark, seconds after a rollover, instead of containing it from cover as required by Sheriff's Office policy;

d. Failing to give JOHN JENUWINE any time to respond to commands before firing;

e. Taking a firing position that put fellow deputies in a crossfire;

f. Failing to render or obtain medical aid for JOHN JENUWINE after shooting him, and failing, for the two hours the scene was run as a "barricaded gunman," to tell anyone that the "shotgun" was in all likelihood a bottle;

g. Failing to intervene to stop fellow deputies from using excessive and deadly force;

h. Any additional acts or omissions revealed in discovery.

272. Defendant HEATH's conduct was so reckless as to demonstrate a substantial lack of concern for whether an injury resulted. It was gross negligence and willful and wanton misconduct within the meaning of M.C.L. § 691.1407(2), and it was the proximate cause of JOHN JENUWINE's injuries and death. Plaintiff pleads in the alternative, as permitted by Fed. R. Civ. P. 8(d), that Defendant HEATH's conduct was the proximate cause of JOHN JENUWINE's death, in that the bullet that killed him was, on information and belief, fired by Defendant HEATH, and in that Defendant HEATH's silence about the bottle, and his failure to obtain medical aid, were the one most

immediate, efficient and direct cause of a death that prompt care would have prevented. Defendant HEATH is not entitled to governmental immunity.

273. Plaintiff is entitled to all damages allowed under the Michigan Wrongful Death Act, M.C.L. § 600.2922, including conscious pain and suffering, loss of society and companionship, medical, funeral and burial expenses, and loss of financial support.

WHEREFORE, Plaintiff, ESTATE OF JOHN JENUWINE, deceased, by LARRY JENUWINE, Personal Representative, asks the Court to enter judgment in his favor and against Defendants, jointly and severally, for all damages recoverable under the Michigan Wrongful Death Act, M.C.L. § 600.2922, in an amount exceeding $75,000, plus interest, costs, and attorney fees.

## COUNT XIII
## STATE LAW — GROSS NEGLIGENCE AND WILLFUL AND WANTON MISCONDUCT
## DEFENDANT DEPUTY GABRIEL BECHTOL

274. Plaintiff incorporates all prior allegations by reference.

275. This Count is directed to Defendant BECHTOL's grossly negligent conduct apart from the intentional shooting of JOHN JENUWINE, which is pleaded as assault and battery in Count XVIII.

276. Defendant BECHTOL owed JOHN JENUWINE a duty to act reasonably and lawfully, to avoid unnecessary, excessive and deadly force, to report

accurately what he observed, and to render and obtain medical aid for a person subjected to force.

277. Defendant BECHTOL breached those duties, including by:

a. Rushing a disabled, overturned van on foot with his pistol drawn, in the dark, seconds after a rollover, instead of containing it from cover as required by Sheriff's Office policy;

b. Failing to give JOHN JENUWINE any time to respond to commands before firing;

c. Moving to the side of the van and firing from a position that put his fellow deputies in a crossfire, as he himself recognized by yelling "crossfire";

d. Reporting, falsely and recklessly, within minutes of the shooting, that JOHN JENUWINE was "armed with a shotgun" and had "stood up with the shotgun in the window," a report on the strength of which the scene was run as a barricade and medical aid was withheld from JOHN JENUWINE until he was dead;

e. Failing to render or obtain medical aid for JOHN JENUWINE after shooting him, while watching and narrating his movements and hearing him yell;

f. Failing to intervene to stop fellow deputies from using excessive and deadly force;

g. Any additional acts or omissions revealed in discovery.

278. Defendant BECHTOL's conduct was so reckless as to demonstrate a substantial lack of concern for whether an injury resulted. It was gross negligence and willful and wanton misconduct within the meaning of M.C.L. § 691.1407(2), and it was the proximate cause of JOHN JENUWINE's injuries and death. Plaintiff pleads in the alternative, as permitted by Fed. R. Civ. P. 8(d), that Defendant BECHTOL's conduct was the proximate cause of JOHN JENUWINE's death, in that his false "shotgun" report was the one most immediate, efficient and direct cause of the decision to withhold medical aid from a man whose wound was survivable with prompt care. Defendant BECHTOL is not entitled to governmental immunity.

