# Washtenaw County Sheriff's Office

## General Order

## Subject Control/Use of Force

## Reference Number: 3.04 GO

Jerry L. Clayton, Sheriff

| | |
|---|---|
| **Subject:** | **Subject Control/Use of Force** |
| **Chapter:** | **Use of Force/Firearms** |
| **Status:** | **Revised 2/26/24** |
| **Compliance:** | **Class 1** |
| **Supersedes:** | **All Previous Directives** |
| **Standards Reference:** | **United States Constitution, United States Bill of Rights** |
| **Prepared by:** | **Kurt Schiappacasse, Commander, Lt. Chad Teets** |
| **Reviewed by:** | **Commander Kurt Schiappacasse, Captain Nancy Hansen and Lt. Chad Teets** |
| **Issued by:** | **Mark Ptaszek, Undersheriff** |
| **Issuing Authority:** | **Jerry L. Clayton, Sheriff** |
| **Date of Issue:** | **April 6, 2022** |
| **Public Facing:** | **Yes** |

The mission of the Sheriff's Office is to create public safety, provide quality service, and build strong and sustainable communities. In accordance with our mission and the law enforcement officer code of ethics, employees are expected to treat all whom they are sworn to serve with courtesy, professionalism, dignity, and respect while providing the highest quality of service in their daily interactions with the community.

This document establishes policies and reporting procedures regarding subject control and the use of force. It builds upon the Supreme Court's broad principles in Graham v. Connor (1989) 490 U.S. 386 and establishes a higher level of expectations than the constitutional standard and state law. Its purpose is to guide employee decision-making regarding the use and application of force to ensure that such applications are used only when necessary to effect arrest, lawful detention, or to legitimately bring a situation under control, thereby supporting the Sheriff's Office in achieving its mission and its highest priorities.

Sheriff's Office employees shall never employ excessive force. They are expected to exercise sound judgment and critical decision making when considering and using force options. Understanding the fluidity of situations and circumstances they may be facing as an incident occurs, employees will seek voluntary compliance and operate with minimal reliance on the use of force by using rapport- building communication and crisis intervention and de-escalation tactics before resorting to physical means of control. These are key factors in safeguarding the public's trust and maintaining legitimacy with the community.

# Washtenaw County Sheriff's Office

## General Order

## Subject Control/Use of Force

## Reference Number: 3.04 GO

Jerry L. Clayton, Sheriff

Understanding that no policy can predict every situation, the type of techniques and tactics selected should not increase risk to employees or another person and will vary depending upon the circumstance. Each incident is unique.

### I. PURPOSE

A. To establish policy and procedures for the use of force.

B. To designate approved use of force options.

C. To establish the reporting requirements in every instance involving the use of force.

D. To provide for the treatment of any injury or complaint of injury arising from the use of force.

E. To ensure compliance through training and dissemination of this policy and procedure.

### II. SCOPE

This General Order applies to all Sheriff's Office full-time employees, part-time employees, and volunteers trained in, and authorized to use force.

### III. POLICY

A. SAFEGUARDING HUMAN LIFE AND DIGNITY

The authority to use force is a serious responsibility given to Sheriff's Office employees by the people who expect them to exercise that authority judiciously and with respect for equitable treatment, human rights, dignity, and the sanctity of all human life.

B. ESTABLISH COMMUNICATION

Communication with non-compliant subjects is often most effective when Sheriff's Office employees attempt to establish rapport, use the proper voice intonation, ask questions, and provide advice to defuse conflict and achieve voluntary compliance before resorting to force- related subject control options.

C. DE-ESCALATION

Sheriff's Office employees shall employ de-escalation techniques throughout the encounter and provide repeated verbal warnings in order to decrease the likelihood of the need to use force and to increase the likelihood of voluntary compliance in situations where they can do so safely, without increasing risk to themselves or another person. Moreover, Sheriff's Office employees shall attempt to understand and consider the possible reasons why a subject may be noncompliant or resisting attempts to gain compliance.

A subject may not be capable of understanding the situation because of:

1. Environmental factors
2. Medical condition(s) i.e., mental, physical, or hearing impairment
3. Language barrier
4. Drug interaction
5. Emotional crisis
6. Those who have no criminal intent

These situations may not make the subject any less dangerous but understanding a subject's condition may enable employees to calm the subject and to allow for the use of de-escalation techniques while maintaining the safety of the public and the employee(s). Employees who act to de-escalate an incident, which can reasonably delay taking a subject into custody, while keeping the public and employees safe, will not be found to have neglected their duty. This act helps to fulfill a service priority of the agency.

Employees shall strive to gain voluntary compliance and use the minimum amount of force necessary to accomplish their lawful purpose.

**Special Note:**

Employees shall continue to use de-escalation techniques after initiating, or being witness to, a use of force incident. The level of force shall be de-escalated immediately as the level of resistance encountered decreases, provided that the employee remains in control and as safety permits.

Employees shall continue to use de-escalation techniques after initiating, or being witness to, a use of force incident. The level of force shall be de-escalated immediately as the level of resistance encountered decreases, provided that the employee remains in control and as safety permits.

D. PROPORTIONALITY

When determining the appropriate level of force, employees shall balance the severity of the offense committed and the level of resistance encountered based on the totality of the circumstances known to, or perceived by, the employee at the time. It is particularly important that employees apply proportionality and critical decision making when encountering a subject who is armed with a weapon other than a firearm, i.e., an edged weapon or a weapon of opportunity.

1. The totality of circumstances must be considered. The question is whether the officer's actions are objectively reasonable in light of all the facts and circumstances confronting the officer, at the time the subject control tactic is used. The term objectively reasonable refers to Graham v. Connor 490 U.S. 386 (1989), a case heard by the United States Supreme Court. Graham v. Connor held that determining the reasonableness of a seizure requires a careful balancing of the nature and quality of the intrusion on the individual against the attempt at 'countervailing' and under the guise of governmental interests, being at stake. The Supreme Court went on to list the factors for balancing an individual's rights against the law enforcement officers. The list is specific:

    a) What was the severity of the crime?

    b) Did the suspect pose an immediate threat to the safety of the officers or the public?

    c) Was the suspect actively resisting arrest or attempting to evade arrest by flight?

    d) Were the officer's actions reasonable for other officers with similar training and experience?

**Special Note:**

It is important to note that the Supreme Court found that the use of force should be judged from the perspective of a reasonable officer on the scene, not with the 20/20 benefit of hindsight. In most excessive force claims, the question of fact is whether the officer's actions are reasonable considering all the facts and circumstantial considerations confronting him/her at the time of the incident.

2. Circumstantial considerations include, but are not limited to:
    a) The type of crime committed or attempted.
    b) Relative size/stature of both the employee and the subject.
    c) Exigent conditions.
    d) Number of employees.
    e) Number of subjects involved.
    f) Availability of back up.
    g) Reaction time.
    h) Relative strength.
    i) Subject(s) access to weapons.
    j) Subject(s) under the influence of alcohol or drugs.
    k) Exceptional abilities/skills (i.e. martial arts).
    l) Injury to or exhaustion of the officer.
    m) Weather or terrain conditions.
    n) Immediacy of danger.
    o) Distance from the subject.
    p) Special knowledge (i.e., subject's prior history of violence, etc.).
3. The degree of force used must be balanced against the certainty of an individual's involvement in a crime.
4. The immediate need for an employee to protect themselves, or others, from physical assault.

5. In all cases, the use of force, especially lethal (deadly) force, must be balanced against the risk of injury to innocent persons. By way of example, the risk of injury to innocent persons would need to be considered when deciding force or control options in a busy sports arena.

6. In arrest situations or where a need to preserve or restore order exists, the use of force must be weighed against the consequence of failing to use sufficient force, i.e., the dangers of escape or allowing the situation to continue unchecked.

7. Situations may occur where certain, immediate, and drastic measures must be undertaken by an employee as a last resort to protect human life. Force used in these situations may involve the use of techniques or weapons not specifically authorized by policy (e.g., neck restraint in deadly force encounters, striking with flashlight or vehicle, etc.).

8. Employees are prohibited from using force against persons in restraints, i.e., handcuffs and leg irons, except as objectively reasonable to prevent imminent bodily harm to the employee(s) or another person, to overcome active resistance, or where physical removal, i.e., lifting a person, is necessary to overcome passive resistance.

9. Unless actively engaged in a situation where s/he has no other option or is otherwise placed in a situation where enforcement action is unavoidable to protect themselves or another person, the employee shall only use force options in which they have been trained. Employees will only carry use of force tools and equipment that are issued and authorized by the Washtenaw County Sheriff's Office.

10. The use of 'warning shots' is prohibited.

11. The control options authorized by the Sheriff's Office are verbal commands, compliance controls (muscling techniques, pressure points, joint manipulation), physical controls (strikes and takedowns), intermediate controls (use of impact devices, police service dog apprehensions, and TASER probe deployments), and deadly force options (firearms and improvised tools of opportunity used in a manner likely to cause death or serious physical injury).

a) Employees will report any use of force technique used to overcome subject resistance in order to gain compliance.

12. Sheriff's Office employees shall only use deadly force only as a last resort when reasonable alternatives have been exhausted or are not possible to protect the safety of the employee(s) or the public.

13. The level of force applied will decrease and increase proportionately to the level of resistance encountered.

E. MANDATORY MEDICAL EVALUATION

Medical evaluation is mandatory for subjects that have been exposed to ASR, Physical Control(s), TASER deployments, impact device strikes, police service dog apprehensions, all other forms of Intermediate Control, and Deadly Force. Medical evaluation is also mandatory for subjects who complain of injury, when an employee observes an injury, or where a reasonable officer believes that an injury may have a delayed introduction, such as a subject falling and hitting a vital area.