279. Plaintiff is entitled to all damages allowed under the Michigan Wrongful Death Act, M.C.L. § 600.2922, including conscious pain and suffering, loss of society and companionship, medical, funeral and burial expenses, and loss of financial support.

WHEREFORE, Plaintiff, ESTATE OF JOHN JENUWINE, deceased, by LARRY JENUWINE, Personal Representative, asks the Court to enter judgment in his favor and against Defendants, jointly and severally, for all damages recoverable

under the Michigan Wrongful Death Act, M.C.L. § 600.2922, in an amount exceeding $75,000, plus interest, costs and attorney fees.

**COUNT XIV**

**STATE LAW — GROSS NEGLIGENCE AND WILLFUL AND WANTON MISCONDUCT**

**DEFENDANT DEPUTY JONATHAN EARLEY**

280. Plaintiff incorporates all prior allegations by reference.

281. Defendant EARLEY owed JOHN JENUWINE a duty to act reasonably and lawfully, to avoid unnecessary, excessive and deadly force, and to render and obtain medical aid for a person subjected to force.

282. Defendant EARLEY breached those duties, including by:

a. Urging and directing Defendant GOMBOS to ram the van, "get him, get him," yelling "fuck you, you piece of shit," and telling him when to execute the ram;

b. Failing to intervene to stop the ramming and PIT maneuver, including during the twenty-eight seconds between "finish this" and the PIT maneuver;

c. Approaching the overturned van with his weapon drawn instead of calling for containment and de-escalation;

d. Failing to intervene to stop fellow deputies from firing;

e. Failing to render or obtain medical aid for JOHN JENUWINE for nearly two hours while he was known to be alive and wounded;

f. Any additional acts or omissions revealed in discovery.

283. Defendant EARLEY's conduct was so reckless as to demonstrate a substantial lack of concern for whether an injury resulted. It was gross negligence and willful and wanton misconduct within the meaning of M.C.L. § 691.1407(2), and it was the proximate cause of JOHN JENUWINE's injuries and death. Defendant EARLEY is not entitled to governmental immunity.

284. Plaintiff is entitled to all damages allowed under the Michigan Wrongful Death Act, M.C.L. § 600.2922, including conscious pain and suffering, loss of society and companionship, medical, funeral and burial expenses, and loss of financial support.

WHEREFORE, Plaintiff, ESTATE OF JOHN JENUWINE, deceased, by LARRY JENUWINE, Personal Representative, asks the Court to enter judgment in his favor and against Defendants, jointly and severally, for all damages recoverable under the Michigan Wrongful Death Act, M.C.L. § 600.2922, in an amount exceeding $75,000, plus interest, costs, and attorney fees.

## COUNT XV
## STATE LAW — GROSS NEGLIGENCE AND WILLFUL AND WANTON MISCONDUCT
## DEFENDANT SERGEANT THOMAS PENNINGTON

285. Plaintiff incorporates all prior allegations by reference.

286. Defendant PENNINGTON owed JOHN JENUWINE a duty to act reasonably and lawfully, to supervise and control the pursuit and the deputies under his command, to avoid unnecessary, excessive, and deadly force, and to render and obtain medical aid for a person subjected to force.

287. Defendant PENNINGTON breached those duties, including by:

a. Failing, as supervising sergeant, to exercise any control over the pursuit after consulting the pursuit directive, and instead "paralleling" it;

b. Failing to terminate the pursuit after the deputies confirmed JOHN JENUWINE did not match the dispatched description;

c. Failing to forbid the ramming and PIT maneuver after hearing the ramming reported and hearing Defendant GOMBOS announce he would "finish this";

d. Directing and participating in a two-hour "barricade" operation against a wounded, unarmed man rather than directing medical aid to him, while knowing and saying that the man was "kicking his feet around";

e. Failing to intervene to stop fellow deputies from using excessive and deadly force;

f. Any additional acts or omissions revealed in discovery.