The decision for treatment options rests on Command Officers and will be based on the totality of the circumstances at the time of the incident.

F. CRISIS INTERVENTION

When it is safe to do so without increasing risk to the public or another person, employees trained in crisis intervention shall respond to calls for service, wherever possible, involving individuals in mental or behavioral health crisis.

G. DUTY TO INTERVENE AND PROVIDE AID

Except in extraordinary circumstances, Sheriff's Office employees shall intervene on a person's behalf when they know or have reason to know, that another law enforcement officer is about to use, or is using, force that is excessive or is otherwise in violation of this policy.

This duty prevails regardless of rank or agency affiliation. Employees shall report any use of unnecessary force and the efforts made to intervene to a supervisor as soon as practical. If the witnessing employee is a supervisor, s/he will issue a

direct order to stop the violation. Further, employees have the duty to provide aid to the victim.

H. FAIR AND UNBIASED POLICING

Employees shall carry out their duties, including the use of force, in a manner that is fair and unbiased.

I. CHEMICAL IMPAIRMENT

Employees of the Sheriff's Office will not carry a firearm or any other control tools, E.g., ECD or ASR, after consuming alcohol or any other substance that would render him/her as being impaired.

## IV. DEFINITIONS

A. ACTIVE AGGRESSION

Subject is aggressive or combative; attempting to assault the officer or another person, verbally or physically displays an intention to assault the officer or another person. Examples include but are not limited to lunging toward the officer, striking the officer with hands, fists, kicks, or any instrument that may be perceived as a weapon. It is reasonable to expect that active aggression causes an imminent threat to the officer or the public.

B. ACTIVE RESISTANCE

Subject exhibits physically evasive movements to defeat an officer's attempt at control. Examples of active resistance include, but are not limited to, bracing, tensing, running away, verbally or physically signaling an intention to avoid or prevent being taken into or retained in custody. Active resistance generally does not cause an intentional imminent threat to the safety of the officer or the public.

C. COMPLIANCE CONTROL

Muscling techniques, using touch pressure on nerve centers (pressure points), joint manipulation (wrist locks), and applying hand or leg restraints in conjunction with muscling techniques.

D. COMPLIANT

Subject offers no resistance and complies with officer direction(s). Compliant subjects are not an imminent threat to the safety of the officer or the public.

E. CONSTITUTIONAL STANDARD

Graham v. Connor, 490 U.S. 386 (1989)

Tennessee v. Garner 471 U.S. 1 (1985)

The United States Supreme Court Case Graham v. Connor, 490 U.S. 386 (1989), and other subsequent cases have established that an officer's right to make an arrest or investigatory stop necessarily carries with it the right to use physical coercion or threat thereof to affect it. An employee's use of force is considered a seizure under the 4th Amendment and must therefore be objectively reasonable when analyzed under the "Objective Reasonableness" standard as defined above. In Tennessee v. Garner, 471 U.S. 1 (1985), the Supreme Court held that under the 4th Amendment, a police officer may not use deadly force to prevent the escape of a fleeing suspect unless the officer has probable cause to believe the suspect poses a significant threat of death or serious physical injury to the officer or others.

F. CONTROL

The method(s) an employee uses to neutralize the unlawful actions of a subject, or to protect the subject from injuring themselves or others.

**Special Note:**

Not all means of control is force. By way of example but not limitation, compliantly escorting, holding, guiding, or placing restraints on a subject (including an emergency restraint chair) would constitute a means of control, not force if used according to training and policy.

G. CRISIS

Situation in which an individual is exhibiting extreme emotional disturbance or behavioral distress, considering harm to self or others, disoriented or out of touch with reality, has a compromised ability to function, or is otherwise agitated and unable to be calmed.

H. DEADLY FORCE

Any use of force likely to cause death or serious physical injury, including the use of a firearm, neck holds and neck restraints, or strike to the head, neck, clavicle, or throat with a hard object.

I. DEADLY FORCE ASSAULT

Any subject action likely to result in serious bodily injury or death of the officer or another person. A deadly force assault causes an imminent life-safety concern for the officer or the public.

J. EMPLOYEES

All Sheriff's Office employee classifications, full-time, part-time, or volunteers trained in, and authorized to use force.

K. EXTRAORDINARY CIRCUMSTANCE

Circumstances that are beyond what is usual, ordinary, regular, or established. Understanding that no policy can predict every circumstance that an employee may encounter, in the absence of clear policy parameters the employee's intended actions shall be to further the Mission of the Sheriff's Office – Public Safety, Quality Service, and to Build Strong and Sustainable Communities.

L. FORCE OPTIONS

Deployment tactics utilizing a layer of force measures. The layered response can range from employees' presence to lethal force. Force options may be used as a team response where employees are working in concert with one another through various force measures. This style of deployment allows the options to fluidly escalate and deescalate the force response.

M. IMMEDIATE THREAT

Considered to exist when it is objectively reasonable to conclude that a person's actions are likely to cause death or great bodily harm to the employee or another person without intervention. To be considered an immediate threat, the employee reasonably believes the person has the present intent, means, opportunity, and ability to complete the threat regardless of whether the threatened action has been initiated.

N. IMMINENT THREAT

Considered to exist when it is objectively reasonable to conclude that a person's impending actions are likely to cause death or great bodily injury unless action is taken. To be considered an imminent threat, the employee reasonably believes the person has the present intent, means, opportunity, and ability to complete the threat regardless of whether the threatened action has been initiated.

O. IMPAIRED

An employee shall not carry a firearm or portable device that uses electro-muscular disruption (EMD) technology while under the influence of alcoholic liquor or a controlled substance or while having a bodily alcohol content of .02 BAC or above.

P. INACTIVE RESISTANCE

Subject does not attempt to defeat officer's effort(s) to gain compliance. Examples of inactive resistance include, but are not limited to, blank stare, or clenching the muscles of the jaw. Inactive resistance generally does not cause an imminent threat to the safety of the officer or the public.

Q. INTERMEDIATE CONTROL

Intermediate control poses a foreseeable risk of injury or harm but is neither likely nor intended to cause death. A level of force used to compel compliance that while less severe than lethal force, nonetheless, presents a significant intrusion upon an individual's rights. Intermediate control has

the potential to, but is not intended to, nor likely to, but may under certain circumstances, cause serious physical injury or death.

R. MINIMAL AMOUNT OF FORCE NECESSARY

The lowest level of force within the range of objectively reasonable force that is necessary to affect an arrest or achieve a lawful objective without increasing the risk to others.

S. OBJECTIVELY REASONABLE FORCE

The test by which courts will evaluate force used to affect an arrest or protect the officer or other persons. This standard that courts will use to examine whether a use of force is constitutional and justifiable was first set forth in Graham v. Connor, 490 U.S. 386 (1989) and expanded by subsequent court cases. This is based on a totality of the circumstances and the facts known to the officer at the time of the incident. Courts will evaluate the reasonableness of an officer's use of force from the perspective of the reasonable officer on-scene at the time of the action rather than with 20/20 hindsight. The United States Supreme Court recognized that courts must make some allowance for the fact police officers are often forced to make split second decisions with limited information in situations which are tense, uncertain, and rapidly evolving.

T. OFFICER PRESENCE

Law enforcement officer(s) being present at a scene.

U. PASSIVE RESISTANCE

Subject does not physically attempt to defeat officer's effort(s) to gain compliance but does not follow direction(s) given. Examples of passive resistance include, but are not limited to, failing to comply with instructions (i.e., direction to exit a vehicle), or by becoming 'dead-weight', thus necessitating the officer(s) to physically lift a subject, and so-on. Passive resistance generally does not cause an imminent threat to the safety of the officer or the public.

V. PERSONAL BODY TOOLS

An employee's use of his/her body parts, including (but not limited to) hand, foot, knee, elbow, shoulder, hip, arm, leg or head by means of high velocity kinetic energy transfer (impact) to gain control of a subject, i.e., strikes or kicks.

W. PHYSICAL CONTROL

Physical Controls, such as control holds, takedowns, strikes to muscle masses with personal body tools, and other similar techniques are designed to gain compliance of and/or control over actively resisting subjects. Physical controls are not intended, or likely to, cause permanent injury.

X. REASONABLE FORCE

An objective standard of force viewed from the perspective of a reasonable officer, without the benefit of 20/20 hindsight, based on the totality of the circumstances known to, or perceived by, the officer at the time of the incident.

Y. REPORTABLE FORCE

Any use of force technique used by an employee to overcome subject resistance in order to gain compliance.

Z. SERIOUS BODILY INJURY

Serious impairment of physical condition including, but not limited to, loss of consciousness, concussion, bone fracture, temporary impairment of function of any bodily member or organ, a wound requiring extensive suturing, and serious disfigurement.

AA. SERIOUS PHYSICAL INJURY

Creates a substantial risk of death, causes death or serious injury, protracted disfigurement, or impairment of the function of any bodily organ or limb.

BB. SHOW OF FORCE

Pointing or displaying a defensive weapon at a person, in preparation to make it ready, should the use of force become necessary. Examples of the display of a defensive weapon could include, but not be limited to the removal of a weapon from its holster/storage container, the shaking of an OC canister, the expanding of a baton, arcing of the electronic control device or projecting the device's laser beam.

A Show of Force form shall be completed if the tool displayed achieved the desired lawful objective without force being used.

CC. USE OF FORCE

The completed use of a defensive weapon as it was intended or designed. The application of physical techniques as listed in this policy, or any other means used to defend, restrain, overcome, or otherwise gain physical control of a person. Some examples of a completed use of a defensive weapon include: the spraying of OC at an individual, the striking of an individual with an ASP baton, or discharging an electronic control device at an individual.