288. Defendant PENNINGTON's conduct was so reckless as to demonstrate a substantial lack of concern for whether an injury resulted. It was gross negligence and willful and wanton misconduct within the meaning of M.C.L. § 691.1407(2), and it was the proximate cause of JOHN JENUWINE's injuries and death. Defendant PENNINGTON is not entitled to governmental immunity.

289. Plaintiff is entitled to all damages allowed under the Michigan Wrongful Death Act, M.C.L. § 600.2922, including conscious pain and suffering, loss of society and companionship, medical, funeral and burial expenses, and loss of financial support.

WHEREFORE, Plaintiff, ESTATE OF JOHN JENUWINE, deceased, by LARRY JENUWINE, Personal Representative, asks the Court to enter judgment in his favor and against Defendants, jointly and severally, for all damages recoverable under the Michigan Wrongful Death Act, M.C.L. § 600.2922, in an amount exceeding $75,000, plus interest, costs and attorney fees.

## COUNT XVI

## STATE LAW — GROSS NEGLIGENCE AND WILLFUL AND WANTON MISCONDUCT

## DEFENDANT DEPUTY BRYAN TRIPP

290. Plaintiff incorporates all prior allegations by reference.

291. Defendant TRIPP owed JOHN JENUWINE a duty to act reasonably and lawfully, to communicate to fellow deputies and supervisors the material facts he learned, to avoid unnecessary, excessive and deadly force, and to render and obtain medical aid for a person subjected to force.

292. Defendant TRIPP breached those duties, including by:

a. Having interviewed the only eyewitness, with his body camera running, and learned that there was one man in the van, that he could not be described, and that no gun had been seen, failing to broadcast that information to the pursuing deputies, the supervisors or dispatch before or during the pursuit;

b. Continuing and assisting a felony-level pursuit after learning JOHN JENUWINE did not match the dispatched description;

c. Failing to intervene to stop the ramming and PIT maneuver;

d. Approaching the overturned van with his weapon drawn instead of calling for containment and de-escalation;

e. Failing to intervene to stop fellow deputies from firing;

f. Failing to render or obtain medical aid for JOHN JENUWINE for nearly two hours while he was known to be alive and wounded, and instead, while JOHN lay bleeding, calling the eyewitness "to get a better statement";

g. Any additional acts or omissions revealed in discovery.

293. Defendant TRIPP's conduct was so reckless as to demonstrate a substantial lack of concern for whether an injury resulted. It was gross negligence and willful and wanton misconduct within the meaning of M.C.L. § 691.1407(2), and it was the proximate cause of JOHN JENUWINE's injuries and death. Defendant TRIPP is not entitled to governmental immunity.

294. Plaintiff is entitled to all damages allowed under the Michigan Wrongful Death Act, M.C.L. § 600.2922, including conscious pain and suffering, loss of society and companionship, medical, funeral and burial expenses, and loss of financial support.

WHEREFORE, Plaintiff, ESTATE OF JOHN JENUWINE, deceased, by LARRY JENUWINE, Personal Representative, asks the Court to enter judgment in his favor and against Defendants, jointly and severally, for all damages recoverable under the Michigan Wrongful Death Act, M.C.L. § 600.2922, in an amount exceeding $75,000, plus interest, costs, and attorney fees.

## COUNT XVII
## STATE LAW — GROSS NEGLIGENCE AND WILLFUL AND WANTON MISCONDUCT
## DEFENDANT SERGEANT SAMUEL WALLACE

295. Plaintiff incorporates all prior allegations by reference.

296. Defendant WALLACE owed JOHN JENUWINE a duty to act reasonably and lawfully, to supervise and control the pursuit and the deputies on the scene, to avoid unnecessary, excessive and deadly force, and to render and obtain medical aid for a person subjected to force.