DD. VERBAL/PSYCHOLOGICAL INTIMIDATION

Subject does not physically attempt to defeat officer's effort(s) to gain compliance but becomes, or remains, verbally abusive towards an officer. An example of verbal/psychological intimidation includes, but is not limited to, yelling at or insulting an officer. Verbal or psychological resistance generally does not cause an imminent threat to the safety of the officer or the public.

EE. VERBAL DIRECTION

Any verbal request or instruction that a law enforcement officer states to a person.

FF. VITAL AREAS OF THE BODY

Head, neck, face, throat, spine, groin and kidney.

## V. GENERAL REQUIREMENTS AND EXPECTATIONS GOVERNING ALL SUBJECT CONTROL SITUATIONS

A. USE OF FORCE MUST BE FOR A LAWFUL PURPOSE

Employees may use reasonable force options in the performance of their duties, in the following circumstances:

1. To effect a lawful arrest, detention, or search.
2. To overcome resistance or to prevent escape.
3. To prevent the commission of a public offense.
4. In defense of others or in self-defense.
5. To gain compliance with a lawful order.
6. To prevent a person from injuring himself/herself. However, an officer is prohibited from using lethal force against a person who presents only a danger to himself/herself and does not pose an immediate threat of death or serious bodily injury to another person or officer.
7. Employees must not engage in unreasonable actions or tactics that precipitate the use of force, or that unduly jeopardize their own safety or the safety of others. Employees shall not use force to attempt to achieve compliance with a command that is unlawful.

B. USE OF FORCE EVALUATION - Determining when to employ objectively reasonable force.

The United States Supreme Court in Graham v. Connor (1989) 490 U.S. 386 held that an officer's use of force must be objectively reasonable under the totality of circumstances known to the officer at the time of the incident. The 'reasonableness' inquiry in reviewing use of force is an objective one: the question is whether the employee's actions are objectively reasonable in light of the facts and circumstances they are confronting. The employee's perception will be a consideration, along with other objective factors that may affect the reasonableness of the employed tactic. Common factors considered by the court are 'Graham Factors':

1. The severity of the crime at issue.

2. Whether the suspect posed an immediate threat to the safety of the employee or others.

3. Whether the suspect is actively resisting arrest or attempting to evade arrest by flight.

This policy builds upon the broad principles in Graham by adding additional factors upon which an employee's subject control tactic shall be evaluated. These standards are more conservative than the constitutional standard and state law. Employees must strive to gain voluntary compliance and use the minimal amount of force necessary without increasing risk to themselves or another person.

1. The reasonableness of a particular use of force must be judged from the perspective of a reasonable criminal justice professional on the scene, rather than 20/20 hindsight, and without regard to the employee's underlying intent and motivation. The reasonableness must account for the fact that employees are often forced to make split-second judgments and decisions, in circumstances that are tense, uncertain and rapidly evolving.

2. Factors for evaluating the use of force include but are not limited to:
   a) Whether the use of force is proportional to the threat.
   b) The availability of other feasible, less intrusive force options.
   c) The employee's tactical conduct, decision making processes, and decisions preceding the use of force.
   d) Whether the employee has reason to believe that the subject is mentally ill, has a physical, developmental or cognitive disability, is emotionally disturbed, or is under the influence of alcohol or drugs.
   e) Whether there was an opportunity to provide a warning about the use of force prior to force being used, and if so, was such a warning given.
   f) Whether there was any assessment by the employee of the subject's ability to cease resistance and/or comply with commands.

g) Specialized knowledge, skills, or abilities of subject(s) involved.

h) Prior contact with subject(s) involved.

i) Environmental factors, including but not limited to lighting, footing, sound conditions, crowds, traffic and other hazards.

j) Whether the subject's escape could pose a future safety risk.

**Special Note:**

Not all of the above factors may be present or relevant in a particular situation, and there may be additional factors not listed.

C. EMPLOYING MINIMAL USE OF FORCE TACTICS NECESSARY

When force is necessary and objectively reasonable, employees must strive to use the minimum amount of force necessary in the available range of objectively reasonable options.

Additionally:

1. While deploying a particular force option, employees should continually evaluate whether the force option may be discontinued while still achieving the arrest or lawful objectives.
2. Whether a particular use of force is the minimum amount of force necessary must be objectively judged from the perspective of a reasonable officer on the scene, rather than with 20/20 vision of hindsight. The objective determination of "minimal" must account for the fact that officers are often forced to make split-second judgments, in circumstances that are tense, uncertain, and rapidly evolving.
3. Employees should be prepared to employ various force options to control the person if one particular tactical option is not effective or the circumstances of the encounter change such that the tactical option is no longer reasonable. For example, an employee encountering a subject that shows no change in behavior following an ASR exposure should consider additional options, including disengaging, under a specific set of circumstances.

4. Employees need not start at the lowest level of force in every situation. Before deploying a particular force option, officers should evaluate the array of objectively reasonable options to select an option anticipated to cause the least injury to the subject while achieving the arrest or lawful objectives, understanding that the evaluation process should not increase risk to the employee or another person.

D. DE-ESCALATION

When encountering a non-compliant subject or a subject armed with a weapon other than a firearm, employees shall use the following de-escalation tactics in an effort to reduce the need or degree of force. Accordingly:

1. Gather as much information possible about the incident.
2. Attempt to isolate and contain the subject.
3. Create time and distance from the subject by establishing a buffer zone (reactionary gap) and utilize cover to avoid creating an immediate threat that may require the use of force.
4. Request additional resources, such as Crisis Intervention Team (CIT) trained employees, or Crisis/Hostage Negotiation Team members. Identify employees who may have a rapport with the subject.
5. Designate an officer to establish rapport and engage in communication with the subject.
6. Tactically re-position as often as necessary to maintain the reactionary gap, protect the public, and preserve officer safety.
7. Continue de-escalation techniques, such as advisements, warnings, verbal persuasion, other alternatives, and take as much time as reasonably necessary to resolve the incident, without having to use force if possible.
8. Employees will assess each incident to determine, based on policy, training, and experience, which option is best to achieve a legal outcome and bring the situation under control in a safe and prudent manner.
9. In general, once control of a combative subject is gained and there is no longer an objectively reasonable threat, further use of force is

prohibited. A degree of force which may have been justified earlier in an encounter does not remain justified indefinitely. Force shall be de-escalated proportionately and immediately as resistance decreases.

10. Other options, not listed above, may be available to assist in de-escalating the situation.

**Special Note:**

Supervisors who become aware of a situation where an employee is using de-escalation techniques shall monitor the radio communications and evaluate the need to respond to the scene. Incidents where de-escalation techniques were attempted shall be documented in the employee's report, as applicable. Such a report will include a disposition of the incident, i.e., the officer/supervisor will indicate if the de-escalation techniques attempted were successful.

It should be noted that the use of de-escalation techniques may not be possible in encounters that where employing such tactics would increase the potential of risk to the employee or the public.

E. CRITICAL DECISION-MAKING MODEL

Using a critical decision-making model, employees shall collect information, assess the threats and risk, consider law enforcement powers and the Sheriff's Office's policies, identify options and determine the best course of action. Employees are expected to continually assess the effectiveness of their actions and consider the desired outcome for the level of force used, including where feasible:

1. What can the employee do to de-escalate the situation or to minimize the need for the use of force?
2. Can the employee allow the subject time to submit to arrest before using force?
3. Is the employee using the minimum amount of force necessary to carry out lawful objectives?
4. Is the subject physically or mentally capable of complying with the employee's commands?

5. Does the employee have an opportunity or time to utilize additional resources to bring the situation to a peaceful resolution?
6. What is the severity of the subject's actions and is the risk of injury to either the subject or employee worth achieving the officer's lawful objective?
7. What is the proximity or access of weapons to the subject?
8. What is the time available to an employee to decide and what efforts has s/he made to provide additional time?
9. What are the physical considerations for the employee, E.g., exhaustion or injury during a physical confrontation?
10. Are innocent bystanders present who could be harmed if force is or is not used?
11. Are there hostile bystanders present who may be sympathetic to the subject?
12. When a confrontation escalates suddenly, the employee may use that degree of force necessary to defend themselves or others if the force is objectively reasonable.

F. UNLAWFUL PURPOSES

Michigan statue provides criminal penalties for law enforcement officers who, "Under color of authority, without lawful necessity, assaults or beats any person." An assault and battery committed by employees constitutes gross and unlawful misconduct and will be criminally investigated.

In addition to criminal prosecution, 42 U.S. Code § 1983 provides for civil action to be brought against "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws."

Any employee present and observing another officer using force that a reasonable officer would view as excessive or unnecessary under the circumstances has, when in a position to do so, the duty to safely

intercede to prevent the use of such force. Any employee witnessing, or who is aware of, or otherwise becomes aware of, the application of force that a reasonable officer would view as excessive or unnecessary has the duty to notify a command officer and provide aid to the victim as applicable.

G. SUBJECT(S) ARMED WITH A WEAPON – NOTIFICATION AND COMMAND

In situations where a subject is armed with a weapon, and is displaying unlawful intent, employees shall adhere to the following:

1. Initial Responders:

   Upon being dispatched to, or otherwise encountering, a subject with a weapon, an employee shall notify Metro Dispatch and a supervisor as soon as tactically feasible.

2. Command:

   When notified that employees are dispatched to or otherwise encounter a subject armed with a weapon, a supervisor shall as soon as tactically feasible:

   a) Notify Metro Dispatch, monitor radio communications, respond to the incident.

   b) Notify other responding employees, while en-route (absent an immediate life-safety concern that increases risk to the employee or the public, or other articulable reason why it would be unsafe to do so, i.e., to protect life) isolate and contain the subject, maintain distance, find cover, build rapport, engage in communication without time constraint, and call for appropriate resources, E.g., mental health employees, employees trained in crisis negotiation, or employees with an established rapport with the subject.

   c) Upon arrival, and when appropriate, the supervisor shall assume command, and ensure appropriate resources are on-scene or are responding.