297. Defendant WALLACE breached those duties, including by:

a. Failing, as a command officer with authority over the pursuit, to terminate it after the deputies confirmed JOHN JENUWINE did not match the dispatched description, and failing to coordinate his own stop-stick deployment with the pursuing units so that the van would be stopped by tire deflation rather than by ramming;

b. Failing to forbid the ramming and PIT maneuver after hearing the ramming reported and hearing Defendant GOMBOS announce he would “finish this”;

c. Arriving at the scene within three minutes of the shooting, while JOHN JENUWINE was alive and moving, and requesting a SWAT and negotiation response rather than directing medical aid to him;

d. Asking whether there had been "any movement," being told there had, and directing no one to reach the wounded man;

e. Directing and participating in a two-hour "barricade" operation against a wounded, unarmed man rather than directing medical aid to him;

f. Any additional acts or omissions revealed in discovery.

298. Defendant WALLACE's conduct was so reckless as to demonstrate a substantial lack of concern for whether an injury resulted. It was gross negligence and willful and wanton misconduct within the meaning of M.C.L. § 691.1407(2), and it was the proximate cause of JOHN JENUWINE's injuries and death. Defendant WALLACE is not entitled to governmental immunity.

299. Plaintiff is entitled to all damages allowed under the Michigan Wrongful Death Act, M.C.L. § 600.2922, including conscious pain and suffering, loss of society and companionship, medical, funeral and burial expenses, and loss of financial support.

WHEREFORE, Plaintiff, ESTATE OF JOHN JENUWINE, deceased, by LARRY JENUWINE, Personal Representative, asks the Court to enter judgment in his favor and against Defendants, jointly and severally, for all damages recoverable under the Michigan Wrongful Death Act, M.C.L. § 600.2922, in an amount exceeding $75,000, plus interest, costs and attorney fees.

## COUNT XVIII
## STATE LAW — ASSAULT AND BATTERY
## DEFENDANTS CUSO, HEATH, BECHTOL AND GOMBOS

300. Plaintiff incorporates all prior allegations by reference.

301. Defendants CUSO, HEATH and BECHTOL intentionally shot JOHN JENUWINE. Defendant GOMBOS intentionally rammed and then flipped the van JOHN JENUWINE was in. Each was an intentional, harmful and offensive touching of JOHN JENUWINE's person, and each placed JOHN JENUWINE in reasonable apprehension of an imminent harmful contact.

302. The force used was not reasonable or necessary under the circumstances, and no privilege justified it. A police officer's privilege to use force extends only to force that a reasonable officer would believe necessary; force used against an unarmed man lying on the floor of a wrecked van, or against a stopped or faltering van in an empty lot and an empty street, is outside it. These Defendants acted in bad faith and with malice, and they are not entitled to governmental immunity.

303. These intentional acts caused JOHN JENUWINE's injuries and death, and Plaintiff is entitled to all damages allowed under M.C.L. § 600.2922.

WHEREFORE, Plaintiff, ESTATE OF JOHN JENUWINE, deceased, by LARRY JENUWINE, Personal Representative, asks the Court to enter judgment in his favor and against Defendants, jointly and severally, for all damages recoverable

under the Michigan Wrongful Death Act, M.C.L. § 600.2922, in an amount exceeding $75,000, plus interest, costs, and attorney fees.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all claims so triable.

Dated: September 25, 2026

Respectfully submitted,

By: /s/ Todd F. Flood
Todd F. Flood (P58555)
FLOOD LAW, PLLC
Attorneys for Plaintiff
155 W. Congress, Suite 350
Detroit, MI 48226
(248) 547-1032

## CERTIFICATE OF SERVICE

I hereby certify that on September 25, 2026, I served the foregoing First Amended Complaint and Jury Demand on all parties or their counsel of record by filing with the Court's CM/ECF system in accordance with the Federal Rules of Civil Procedure.

Dated: September 23, 2026

Respectfully submitted,

By: /s/ Todd F. Flood
Todd F. Flood (P58555)
FLOOD LAW, PLLC
Attorneys for Plaintiff
155 W. Congress, Suite 350
Detroit, MI 48226
(248) 547-1032