## VI. LEVELS OF RESISTANCE

It should be noted that subjects can enter the below continuum at any level. Additionally, a subject's level of resistance can escalate and de-escalate at any time during an encounter. While deploying a particular force option, employees shall continually evaluate whether the force option may be discontinued while still achieving the arrest or lawful objective. See appendix 1, 'Resistance v. Control Chart' for information regarding levels of resistance encountered versus the level of control that may be used to achieve lawful objectives.

A. Compliant

Subject offers no resistance and complies with officer direction(s). Compliant subjects are not an imminent threat to the safety of the officer or the public.

B. Inactive Resistance

Subject does not attempt to defeat officer's effort(s) to gain compliance. Examples of inactive resistance include, but are not limited to, blank stare, or clenching the muscles of the jaw. Inactive resistance generally does not cause an imminent threat to the safety of the officer or the public.

C. Verbal/Psychological Intimidation

Subject does not physically attempt to defeat officer's effort(s) to gain compliance but becomes, or remains, verbally abusive towards an officer. An example of verbal/psychological intimidation includes, but is not limited to, yelling at or insulting an officer. Verbal or psychological resistance generally does not cause an imminent threat to the safety of the officer or the public.

D. Passive Resistance

Subject does not physically attempt to defeat officer's effort(s) to gain compliance but does not follow direction(s) given. Examples of passive resistance include, but are not limited to, failing to comply with instructions (E.g., direction to exit a vehicle), or by becoming 'dead-weight', thus necessitating the officer(s) to physically lift a subject, and so-on. Passive

resistance generally does not cause an imminent threat to the safety of the officer or the public.

E. Active Resistance

Subject exhibits physically evasive movements to defeat an officer's attempt at control. Examples of active resistance include, but are not limited to, bracing, tensing, running away, verbally or physically signaling an intention to avoid or prevent being taken into or retained in custody. Active resistance generally does not cause an intentional imminent threat to the safety of the officer or the public.

F. Active Aggression

Subject is aggressive or combative; attempting to assault the officer or another person, verbally or physically displays an intention to assault the officer or another person. Examples include, but are not limited to lunging toward the officer, striking the officer with hands, fists, kicks, or any instrument that may be perceived as a weapon. It is reasonable to expect that active aggression causes an imminent threat to the officer or the public.

G. Deadly Force Assault

Any subject action likely to result in serious bodily injury or death of the officer or another person. A deadly force assault causes an imminent life-safety concern for the officer or the public.

## VII. LEVELS OF CONTROL AND CONTROL OPTIONS

Employees shall strive to gain voluntary compliance and use the minimum amount of force necessary to accomplish their lawful purpose. While deploying a particular force option, employees shall continually evaluate whether the force option may be discontinued while still achieving the arrest or lawful objective.

The control options authorized by the Sheriff's Office are verbal commands, compliance controls (muscling techniques, pressure points, joint manipulation), physical controls (strikes and takedowns), intermediate controls (use of impact devices, police service dog apprehensions, and TASER deployments), and

deadly force options (firearms and improvised tools of opportunity used in a manner likely to cause death or serious physical injury).

It should be noted that employees are prohibited from using force against persons in restraints, i.e., handcuffs and leg irons, except as objectively reasonable to prevent bodily harm to the employee(s) or another person, to overcome active resistance, or where physical removal, e.g., lifting a person, is necessary to overcome passive resistance.

**Special Note:**

Medical evaluation is mandatory for subjects that have been exposed to ASR, Physical Control(s), TASER deployments, impact device strikes, police service dog apprehensions, all other forms of Intermediate Control, and Deadly Force. Medical evaluation is also mandatory for subjects who complain of injury, when an employee observes an injury, or where a reasonable officer believes that an injury may have a delayed introduction, such as a subject falling and hitting a vital area.

A. Officer Presence

Law enforcement officer(s) being present at a scene. The mere presence of a uniformed employee may dramatically change a rapidly evolving situation. In some instances the presence of the uniformed employee will suffice in gaining compliance. Conversely, in others, the presence of a uniformed employee may prompt further resistance.

B. Verbal Direction

Any verbal request or instruction that a law enforcement officer states to a person.

C. Compliance Control

Any technique or tactic an employee uses that is neither intended nor likely to cause injury. Examples of Compliance Controls are muscling techniques, using touch pressure on nerve centers (pressure points), joint manipulation (wrist locks), and applying hand or leg restraints in conjunction with muscling techniques. It should be noted that the sole compliant application of restraints is not considered to be force.

D. Aerosol Subject Restraint

Aerosol Subject Restraint (ASR), a chemical agent, is a control option available to employees. ASR does not fall into one particular level of control or force, rather it may be deployed when the employee feels that lower forms of control or force, i.e., solely relying on verbal commands or muscling techniques, will not be sufficient given the level of resistance being encountered.

Purpose of ASR

ASR can be used to subdue an unarmed attacker or to overcome resistance that is otherwise likely to result in injury to either the subject or the employee. ASR devices shall not be brandished as a form of intimidation.

Considerations for the use of ASR

Chemical agents may reduce or eliminate the necessity to use other force options to gain compliance, consistent with Sheriff's Office training. Employees shall provide a warning prior to deploying a chemical agent, if doing so does not increase risk to the employee or another person:

1. Announce a warning to the subject and other employees of the intent to deploy ASR if the subject does not comply with verbal commands.
2. Give the subject a reasonable opportunity to voluntarily comply, unless such an opportunity increases the risk for the employee or another person or permits the subject to undermine the deployment of the ASR.
3. ASR should be deployed in a one (1) to two (2) second burst to the subject's face.

Post ASR deployment considerations.

Any person exposed to a chemical agent shall be medically assessed by emergency medical personnel. Any exposed person shall be kept under direct visual observation until he/she has been medically assessed. If an exposed person loses consciousness or has difficulty breathing, the

employee shall immediately request for emergency medical personnel, render first aid and monitor the subject until relieved by emergency medical personnel. Employees shall notify Metro Dispatch to expedite emergency medical personnel if the person loses consciousness or has difficulty breathing.

Subjects in custody exposed to a chemical agent must be transported in an upright position by two employees if staffing levels allow. The passenger employee shall closely monitor the subject for any signs of distress. If the subject loses consciousness or has difficulty breathing, employees shall immediately seek emergency medical attention. Hobble cords or similar types of restraints shall only be used to secure a subject's legs together. They shall not be used to connect the subject's legs to his/her waist or hands or to a fixed object.

Subjects experiencing, or claiming to be having, difficulty breathing will not be placed on their stomachs. Positional asphyxiation can occur in this position (where the subject's diaphragm is unable to expand, thus s/he is unable to breathe).

ASR deployments by employees shall be reported to a command officer as soon as tactically possible.

See Appendix 8 for additional information regarding ASR.

E. Physical Controls

Physical Controls, such as control holds, takedowns, strikes to muscle masses with personal body tools, and other similar techniques are designed to gain compliance of and/or control over actively resisting subjects. Physical controls are not intended, or likely to, cause permanent injury.

Purpose of Physical Controls

When a subject offers some degree of active resistance to a lawful order or objective, in addition to de-escalation techniques and appropriate communication skills, employees may use physical controls consistent

with Sheriff's Office training to gain compliance. A subject's level of resistance and the threat posed by the subject are important factors in determining what type of physical controls or personal body tools, i.e., strikes, should be used.

Considerations for Using Physical Controls

Employees shall consider the relative size and possible physical capabilities of the subject compared to the size, physical capabilities, skills, and experience of the officer. When faced with a situation that may necessitate the use of physical controls, employees shall consider requesting additional resources to the scene prior to making contact with the subject, as long as such a delay in interception does not increase the risk to the employee or another person.

F. Intermediate Control

Intermediate control poses a foreseeable risk of injury or harm but is neither likely nor intended to cause death. A level of force used to compel compliance that while less severe than lethal force, nonetheless, presents a significant intrusion upon an individual's rights. Intermediate control has the potential to, but is not intended to, nor likely to, but may under certain circumstances, cause serious physical injury or death. Examples of Intermediate Control include Electronic Control Device (ECD) probe deployment(s) or impact device strikes (including baton and less lethal impact munitions (LLIM)).

1. Impact Device

   Impact devices are designed to temporarily incapacitate a subject, not to cause permanent injury. Employees shall have impact devices (baton/LLIM) readily accessible when engaged in activities or assignments that may expose them to risk or have a high likelihood of employing control techniques.

   For additional information regarding batons see Appendix 9.

2. Less Lethal Impact Munitions (LLIM)

The less lethal launcher system is an authorized device for Sheriff's Office personnel who have been trained in its use. The intent of deploying this device is to reduce the possibility of injury to both the offender and the employee.

The use of Less-Lethal force is a decisive action that can assist in achieving the goal of protection of life and the restoration of order. Such force should be considered whenever the use of less-lethal weapons would safely assist in facilitating an arrest and/or restoring order while reducing the risk of death or serious injury. Circumstances justifying the use of less-lethal weapons include, but are not limited to:

a) Protect oneself or another from assault or the imminent threat of an assault.

b) Control persons engaged in riotous or tumultuous behavior.

c) Suicidal subjects

d) Handling of emotionally disturbed persons; or

e) Any situation deemed necessary that has been authorized by a command officer.

Those trained in the use of a LLIM must qualify annually in order to utilize the LLIM operationally. The LLIM shall be carried/stored in an approved agency case until deployment is deemed necessary.

The approved Less Lethal Launcher system is as follows:

a) Defense Technology 40MM LMTS Tactical Single Shot Launcher

   (1) Including agency equipped accessories (sighting system, etc.)

The approved Less Lethal Munition is as follows:

a) Defense Technology 40MM eXact iMpact Sponge Round

When feasible, personnel should announce over the radio that less lethal is being utilized at the scene (removed from the vehicle/storage container for possible use).

Whenever LLIM are deployed, lethal cover shall be provided to the user (unless deployed within the Washtenaw County Jail). Prior to deploying an LLIM munition, the operator, if feasible, will announce their intent to do so by stating, "impact, impact, impact." The announcement is intended to prevent sympathetic firing from other personnel.

Post deployment, the operator must log the spent munition casing into WCSO property room along with the projectile, if able to locate on scene. If unable to locate the projectile, the operator must document this in their case report.

All Less Lethal Launcher devices will be maintained by certified instructors. In the event that a munition is fired from the launcher, the employee must contact his/her supervisor so that replacement ammunition can be obtained.

Purpose of Impact Devices

An impact device (baton or LLIM) may be used in accordance to Sheriff's Office training to administer strikes to major muscle masses (not vital areas of the body such as the head, neck, face, throat, clavicle, spine, groin or kidney) which can subdue an assaultive subject who is actively and violently resisting and poses a threat to the safety of the employee or another person. Employees may resort to the use of other objects as impact devices, such as a flashlight or police radio, if exigent circumstances exist. Employees must articulate the reason for doing so.

**Special Note:**

Prior to using an impact device (baton/LLIM), an employee shall:

1. Announce a warning to the subject of the intent to use the impact device if s/he does not comply with employee's commands.
2. Give the subject a reasonable opportunity to voluntarily comply, except that employees need not do so where it would pose a risk to the public or the officer or permit the subject to undermine the use of the impact device.
3. Unless exigent circumstances exist, employees shall not intentionally strike vital areas such as the head, neck, face, throat, clavicle, spine, groin or kidney. The use of an impact device to a

vital area has the potential of causing physical injury or death, and the intentional use of an impact device to these areas shall only be used in situations where lethal force is justified.

4. Employees shall not:
    a) Use the impact device to intimidate a subject or person, such as slapping the palm of their hand with an impact device where neither the use of an impact device or impact device warning is appropriate.
    b) Strike a handcuffed prisoner who poses no threat. This action may result in disciplinary action and/or criminal prosecution.
5. Any employee who strikes a subject with an impact device (baton/LLIM) shall ensure the subject is assessed by hospital personnel.
6. Impact device strikes by employees shall be reported to a command officer as soon as tactically possible.

Electronic Control Device (ECD)

The ECD shall be carried on the employee's non-gun side/support side of their person on either their duty belt or external protective vest in a Sheriff's Office approved holster. An ECD is designed to fire two small dart-like electrodes, which stay connected to the main unit by conductors, to deliver electric current to disrupt voluntary control of muscles causing neuromuscular incapacitation. Someone struck by an ECD, such as a TASER, experiences pain and over-stimulation of sensory nerves and motor nerves, resulting in strong involuntary muscle contractions. TASERs will incapacitate, not simply causing pain compliance. The use of a TASER in Drive-Stun mode to cause pain compliance is prohibited.

Purpose of ECD

The Sheriff's Office will employ an ECD as a less than lethal force option in order to minimize the risk of injury to employees and the public. ECDs are to be deployed in a manner consistent with approved Sheriff's Office training. ECDs may be utilized when the employee can articulate a subject's actions constituted active resistance, active

aggression, and deadly force assaults (under specific conditions where another employee is providing lethal coverage).

Medical evaluation is mandatory for any subject exposed to a TASER application, either in probe or drive-stun mode.

**Special Note:**

The United States Court of Appeals-Fourth Circuit has ruled that TASERs may not be used on subjects solely displaying passive resistance. See appendix 2 for more information regarding the use of TASERs.

Prior to using an impact device, an employee shall:

1. Announce a warning to the subject of the intent to use the ECD if s/he does not comply with employee's commands.
2. Give the subject a reasonable opportunity to voluntarily comply, except that employees need not do so where it would pose a risk to the public or the officer or permit the subject to undermine the use of the ECD.

Police Service Dogs (PSD)

Use of PSD's to assist in the apprehension of criminal suspects or in defense of human life or property is governed by the Sheriff's Office Subject Control/Use of Force policy. Note that the mere presence of a PSD at the scene of an arrest or use of a PSD solely to track a subject does not constitute an apprehension.

Deployment of a PSD:

The decision to use a PSD to apprehend a suspect in a criminal matter is the sole decision of the handler. The handler shall allow the PSD to use only the force necessary to affect the apprehension of the suspect the PSD was ordered to apprehend.

A PSD handler may deploy a dog to assist in the apprehension of a suspect, with the following restrictions:

1. The PSD will not be deployed if:

a) The suspect can be safely apprehended without the use of the PSD.

b) It appears likely at the time that an innocent person may be injured.

2. The PSD handler must:

a) Balance immediate apprehension and arrest of a suspect against the safety of the public.

b) If the suspect visibly surrenders either before the dog begins to pursue or after the PSD is in pursuit, it is the handler's responsibility to make every reasonable effort to ensure that the dog does not bite the suspect.

3. Any subject apprehended by a PSD will be medically evaluated.

**Special Note:**

Prior to deploying a PSD, an employee shall:

1. Announce a warning to the subject of the intent to deploy the PSD if s/he does not comply with employee's commands.

a) The warning should be repeated should a search continue into a new area, i.e., a different story within the same building.

b) Give the subject a reasonable opportunity to voluntarily comply, except that employees need not do so where it would pose a risk to the public or the officer or permit the subject to undermine the deployment of the PSD.

PSD apprehensions shall be reported to a command officer as soon as tactically possible in accordance with the Police Service Dog Unit policy.

G. Deadly Force

Any use of force likely to cause death or serious physical injury, including the use of a firearm, neck hold, or strike to the head, neck, clavicle, or throat with a hard object.

**Special Note:**

The term 'neck hold' refers to one of the following: a carotid restraint hold, a lateral vascular neck constraint, or a hold with a hand, knee or other object to a subject's neck for the purpose of restricting the flow of blood or oxygen to the brain. A neck hold is considered lethal force. Mere incidental contact does not constitute a neck hold.

Without exception, the use of neck holds as defined above, or in any variant related to those defined and described above for the purposes of restricting the flow of blood or oxygen to the brain are prohibited except for situations where deadly force is required to achieve a lawful and legitimate objective.

Firearms and Other Forms of Deadly Force

Sheriff's Office employees shall use deadly force only as a last resort when reasonable alternatives have been exhausted or are not possible to protect the safety of the employee(s) or the public. The use of firearms and the use of other deadly force options is the most serious decision an employee may ever make. When safe under the totality of circumstances, employees shall consider other objectively reasonable force options before discharging a firearm or using other deadly force options, so long as that process does not increase risk to an employee or another person.

Nothing in this section is meant to prevent employees from having their firearms in a deployed position when confronted with situations which may escalate with such speed as the employee's ability to react defensively would be unacceptably slow as a result of having a holstered firearm.

For list of approved side arms, see 'Side Arms and Side Arms Regulations Appendix' (Appendix 3). For side arm modifications, see 'Side arm Modifications Appendix' (Appendix 12).

1. Handling, drawing, and pointing a firearm.
   a) An employee shall handle and manipulate a firearm in accordance with Sheriff's Office-approved firearms training.
2. An employee may draw, exhibit or point a firearm in the line of duty when s/he has reasonable cause to believe it may be necessary for the safety of others or for his or her own safety. When an employee

determines that the threat is over, s/he shall holster his or her firearm, place a shoulder weapon in the port-arms position (pointed in a safe direction) or slung in a manner consistent with Sheriff's Office approved firearms training.

3. Except for maintenance, safekeeping, inspection by an approved employee, Sheriff's Office-approved training, or as otherwise authorized by this policy, an employee shall not draw, exhibit or point a firearm.

4. The pointing of a firearm at a person is a seizure and requires legal justification. Such show of force must be reasonable under the objective facts and circumstances. No employee shall point a firearm at or in the direction of a person unless there is a reasonable perception of a substantial risk that the situation may escalate to justify deadly force. If an employee points a firearm at a person, s/he shall, if possible, safe, and whenever appropriate, advise the subject the reason why the employee(s) pointed the firearm.

5. Discharge of a firearm and other uses of deadly force:

   a) An employee may discharge a firearm or use other deadly force techniques in any of the following circumstances:

      (1) In self-defense when the employee has reasonable cause to believe that he or she is in immediate danger of death or serious bodily injury.

      (2) In defense of another person when the employee has reasonable cause to believe that another person is in immediate danger of death or serious bodily injury. However, an employee may not discharge a firearm at, or use deadly force against, a person who presents a danger only to him or herself, and there is no reasonable cause to believe that the person poses an immediate danger of death or serious bodily injury to the officer or any other person.

      (3) To kill an animal posing an immediate threat.

      (4) To apprehend a person when both of the following circumstances exist:

(a) The employee has probable cause to believe that the person has committed or has attempted to commit a violent felony involving the use or threatened use of deadly force;

AND

(b) The employee has probable cause to believe that a substantial risk exists that the person will cause death or serious bodily injury to the employee or others if the person's apprehension is delayed.

**Special Note:**

The above circumstances (a. 1-4) apply to each discharge of a firearm or application of deadly force. Employees shall reassess the situation, when safe, to determine whether the subject continues to pose an active threat.

a) If doing so would not increase the danger to the employee or another innocent person, an employee shall give a verbal warning to submit to the authority of the Sheriff's Office before discharging a firearm or using other deadly force.

b) To the extent feasible, an employee shall take reasonable care when discharging his or her firearm so as not to jeopardize the safety of the employee or another person.

c) An employee shall not discharge a firearm at the operator or occupant of a moving vehicle, vessel, or other means of similar mechanical conveyance unless the operator or occupant poses an immediate threat of death or serious bodily injury to employee or another person.

d) Employees are prohibited from discharging a firearm from a moving vehicle, vessel, or other means of similar mechanical conveyance unless the operator, after considering the totality of circumstances, reasonably believes that the subject(s) poses an immediate threat to the employee or another person.

e) Following the use of deadly force, employees shall render or request medical aid as soon as practical.

f) Except for firearm discharges at an approved firearms range or during lawful recreational activity, an employee who discharges a firearm, on-duty or off-duty, shall report the discharge as soon as practical. This includes an intentional or unintentional discharge, regardless of location or jurisdiction at the time of the incident.

g) An employee who applies other force that results in death or serious bodily injury shall report the incident as soon as tactically possible to a command officer. The command officer shall, regardless of whether possible misconduct occurred, immediately report the force to his/her commanding officer who shall determine which unit shall be responsible for further investigation.

6. Fleeing Felons

This policy builds upon the broad standard set in Tennessee v. Garner, 471 U.S. 1 (1985), where the Supreme Court held that under the 4th Amendment, a police officer may not use deadly force to prevent the escape of a fleeing suspect unless the employee has probable cause to believe the suspect poses an immediate threat of death or serious bodily injury to the employee or another person.

a) Deadly force will never be used against fleeing misdemeanants.

b) Deadly force may only be used against a fleeing felon if, after considering the totality of circumstances:

(1) The employee(s) has probable cause to objectively believe that the underlying felony involves an assault resulting in serious bodily injury or death – not property or paper crimes.

AND

(2) The employee(s) has probable cause to objectively believe that the fleeing felon presents an immediate threat of death or serious bodily injury to the employee or another person if apprehension is delayed.

For information regarding sidearm-mounted illumination devices, see Appendix 5. For information regarding sidearm holsters, see Appendix 6. For information regarding sidearm magazines and magazine pouches, see Appendix 7. For information regarding shotguns, see Appendix 10. For information regarding patrol rifles, see policy 3.01RR. For information regarding firearms training, see Appendix 13.

H. Vehicle Interventions

Employees shall not ram or utilize roadblock techniques on the fleeing vehicle or individual unless the use of deadly force is justified.

The Sheriff's Office's policies concerning vehicle pursuits and intervention tactics are set forth in Sheriff's Office Policy and Procedure 3.05-Vehicle Pursuits.

## VIII. SHOW OF FORCE REPORTING

A. Reportable show of force

Employees shall report any show of force technique(s) used which resulted in the desired lawful objective without using force.

1. Notification of show of force

a) An employee shall notify his/her supervisor immediately or as soon as practical of any reportable show of force.

A show of force includes pointing or displaying a defensive weapon, in preparation to make it ready, should the use of force become necessary. Some examples include but are not limited to: Conducting a felony stop with firearms drawn, fielding a less lethal launcher while attempting to secure a suicidal subject, displaying a TASER or ASR while attempting to secure an incarcerated individual, conducting a building search with a firearm drawn and encountering an occupant. All scenarios regarding a show of force resulting in no force being used.

2. Show of Force review

a) A supervisor shall review all show of force submissions ensuring no force was used.

B. Procedures

1. Officer responsibilities

a) Any show of force will be investigated by a higher-ranking employee.

b) A show of force incident shall be documented in a Show of Force form in evidence.com. Depending on the type of incident, additional documentation may be necessary in an incident report, supplemental incident report, or statement form.

2. Supervisor responsibilities

a) When notified of a show of force, the supervisor shall ensure that no force was used.

b) Review Show of Force forms for incidents occurring during their shift(s) and within their assigned areas.

c) Assign the Show of Force form to the next level supervisor for review once approved.

**Commentary:**

Much attention is given to police use of force including various measures within both the professional and academic arenas. The data regarding situations that are resolved without the use of force is meager.

The aim of collecting show of force (SOF) information is to, in part, provide such data. Doing so improves the balance in use of force data in general, allows us to measure change over time, and improve policy, practice, and use of force related training.

**IX. USE OF FORCE REPORTING**

A. Reportable use of force

Employees shall report any use of force technique(s) used to overcome subject resistance in order to gain compliance.

1. Notification of use of force

a) An employee shall notify his/her supervisor immediately or as soon as practical of any reportable use of force.

2. Use of force evaluation

a) A supervisor shall conduct a use of force evaluation in all cases involving a reportable use of force.

b) The operational lieutenant assigned to oversee the area or unit where the force occurred will review all use of force incidents occurring therein. For example, the lieutenant assigned to oversee West operations would ultimately review all use of force occurring in that operational area. Concerns arising from that review would be expressed to the Division Captain and so-on.

3. Claims of excessive force

a) Every allegation of excessive force shall be subject to the reporting and investigative requirements of this policy and applicable policies.

**Special Note:**

Incidents where de-escalation techniques were attempted shall also be reported. Such a report will include a disposition of the incident, i.e., the officer/supervisor will indicate if the de-escalation techniques attempted and whether they were successful.

B. Procedures

1. Officer responsibilities

a) For the purposes of this section, the term 'officer' pertains to any employee using force. Accordingly, any use of force will be investigated by a higher-ranking employee, as applicable.

b) Any reportable use of force shall be documented in detail in an incident report, supplemental incident report, or statement form. Descriptions shall be in clear, precise and plain language and shall be as specific as possible. Employees will cite specific levels of resistance encountered and the specific techniques that were attempted to gain compliance.

c) Subject Control/Use of force reports will be completed in evidence.com and will be submitted prior to the conclusion of

the officer's tour of duty, unless exceptional circumstances preclude that from occurring, such as the employee being physically unable due to injury or illness.

d) When the employee using force is preparing the incident report, s/he shall include the following information:

(1) The subject's action necessitating the use of force, including a description of the threat presented by the subject.

(2) Efforts to de-escalate the situation prior to the use of force and if not, why not.

(3) Any warning given and if not, why not.

(4) The type of force used, by way of example but not limitation, "Compliance Controls in the form of Muscling Techniques."

(5) Descriptions of any injury sustained by the subject; provide post-initial treatment photographs of any injuries claimed or observed and if not, why not.

(6) Injury sustained by the officer or another person; photographs will be collected regardless of claim of injury or lack of visible injury. Any deviation from this practice will be noted in the report.

(7) Information regarding medical assessment or evaluation, including whether the subject refused.

(8) The name and rank of the supervisor notified; and if not, why not.

e) If an officer cannot document his/her use of force due to exceptional circumstances, another officer shall document this use of force in an incident report, supplemental incident report or statement form at the direction of a supervisor.

2. Supervisor responsibilities

a) When notified of the use of force, the supervisor shall evaluate what occurred to:

b) Determine whether the force used appears reasonable.

c) Determine whether the force complies with the provisions of this General Order.

The supervisor shall:

a) If in the supervisor's assigned area, immediately respond to the scene unless a response is impractical or poses a danger to the employee or other person.

b) Ensure the scene is secure and observe injured subjects or employees, immediately requesting or affirming that appropriate medical resources will be, or have been, provided.

c) Ensure that witnesses (including employees) are identified and interviewed, and that this information is included in the incident report. The number of witnesses may preclude identification and interview of all witnesses; however, supervisors shall ensure identification to the best of their ability.

d) Ensure post-initial treatment photographs of injuries, or claimed injuries, are taken and all other evidence is secured and properly managed.

e) The supervisor will review:

   (1) Employee's incident report

   (2) Employee's subject control form in evidence.com

   (3) Any supplemental incident report(s)

   (4) Any other written statement(s)

The reviewing supervisor will ensure that all reports meet threshold for approval and are free of contextual and grammatical errors.

**Special note:**

1. A supervisor shall not approve an incident report or written statement involving a use of force that does not comply with the requirements outlined by this General Order.

2. The investigating supervisor shall notify a higher-ranking employee of any application of force that appears to not be reasonable.

a) As applicable, ensure the supervisor's reason for not responding to the scene is included in the incident report.

b) Complete supervisor Subject Control/Use of Force review in evidence.com, indicating whether the force used appears reasonable as soon as practical.

c) Ensure that all applicable reports, photographs, and statements are included in the Subject Control/Use of Force form in evidence.com.

d) Submit completed Subject Control/Use of Force form in evidence.com to the assigned higher-ranking employee.

**Special note:**

If a supervisor determines that an employee's use of force is unnecessary or that an employee has applied force that results in serious physical injury or death, the supervisor shall immediately notify his/her commanding officer.

3. Senior command responsibility

When a senior command officer is notified of reasonable force, s/he shall:

a) Review the Subject Control/Use of Force form in evidence.com, resubmitting it to the completing supervisor to correct contextual or grammatical errors as applicable.

b) Submit Subject Control/Use of Force form to the division Captain.

When a senior command officer is notified of unnecessary force or force that results in serious bodily injury or death, s/he shall:

a) Respond to the scene and assume command, as practical.

b) Notify Sheriff's Office Administration and ensure all other notifications are made to higher-ranking employees.

c) Complete an internal investigation containing preliminary findings, conclusions and/or recommendations, if appropriate.

C. Additional reporting responsibilities

1. Recording

Sheriff's Office Administration shall maintain documentation on all reportable use of force by all employees. Regardless of employee assignment within the Sheriff's Office all use of force information will be memorialized in one database.

Sheriff's Office Administration will monitor subject control and use of force trends in order to perform a non-punitive review to determine the number, types, proper application, and effectiveness of uses of force. The information developed shall be used to identify training needs and mitigate risk while providing quality service to the community. See Appendix 4 for an example of a subject control and use of force annual assessment form.

2. Data collection and analysis

The Sheriff's Office will collect and analyze its use of force data in the Subject Control/Use of Force database. Statistics and analysis will include at a minimum:

a) The type of resistance encountered by employees.

b) The type of control(s) used by employees.

c) De-escalation techniques attempted.

d) De-escalation techniques used successfully.

e) The types and degree of injury to suspect and employee.

f) Date and time.

g) Employee's assignment.

h) Geographic location where the use of force occurred.

i) Number of employees using force in the incident.

j) Employee's activity when force was used (e.g., handcuffing, search warrant, pursuit).

k) Employee's demographics (age, gender, race/ethnicity, rank, number of years with the Sheriff's Office, number of years as a police officer or corrections officer).

l) Suspect demographics including race/ethnicity, age, gender, gender identity, primary language and other factors such as mental illness, cognitive impairment, developmental disability, drug and alcohol use/addiction and homelessness.

3. Use of Force Investigative Team (UFIT)

The UFIT is comprised of designated staff, all of whom are responsible for reviewing select use of force incidents. The purpose of the review is to improve both individual and Sheriff's Office performance by examining what happened prior to the incident, why it happened, and what can be done differently, if anything, to improve performance.

The UFIT will generally be activated or requested when use of force occurred that is unnecessary or when an employee applied force that results in serious physical injury or death in order to:

a) Complete and submit reports, investigative inquiries, or any other duty as assigned by a higher-ranking employee.

b) Act as a trusted advisor to higher-ranking employees.

c) UFIT members involved in the incident scheduled for review may not participate in the UFIT evaluation process.

d) UFIT members conducting the initial use of force evaluation in the incident scheduled for review may not participate in the UFIT evaluation process.

## X. Use of Force/Subject Control Special Considerations

The Washtenaw County Sheriff's Office recognizes the significance of its interaction with youth and other populations requiring special considerations. While youth and those requiring special considerations are afforded the same constitutional protections as any member of the public, the Washtenaw County Sheriff's Office recognizes and appreciates the need for additional protective measures and considerations during its interactions with these populations.

The requirement for Sheriff's Office staff to fully utilize and embrace the concepts, systems and principles outlined in this policy is especially critical during encounters with youth or those requiring special considerations. Minimal reliance on force as a means to resolve situations increases legitimacy in the eyes of the communities we serve and ultimately assists us to realize the Mission of the Sheriff's Office.

These concepts, systems and principles include, but are not limited to:

A. Establishing communication

B. Proportionality

C. Using the most effective control tactic and/or minimal amount of force required to achieve a lawful objective

D. Definitions

1. Youth

For the purposes of this policy, a youth is a person under the age of 18; youth is differentiated by age group. Approved control and force options vary by age group, except for situations where the youth's actions will likely result in serious bodily injury to, or death of, the officer or another person. Youth age groups are identified as:

a) 10 years and younger

b) 11 years to 14 years

c) 15 years to 17 years

2. Populations requiring special considerations

Includes, but is not limited to youth, those feeble from age, people with physical disabilities, and people with intellectual disabilities.

3. Disability

A physical or intellectual impairment that substantially limits one or more of the major life activities of such individual, a record of such an impairment, or being regarded as having such a disability.

a) Physical disability

Any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the neurological, musculoskeletal, or special sense organs body systems.

b) Intellectual disability

Any mental or psychological disorder such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities.

E. Use of Force Considerations – Age Dependent (Youth and the Feeble from Age)

Understanding that distinguishing a person's age may be difficult in situations that are tense and rapidly developing, employees have to use their best judgment during their interactions. Approved control and force options vary by age group, except for situations where the person's actions will likely result in serious bodily injury to, or death of, the officer or another person.

While it is acknowledged each age segment is capable of resisting, utmost discretion should be used when determining a subject's ability to actually be a danger.

Considering the totality of circumstances, and all the facts known to or perceived by the officers during the incident, age is a critical consideration for the application of proportionate control or force technique.

1. 10 years and younger

a) Employees shall use de-escalation techniques, such as time and space, prior to the application of muscling techniques to achieve a lawful objective. Employees may use muscling techniques if verbal direction fails to achieve a lawful objective.

b) Employees shall not use pressure points, joint manipulation, strikes or takedowns on youth appearing to be 10 years old or younger, except for situations where the youth's actions

will likely result in serious bodily injury to themselves, the officer, or another person.

c) Employees shall not use or display restraints (handcuffs, leg irons, etc.), ASR, TASER, baton or firearms, except for situations where the youth's actions will likely result in serious bodily injury to, or death of, the officer or another person.

(1) Use of restraints on the youth may be appropriate in situations where their actions are likely to result in self-injury or death.

2. 11 years old to 14 years old

a) Employees may utilize options consisting of compliance controls, e.g., muscling techniques or joint manipulation, if verbal direction fails to achieve a lawful objective. Understanding the possibility of size and strength disparities (i.e., totality of circumstances) in teenage youth, joint manipulation or pressure points may be appropriate in order to achieve a lawful objective.

b) Employees shall use time and space to their advantage whenever doing so does not increase risk to the officer or another person prior to the application of any force technique.

c) Employees shall not use or display a TASER, baton or firearm, except for situations where the youth's actions will likely result in serious bodily injury to, or death of, the officer or another person.

3. 15 years old to 17 years old

a) Employees may utilize options consisting of compliance controls or physical controls if verbal direction fails to achieve a lawful objective, based on the totality of circumstances.

b) Understanding the possibility of size and strength disparities in teenage youth, joint manipulation, pressure points or the application of ASR or TASER may be appropriate in order to achieve a lawful objective.

c) Employees shall use time and space to their advantage whenever doing so does not increase risk to the officer or another person prior to the application of any force technique.

d) Employees shall not use or display a firearm, except for situations where the youth's actions will likely result in serious bodily injury to, or death of, the officer or another person.

4. Feeble from Age

a) Employees may utilize options consisting of compliance controls or physical controls if verbal direction fails to achieve a lawful objective, based on the totality of circumstances.

b) Understanding the possibility of size and strength disparities and the varying ability to carry out threats (totality of circumstance), joint manipulation, pressure points or the application of ASR or TASER may be appropriate in order to achieve a lawful objective.

c) Employees shall use time and space to their advantage whenever doing so does not increase risk to the officer or another person prior to the application of any force technique.

F. Use of Force Considerations – Intellectual Disability

Individuals with intellectual disabilities are more likely to come into contact with law enforcement officers than members of the general population. While the reasons for this are complex, communication difficulties, i.e., ability to comprehend an employee's directions, may be a contributing factor. Moreover, some individuals may be eligible for protection under the Americans with Disabilities Act. An employee encountering a dynamic and violent situation may be required to use approved subject control tactics to achieve a lawful objective.

Important subject control and use of force considerations concerning people with intellectual disabilities includes, but is not limited to, reason for law enforcement contact, ability to comprehend and obey an employee's

direction, a person's ability to carry out a threat, likelihood to comply with parent or guardian interaction or control, cooperation of involved parties, and prior established history.

1. Employees shall consider the following known factors throughout the entire interaction:
    a) Nature of complaint or reason for contact
        (1) Is there a crime?
            (a) If so, what type of crime has been committed?
        (2) What is the likelihood the subject(s) is armed?
    b) Subject's perceived level of intelligence, mental capacity, and ability to comprehend and obey directions
        (1) The capacity for a subject to comprehend an officer's direction based on intellectual disability shall be considered.
        (2) Considering the totality of circumstances, an employee is expected to adjust their approach or tactic to gain voluntary compliance prior to the application of force.
        (3) Understanding people with intellectual disabilities are capable of resisting, utmost discretion should be used when determining a subject's ability to actually be a danger.
    c) Intellectual disability and ability to act on threats
        (1) The ability for a subject to carry out a threat shall be evaluated by the officer based on the perceived intellectual disability of the subject.
        (2) Officers shall use the minimum amount of force required to achieve a lawful objective.
    d) Prior established history
        (1) An officer shall consider prior encounters with a subject, if known.

(2) Without increasing risk to the officer or another person, successful tactics used during previous encounters shall be considered.

e) Likelihood to comply with parent or guardian interaction or control

(1) When safe to do so when evaluating the totality of circumstances, the success of involving a parent or guardian shall be considered prior to the application of force.

(2) Whenever possible, and when safe to do so when evaluating the totality of circumstances, officers shall consider involving other employees who may have a rapport with the subject(s).

f) Cooperation of involved parties

(1) When considering all the facts and circumstances, the officer should gauge the subject's level of cooperation during an encounter.

(2) Whenever possible without increasing risk to the officer or another person, time and space should be used by the officer(s) to gain voluntary compliance prior to the application of force.

G. Use of Force Considerations – Physical Disabilities

Some people with physical disabilities may be eligible for protection under the Americans with Disabilities Act. An employee encountering a dynamic and violent situation may be required to use approved subject control tactics to achieve a lawful objective.

Important subject control and use of force considerations concerning people with physical disabilities includes, but is not limited to, reason for law enforcement contact, ability to comprehend and obey an employee's direction, a person's ability to carry out a threat, likelihood to comply with parent or guardian interaction or control, cooperation of involved parties, and prior established history.

1. Employees shall consider the following known factors throughout the entire interaction:
   a) Nature of complaint or reason for contact.
      (1) Is there a crime?
         (a) If so, what type of crime has been committed?
      (2) What is the likelihood the subject(s) is armed?
   b) Subject's perceived level of physical ability to comprehend and obey directions
      (1) The capacity for a subject to comprehend an officer's direction shall be considered. This includes segments of the population who cannot understand an officer's direction based on physiological condition, E.g., subjects who are hard of hearing or deaf.
      (2) Considering the totality of circumstances, an officer is expected to adjust their approach or tactic to gain voluntary compliance prior to the application of force.
      (3) Understanding people with physical disabilities are capable of resisting, utmost discretion should be used when determining a subject's ability to actually be a danger.
   c) Physical condition and ability to act on threats
      (1) The ability for a subject to carry out a threat shall be evaluated by the officer based on the perceived physical condition of the subject.
      (2) Officers shall use the minimum amount of force required to achieve a lawful objective.
   d) Prior established history
      (1) An officer shall consider prior encounters with a subject, if known.
      (2) Without increasing risk to the officer or another person, successful tactics used during previous encounters shall be considered.

e) Likelihood to comply with parent or guardian interaction or control

(1) When safe to do so when evaluating the totality of circumstances, the success of involving a parent or guardian shall be considered prior to the application of force.

(2) Whenever possible, and when safe to do so when evaluating the totality of circumstances, officers shall consider involving other employees who may have a rapport with the subject(s).

f) Cooperation of involved parties

(1) When considering all the facts and circumstances, the officer should gauge the subject's level of cooperation during an encounter.

(2) Whenever possible without increasing risk to the officer or another person, time and space should be used by the officer(s) to gain voluntary compliance prior to the application of force.

## XI. RESPONSIBILITY AND QUALITY ASSURANCE SUMMARY BY POSITION AND RANK

The below list of duties by position and rank is a summary. It should not be interpreted as all inclusive. Employees in the various positions may be directed to perform or be responsible for duties and tasks other than those outlined; or, the outlined duties and tasks may be modified by the Division Commander or higher.

A. Employee

For the purposes of this section, 'employee' refers to an employee of the Sheriff's Office using force or control.

1. Exercise authority to use control and force judiciously and with respect for equitable treatment, human rights, dignity, and life.

2. Attempt to establish rapport, use the proper voice intonation, ask questions, and provide advice to defuse conflict and achieve voluntary compliance before resorting to force- related subject control options.

3. Employ de-escalation techniques and provide repeated verbal warnings in order to decrease the likelihood of the need to use force and to increase the likelihood of voluntary compliance in situations where they can do so safely, without increasing risk to themselves or another person.
4. Balance the severity of the offense committed and the level of resistance encountered based on the totality of the circumstances known to, or perceived by, the employee at the time.
5. Carry use of force tools and equipment that are issued and authorized by the Sheriff's Office.
6. Use approved force options in which they have been trained, unless actively engaged in a situation where s/he has no other option or is otherwise placed in a situation where enforcement action is unavoidable to protect themselves or another person.
7. Facilitate medical evaluation for subjects that have been exposed to ASR, Physical Control(s), TASER deployments, impact device strikes, police service dog apprehensions, all other forms of Intermediate Control, and Deadly Force. Medical evaluation is also mandatory for subjects who complain of injury, when an employee observes an injury, or where a reasonable officer believes that an injury may have a delayed introduction, such as a subject falling and hitting a vital area.
8. Consider requesting employees specially trained in crisis intervention to respond to calls for service, wherever possible, involving individuals in mental or behavioral health crisis.
9. Intervene when the employee knows or has reason to know, that another law enforcement officer or employee is about to use, or is using, unnecessary force. Further, employees have the duty to provide aid to the victim.
10. Employees shall carry out their duties, including the use of force, in a manner that is fair and unbiased.
11. Strive to use the minimum amount of force necessary in the available range of objectively reasonable options.
12. Continually evaluate whether the force option(s) employed may be discontinued while still achieving the arrest or lawful objectives.

13. Use deadly force only as a last resort when reasonable alternatives have been exhausted or are not possible to protect the safety of the employee(s) or the public.
14. Document, in detail and in accordance to the parameters set forth by this General Order, any reportable use of force.
15. Seek clarity for any information, technique, or tactic unclear to the employee.

B. Training Officer

1. For the purposes of this section, 'training officer' refers to any employee assigned to train another employee, or groups of employees, in the use and application of force and control.
2. Deliver training in a manner that best reflects the Mission of the Sheriff's Office and the spirit of this General Order.
3. Ensure that employees attending training understand information, techniques, or tactics being instructed.
4. Submit accurate training records to appropriate point of contact.
5. Seek clarity for any information, technique, or tactic unclear to the trainer.
6. Provide clarity for any information, technique, or tactic unclear to the employee(s) attending training.

C. Use of Force Investigative Team (UFIT)

1. Respond as requested by higher-ranking employee, generally for use of force that is unnecessary or when an employee applied force that results in serious physical injury or death.
2. Complete and submit reports, investigative inquiries, or any other duty as assigned by a higher-ranking employee.
3. Seek clarity for any information, technique, or tactic unclear to the UFIT member.
4. Provide clarity for any information, technique, or tactic unclear to employees.
5. Act as a trusted advisor to higher-ranking employees.

D. Supervisor

For the purposes of this section, 'supervisor' refers to employees charged with managing, supervising, and regulating subordinate employees.

1. Ensure employees exercise authority to use control and force judiciously and with respect for equitable treatment, human rights, dignity, and life.
2. Ensure employees attempt to establish rapport, use the proper voice intonation, ask questions, and provide advice to defuse conflict and achieve voluntary compliance before resorting to force-related subject control options.
3. Ensure employees use de-escalation techniques and provide repeated verbal warnings in order to decrease the likelihood of the need to use force and to increase the likelihood of voluntary compliance in situations where they can do so safely, without increasing risk to themselves or another person.
4. Ensure employees balance the severity of the offense committed and the level of resistance encountered based on the totality of the circumstances known to, or perceived by, the employee at the time.
5. Ensure employees carry use of force tools and equipment that are issued and authorized by the Sheriff's Office.
6. Ensure employees use approved force options in which they have been trained, unless actively engaged in a situation where s/he has no other option or is otherwise placed in a situation where enforcement action is unavoidable to protect themselves or another person.
7. Ensure employees facilitate medical evaluation for subjects that have been exposed to ASR, Physical Control(s), TASER deployments, impact device strikes, police service dog apprehensions, all other forms of Intermediate Control, and Deadly Force. Medical evaluation is also mandatory for subjects who complain of injury, when an employee observes an injury, or where a reasonable officer believes that an injury may have a delayed introduction, such as a subject falling and hitting a vital area.
8. Ensure employees consider requesting officers specially trained in crisis intervention to respond to calls for service, wherever possible, involving individuals in mental or behavioral health crisis.

9. Intervene, and ensure employees intervene, when the supervisor knows or has reason to know, that another employee or law enforcement officer is about to use, or is using, unnecessary force. Further, supervisors have the duty to immediately request or affirm that appropriate medical resources will be, or have been, provided.
10. Carry out, and ensure that employees carry out, their duties, including the use of force, in a manner that is fair and unbiased.
11. Strive to, and ensure employees strive to, use the minimum amount of force necessary in the available range of objectively reasonable options.
12. Continually evaluate, and ensure employees continually evaluate, whether the force option(s) employed may be discontinued while still achieving the arrest or lawful objectives.
13. Use deadly force, and ensure employees use deadly force, only as a last resort when reasonable alternatives have been exhausted or are not possible to protect the safety of the employee(s) or the public.
14. Document, and ensure employees document, in detail and in accordance to the parameters set forth by this General Order, any reportable use of force.
15. Determine if the use of force is reasonable and within the parameters set forth by this General Order.
16. Ensure that all reports meet threshold for approval and are free of contextual and grammatical errors.
17. Complete supervisor Subject Control/Use of Force form review in evidence.com.
18. Notify commanding officer if an employee's use of force is unnecessary or that an employee has applied force that results in serious physical injury or death.
19. Complete any supplemental report(s) as directed by commanding officer.
20. Seek clarity for any information, technique, or tactic unclear to the supervisor.

21. Provide clarity for any information, technique, or tactic unclear to the employee.
22. Request Use of Force Investigative Team (UFIT) for use of force that is unnecessary or when an employee applied force that results in serious physical injury or death.

E. Administration

For the purposes of this section, 'administration' refers to employees charged with managing, supervising, and regulating subordinate employees, reviewing use of force and subject control, completing investigative inquiries, or any other duty as assigned by a higher ranking employee.

1. Review Subject Control/Use of Force forms in evidence.com, resubmitting it to the completing supervisor to correct contextual or grammatical errors as applicable.
2. Submit approved Subject Control/Use of force report to division Captain in evidence.com.
3. Respond to the scene and assume command, as practical, when notified of unnecessary force or force that results in serious bodily injury or death.
4. Ensure all other any requisite notifications are made to higher ranking employees when notified of unnecessary force or force that results in serious bodily injury or death.
5. Complete any investigative reports or investigations as directed by higher-ranking employee(s).
6. Maintain documentation on all reportable use of force by all employees.
7. Review subject control and use of force trends in order to perform reviews to determine the number, types, proper application, and effectiveness of uses of force.
8. Approve Use of Force Investigative Team (UFIT) call-out for use of force that is unnecessary or when an employee applied force that results in serious physical injury or death.
9. Ensure employees are trained in the use and application of force.

10. Ensure compliance with the parameters of this General Order.

## XII. MODIFICATION

A. The Sheriff or Undersheriff may modify the provisions of this General Order.

## XIII. COMPLIANCE

A. All employees shall comply with all provisions of this General Order. A violation of any section is a Class 1 offense and may result in corrective discipline.

B. A violation of this policy and procedure may also be a violation of other Sheriff's Office Professional Conduct Standards, which may result in corrective disciplinary action up to and including discharge.