UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ESTATE OF JOHN JENUWINE, deceased, by LARRY JENUWINE, Personal Representative,

Plaintiff,

v.

WASHTENAW COUNTY, DEPUTY JACOB CUSO, individually; DEPUTY VON HEATH, individually; DEPUTY GABRIEL BECHTOL, individually; DEPUTY JACOB GOMBOS, individually; DEPUTY JONATHAN EARLEY, individually; SERGEANT THOMAS PENNINGTON, individually; DEPUTY BRYAN TRIPP, individually; and SERGEANT SAMUEL WALLACE, individually,

Defendants.

Case No. 5:26-cv-11937

Hon. Matthew F. Leitman

---

**Defendants' Motion to Dismiss the First Amended Complaint under Rule 12(b)(6)**

Defendants respectfully move this Court to dismiss the First Amended Complaint in its entirety, with prejudice, pursuant to Federal Rule of Civil Procedure 12(b)(6). In support of their motion, Defendants rely on the accompanying brief.

Pursuant to E.D. Mich. LR 7.1, Defendants' counsel certifies that counsel communicated in writing with Plaintiff's counsel, explaining the nature of relief sought in this motion and seeking concurrence. Plaintiff's counsel did not concur.

Dated: November 13, 2026

MILLER JOHNSON
Attorneys for Defendants

By: _/s/Erin K. Lane_
Erin K. Lane (P75822)
Sunita Doddamani (P67459)
45 Ottawa Avenue SW, Suite 1100
Grand Rapids, MI 49501-0306
616.831.1700
lanee@millerjohnson.com
doddamanis@millerjohnson.com

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| ESTATE OF JOHN JENUWINE, deceased, by LARRY JENUWINE, Personal Representative,<br><br>Plaintiff,<br><br>v.<br><br>WASHTENAW COUNTY, DEPUTY JACOB CUSO, individually; DEPUTY VON HEATH, individually; DEPUTY GABRIEL BECHTOL, individually; DEPUTY JACOB GOMBOS, individually; DEPUTY JONATHAN EARLEY, individually; SERGEANT THOMAS PENNINGTON, individually; DEPUTY BRYAN TRIPP, individually; and SERGEANT SAMUEL WALLACE, individually,<br><br>Defendants. | Case No. 5:26-cv-11937<br><br>Hon. Matthew F. Leitman |

---

**<u>Defendants' Brief in Support of their Motion to Dismiss the First Amended Complaint under Rule 12(b)(6)</u>**

Table of Contents

Page

Statement of the Issues ........ 1

Most Appropriate Authority ........ 4

Introduction ........ 5

Allegations ........ 8

Argument ........ 14

I. Deputy Gombos is entitled to qualified immunity on Counts 1 and II because his use of his patrol car to end Mr. Jenuwine's flight was reasonable and violated no clearly established law ........ 15

A. Both vehicle contacts were reasonable responses to a driver who would not stop. ........ 15

1. The First Contact Was Objectively Reasonable (Count I) ........ 17

2. The PIT Maneuver (Count II) ........ 20

B. No clearly established law prohibited Deputy Gombos from using his patrol car to end the flight ........ 21

II. Deputies Cuso, Heath, and Bechtol are entitled to qualified immunity on Counts III, IV, and V. ........ 23

A. The deputies reasonably responded to a fellow deputy's warning that the driver of the van had a firearm ........ 23

B. No clearly established law prohibited the deputies from firing. ........ 27

III. Deputies Earley, Gombos, and Tripp and Sergeants Pennington and Wallace are entitled to qualified immunity on the failure-to-intervene claim (Count VI) ........ 28

IV. The individual Defendants are entitled to qualified immunity on the medical-care claim (Count VII) .... 31

V. Sergeants Pennington and Wallace are entitled to qualified immunity on the supervisory-liability claim (Count VIII) .... 35

VI. Plaintiff failed to plead a plausible *Monell* claim against Washtenaw County. .... 37

A. Plaintiff has not plausibly established that Washtenaw County acted with deliberate indifference. .... 38

B. Plaintiff's ratification and policymaker theories fail .... 42

VII. Plaintiff's state law claims for gross negligence and willful and wanton misconduct fail as a matter of law. (Counts X-XVII) .... 43

VIII. Count XVIII fails because the deputies' force was reasonable and they are entitled to governmental immunity. .... 47

A. Deputy Gombos is entitled to governmental immunity for the vehicle contacts. .... 48

B. Deputies Cuso, Heath, and Bechtol are each entitled to governmental immunity because they acted reasonably and in good faith when they shot Mr. Jenuwine, who they believed was armed and dangerous. .... 49

Conclusion .... 50

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Allen v. Lo*,
751 F. Supp. 3d 863 (M.D. Tenn. 2024) ........ 29, 31

*Ashcroft v. al-Kidd*,
563 U.S. 731 (2011) ........ 22

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ........ *passim*

*Ashford v. Raby*,
951 F.3d 798 (6th Cir. 2020) ........ 16

*Bailey v. City of Ann Arbor*,
860 F.3d 382 (6th Cir. 2017); (Ex. 1, Heath dashcam.) ........ *passim*

*Barnes v. Felix*,
605 U.S. 73 (2025) ........ 16, 24

*Bassett v. Nat'l Collegiate Athletic Ass'n*,
528 F.3d 426 (6th Cir. 2008) ........ 14

*Bd. of Cty. Com'rs of Bryan Cty., Okl. v. Brown*,
520 U.S. 397 (1997) ........ 37

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) ........ 4, 14, 41

*Bell v. City of Southfield*,
37 F.4th 362 (6th Cir. 2022) ........ 15

*Blackwell v. Nocerini*,
123 F.4th 479 (6th Cir. 2024) ........ 33

*Bletz v. Gribble*,
641 F.3d 743 (6th Cir. 2011) ........ 28, 43, 45

*Brent v. Wayne Cnty. Dep't of Human Servs.*,
901 F.3d 656 (6th Cir. 2018) ........ 37, 48, 49

*Brower v. County of Inyo*,
489 U.S. 593 (1989) .......... 15, 22

*Burgess v. Fischer*,
735 F.3d 462 (6th Cir. 2013) .......... 37, 38

*City & County of San Francisco v. Sheehan*,
575 U.S. 600 (2015) .......... 26

*City of Canton v. Harris*,
489 U.S. 378 (1989) .......... 39

*Collins v. Ferguson*,
No. 17-cv-10898, 2017 WL 4387287 (E.D. Mich. Oct. 3, 2017) .......... 45

*Connick v. Thompson*,
563 U.S. 51 (2011) .......... 39

*Courtright v. City of Battle Creek*,
839 F.3d 513 (6th Cir. 2016) .......... 4, 14, 15

*District of Columbia v. Wesby*,
583 U.S. 48 (2018) .......... 22

*Eastep v. City of Nashville*,
156 F.4th 819 (6th Cir. 2025) .......... *passim*

*Fisher v. Harden*,
398 F.3d 837 (6th Cir. 2005) .......... 38

*Gambrel v. Knox Cnty., Kentucky*,
25 F.4th 391 (6th Cir. 2022) .......... 39, 41

*Godawa v. Byrd*,
798 F.3d 457 (6th Cir. 2015) .......... 28

*Gordon v. Bierenga*,
20 F.4th 1077 (6th Cir. 2021) .......... 22

*Gordon v. Bierenga*,
No. 18-CV-13834, 2019 WL 2205853 (E.D. Mich. May 22, 2019) ........ 41

*Graham v. Connor*,
490 U.S. 386 (1989) ........ *passim*

*Groth v. City of Birmingham*,
761 F. Supp. 3d 1031 (E.D. Mich. 2025) ........ 29, 40, 46

*Harvey v. Campbell Cnty., Tenn.*,
453 F. App'x 557 (6th Cir. 2011) ........ 40, 41

*Heeter v. Bowers*,
99 F.4th 900 (6th Cir. 2024) ........ 26, 31, 34

*Humphrey v. Mabry*,
482 F.3d 840 (6th Cir. 2007) ........ 15

*Johnson v. Moseley*,
790 F.3d 649 (6th Cir. 2015) ........ 14

*Jordan v. Howard*,
987 F.3d 537 (6th Cir. 2021) ........ 26

*Kisela v. Hughes*,
584 U.S. 100 (2018) (per curiam) ........ 21

*Latits v. Phillips*,
826 N.W.2d 190 (Mich. Ct. App. 2012) ........ 45

*Latits v. Phillips*,
878 F.3d 541 (6th Cir. 2017) ........ 20, 36

*Lyoya v. Schurr*,
No. 1:22-cv-1160, 2026 WL 2666753 (W.D. Mich. Aug. 6, 2026) ........ 46

*Miller v. Sanilac County*,
606 F.3d 240 (6th Cir. 2010) ........ 44

*Monell v. New York City Department of Social Services*,
436 U.S. 658 (1978) .......... *passim*

*Moore v. Wkly.*,
159 F. Supp. 3d 784 (E.D. Mich. 2016) .......... 41

*Odom v. Wayne County*,
482 Mich. 459; 760 N.W.2d 217 (2008) .......... 4, 44

*Okolo v. Metro. Gov't of Nashville*,
892 F. Supp. 2d 931 (M.D. Tenn. 2012) .......... 38

*Pearson v. Callahan*,
555 U.S. 223 (2009) .......... 15

*Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist.*,
455 F.3d 690 (6th Cir. 2006) .......... 38

*Plumhoff v. Rickard*,
572 U.S. 765 (2014) .......... *passim*

*Ray v. Swager*,
501 Mich. 52; 903 N.W.2d 366 (2017) .......... 44, 46

*Reich v. City of Elizabethtown*,
945 F.3d 968 (6th Cir. 2019) .......... 21, 23, 26, 27

*Romero v. City of Lansing*,
159 F.4th 1002 (6th Cir. 2025) .......... *passim*

*Sample v. Bailey*,
409 F.3d 689 (6th Cir. 2005) .......... 27

*Scott v. Harris*,
550 U.S. 372 (2007) .......... 18, 19, 22

*Scozzari v. Miedzianowski*,
597 F. App'x 845 (6th Cir. 2015) .......... 31, 32, 34

*Shehee v. Lutterll*,
199 F.3d (6th Cir. 1999) .......... 35

*Smith v. Cupp*,
430 F.3d 766 (6th Cir. 2005) ........ 27

*Smith v. Freland*,
954 F.2d 343 (6th Cir. 1992) ........ 20

*Spicer v. Michigan*,
No. 2:19-cv-13718, 2020 WL 12443428 (E.D. Mich. May 19, 2020) ........ 45

*Tennessee v. Garner*,
471 U.S. 1 (1985) ........ 22, 25

*Thomas v. City of Columbus*,
854 F.3d 361 (6th Cir. 2017) ........ 31

*VanVorous v. Burmeister*,
262 Mich. App. 467; 687 N.W.2d 132 (2004) ........ 4, 45, 46, 47

*Ward v. Brotzke*,
178 F.4th 966 (6th Cir. 2026) ........ 23, 47, 49, 50

*Weiner v. Klais & Co.*,
108 F.3d 86 (6th Cir. 1997) ........ 33

*Wells v. City of Dearborn Heights*,
538 F. App'x 631 (6th Cir. 2013) ........ 29, 46, 47

*White v. Pauley*,
580 U.S. 73 (2017) ........ 28

**Statutes**

M.C.L. § 600.2922 ........ 43

M.C.L. § 691.1407(2)(c) ........ 43

M.C.L. § 691.1407(8)(a) ........ 43

**Other Authorities**

17, Am. Compl. ........ 13

Fourteenth Amendment ........................................................................ 36

Fed. R. Civ. P. 12(b)(6) ................................................................ 4, 14, 41

Rule 12(c) ........................................................................................ 48

U.S. Constitution Fourth Amendment ........................................ *passim*

# Statement of the Issues

I. Whether Deputy Gombos is entitled to qualified immunity on Counts I and II because Plaintiff does not plausibly allege that his use of his patrol car to end Mr. Jenuwine's flight violated the Fourth Amendment and no clearly established law prohibited it?

Defendants answer: Yes.

Plaintiff answers: No.

II. Whether Deputies Cuso, Heath, and Bechtol are entitled to qualified immunity on Counts III, IV, and V because Plaintiff does not plausibly allege that firing within about one second of a fellow deputy's warning that Mr. Jenuwine had a gun violated the Fourth Amendment, and no clearly established law prohibited their conduct?

Defendants answer: Yes.

Plaintiff answers: No.

III. Whether Plaintiff fails to state a failure-to-intervene claim (Count VI) because no Defendant had a realistic opportunity to stop any use of force and there was no underlying violation?

Defendants answer: Yes.

Plaintiff answers: No.

IV. Whether the individual Defendants are entitled to qualified immunity on the medical-care claim (Count VII) because Plaintiff alleges that they summoned an ambulance within seconds and waited for a tactical team before approaching a man they believed was armed, and no clearly established law required them to approach sooner?

Defendants answer: Yes.

Plaintiff answers: No.

V. Whether Sergeants Pennington and Wallace are entitled to qualified immunity on the supervisory-liability claim (Count VIII) when Plaintiff does not plausibly allege that either sergeant authorized, approved, or knowingly acquiesced in unconstitutional conduct, and cannot establish an underlying constitutional violation by any subordinate?

Defendants answer: Yes.

Plaintiff answers: No.

VI. Whether Plaintiff fails to plead a plausible *Monell* claim against Washtenaw County (Count IX) when he cannot establish an underlying constitutional violation, concedes that the County maintained written policies and training on each subject he challenges, relies on a single incident without any prior similar violation, and identifies no pre-incident policymaker decision that caused Mr. Jenuwine's death?

Defendants answer: Yes.

Plaintiff answers: No.

VII. Whether Plaintiff's gross negligence claims (Counts X–XVII) fail because they repackage intentional uses of force and do not satisfy Michigan's proximate-cause requirement?

Defendants answer: Yes.

Plaintiff answers: No.

VIII. Whether Plaintiff's assault and battery claim (Count XVIII) Plaintiff pleads no facts showing that the deputies acted without good faith, and they are entitled to governmental immunity?

Defendants answer: Yes.

Plaintiff answers: No.

## Most Appropriate Authority

1. Fed. R. Civ. P. 12(b)(6)
2. Fourth Amendment to the U.S. Constitution
3. *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)
4. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)
5. *Courtright v. City of Battle Creek*, 839 F.3d 513 (6th Cir. 2016)
6. *Eastep v. City of Nashville*, 156 F.4th 819 (6th Cir. 2025)
7. *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978)
8. *Odom v. Wayne County*, 482 Mich. 459; 760 N.W.2d 217 (2008)
9. *Plumhoff v. Rickard*, 572 U.S. 765 (2014)
10. *VanVorous v. Burmeister*, 262 Mich. App. 467; 687 N.W.2d 132 (2004)

## Introduction

This case arises from the January 6, 2026 officer-involved shooting of John Jenuwine following the pursuit of his van, which law enforcement believed was connected to a reported armed assault. The dash camera video from Deputy Von Heath's patrol car shows a flight more dangerous than the one Plaintiff describes. Mr. Jenuwine led law enforcement on an over thirteen-minute chase, driving erratically through residential neighborhoods, evading escalating attempts by law enforcement to stop his vehicle, running stop signs and red lights, driving on the wrong side of the road or off the road, reaching speeds of 55 miles per hour, passing other civilian motorists, and twice reversing into the path of pursuing patrol cars. (Ex. 1, Heath dashcam, 02:15-02:35, 02:35-03:00, 04:00-04:03, 05:20-05:30, 05:48-05:54, 11:50-11:58.) The Michigan Attorney General has since reviewed the shooting and declined to pursue criminal charges, finding it was reasonable based on the totality of the circumstances for deputies to believe that Mr. Jenuwine was armed with a firearm.

A 911 caller reported that someone in a white van was following his wife on Clark Road and someone inside of the van waved a gun at her. (R.17, Am. Compl., at ¶¶20, 23.) Deputies from the Washtenaw County Sheriff's Office spoke directly with the 911 caller's wife. She told them that a man in a white van "appeared to have something in his hand" and was waiving/pointing it at her while yelling." (*Id.* at ¶

26.) About twenty minutes after the initial 911 call regarding the felonious assault, Washtenaw County deputies found a white van driving with its headlights off, driven by Mr. Jenuwine. (*Id.* at ¶36.) The van also did not have a license plate. (*Id.*) Law enforcement activated their emergency overhead lights to try and pull over the van, but the driver, John Jenuwine, did not stop. For the next approximately thirteen minutes he fled deputies, driving erratically through residential neighborhoods, going the wrong way in traffic with his headlights off, running red lights and stop signs, at times driving over twice the posted speed limit, reversing toward police, dodging stop sticks, and kept driving even after a patrol car struck his van in a school parking lot. (*Id.* at ¶¶28, 44, 50, 65, 153.) Deputy Jacob Gombos eventually ended Mr. Jenuwine's flight with a Precision Immobilization Technique ("PIT") maneuver, and the van rolled onto its side. (*Id.* at ¶65.) Seconds after deputies reached the van, one shouted that the driver had a gun, and three deputies fired into the van. (*Id.* at ¶¶79–81.) Unable to see into the dark, overturned van, deputies then treated the scene as a barricaded armed subject and waited for a tactical team. (*Id.* at ¶¶72, 76, 243.) The medical examiner's report, on which Plaintiff relies, determined that Mr. Jenuwine died from gunshot wounds and had cocaine in his system. (Ex. 2, Autopsy.) No gun was found in the van. (*Id.* at ¶112.)

Plaintiff, the personal representative of Mr. Jenuwine's estate, has filed a lawsuit against Washtenaw County, six deputies, and two sergeants in eighteen

counts. Plaintiff alleges that deputies used excessive force in ending Mr. Jenuwine's flight from police and in responding to what they perceived as an armed occupant. (R.17, Am. Compl., at ¶¶162–218.) The Fourth Amendment asks whether a reasonable officer, facing what these deputies faced in the dark and in seconds, could have acted as they did. Qualified immunity adds a second question, which is, even if their actions were not reasonable, whether any precedent clearly told them otherwise. Plaintiff's own allegations answer both questions in Defendants' favor. Deputy Gombos used his patrol car to end a long and dangerous flight by a driver whom Plaintiff himself ties to the reported Clark Road assault. Neither vehicle contact violated the Fourth Amendment, and, moreover, no case clearly prohibited either one. The three deputies who fired did so within one second of a fellow deputy's warning that the driver had a gun, at the end of a flight that began with a report of a handgun. Plaintiff identifies no case holding that conduct unconstitutional.

The remaining federal claims depend on those first claims, seek to impose liability for seconds-long events no one could stop, challenge a decision to wait for a tactical team before approaching a man the deputies believed was armed, or fault the County for policies that are stricter than the Constitution. The state-law claims fail because Michigan does not allow a plaintiff to repackage intentional force as gross negligence and because Plaintiff pleads no facts showing bad faith.

The Court should dismiss each count of the First Amended Complaint with prejudice.

## Allegations

Defendants accept Plaintiff's well-pleaded allegations as true for this motion only, except where those allegations are "internally contradict[ed]" by "verifiable facts" captured on Deputy Heath's patrol car dashboard camera. *Bailey v. City of Ann Arbor*, 860 F.3d 382, 387 (6th Cir. 2017); (Ex. 1, Heath dashcam.)

At about 1:24 a.m. on January 6, 2026, a caller reported a "white turtle top construction van" driving "erratically" in Ypsilanti Township. (R.17, Am. Compl., at ¶19.) Six minutes later, C.C. called 911. He said a white van had been following his wife on Clark Road and that "they just waved a gun at my wife." (*Id.* at ¶20.) At 1:33 a.m., dispatch broadcast to every deputy on the channel that a white construction van had "pulled a handgun" on the caller's wife. (*Id.* at ¶23.) When deputies interviewed the caller's wife, M.C., she said there was one man in the van, he "appeared to have something in his hand," and was "waiving/pointing it at her while yelling." (*Id.* at ¶¶ 24, 26.) Mr. Jenuwine was that man.

At 1:53 a.m., Deputy Von Heath found a white Nissan cargo van idling in the middle of the road. (Ex. 1, Heath dashcam, at 00:00-00:22.) It was dark outside, yet the van had its headlights off. (*Id.*) The van also had no license plate. (R.17, Am. Compl., at ¶36.) When Mr. Jenuwine saw Deputy Heath's patrol car, Mr. Jenuwine,

who was driving the white van, immediately sped away. (Ex. 1, Heath dashcam, at 00:22-00:31.) Deputy Heath activated his overhead lights and sirens and attempted to pull the white van over. (*Id.*) However, Mr. Jenuwine did not stop. Instead, he quickly cut through a parking lot, swerved down a street, and made a sharp turn into another parking lot while he yelled at police through the van driver's side window. (*Id.* at 00:31-01:22.) Deputy Heath continued to follow the van with his lights and sirens activated. (*Id.*) At 1:55 a.m., Mr. Jenuwine stopped the van and purposefully waited for police to get outside of their patrol car before suddenly reversing toward a deputy standing in the roadway. (*Id.* at 01:25-01:33.) Deputy Heath broadcast that Mr. Jenuwine tried to reverse into police. Mr. Jenuwine drove away, flipped his car around, and sped past a second patrol car before slamming on his brakes and backing toward police again, narrowly missing one of the patrol vehicles. (*Id.* at 2:25-3:00.) At 1:56 a.m., a deputy warned, "we have a good FA," a reference to this felonious assault. (R.17, Am. Compl., at ¶29.)

The pursuit lasted about thirteen minutes and wound through residential neighborhoods around Prospect Road. (R.17, Am. Compl., at ¶44.) Plaintiff alleges that the van mostly traveled about 20 miles per hour, repeatedly stopped, turned around in the road, and pulled into parking lots. (*Id.*)

However, Deputy Heath's dash camera video shows that the pursuit was far more dangerous than Plaintiff alleges. Plaintiff states that the van reached only 45

miles per hour at times, but the video shows the van reaching 55 miles per hour and still accelerating. (Ex. 1, Heath dashcam, 02:35-03:00.) Throughout the chase, the van ran multiple red lights and stop signs and drove on the wrong side of the road. (*Id*. at 05:20-05:30, 05:48-05:54, 06:09-06:32, 09:46, 11:02-11:07.)) It wove between patrol cars and slammed on its brakes in front of them. (*Id*. at 07:00-07:12.) The van even veered off the road and onto grass in a park before driving back onto the road again. (*Id*. at 03:00-03:15.)

The video also contradicts Plaintiff's allegation that there was "no traffic, no peds" throughout the chase. (R.17, Am. Compl., at ¶¶44, 67.) Other motorists were on the road at several points during the pursuit. (Ex. 1, Heath dashcam, 03:57-04:03, 08:34-08:37, 10:04-10:07, 13:15-13:17, 13:22-13:24.) The video shows that these bystander cars had to pull off to the side of the road to avoid being hit. (*Id*.)

At 2:05:20 a.m., in the parking lot of East Middle School, the van slammed on its brakes and reversed into the path of the patrol cars, again forcing deputies to back up to avoid being hit. (Ex. 1, Heath dashcam, at 11:50-11:58.) One second later, Deputy Gombos drove his patrol car into the van's driver's door, causing the side-curtain airbags to deploy. (R.17, Am. Compl., at ¶51.) Mr. Jenuwine was undeterred. He "pull[ed] away onto the grass and dr[ove] out of the lot." (*Id*. at ¶153.) About thirteen into the dangerous chase, and after every intermediate measure had

failed, Deputy Gombos radioed, "I am going to take primary and finish this." (*Id.* at ¶56.)

Deputy Gombos attempted a PIT maneuver at 2:06:39 a.m. on Prospect Street, with the van traveling about 40 miles per hour in a 25-mile-per-hour residential zone. The first attempt missed. The second attempt, at 2:06:47 a.m., connected. The van spun, struck the curb, and rolled onto its passenger side. (R.17, Am. Compl., at ¶65.) Plaintiff alleges that the cabin was dark and filling with smoke, that the driver had been thrown from his seat, and that he was no longer visible through the windshield. (*Id.* at ¶¶68, 72, 73.)

Deputies Cuso, Heath, Bechtol, and Tripp approached the front of the van with pistols drawn. (R.17, Am. Compl., at ¶74.) At about 2:07:00 a.m., deputies shouted at Mr. Jenuwine to show his hands. (*Id.* at ¶79.) About three seconds later, a deputy shouted, "He's got a gun! He's got a gun! He's got a gun! Gun! Gun! Gun!" (*Id.* at ¶80.) Within about one second of that shout, Deputies Cuso, Heath, and Bechtol fired. (*Id.* at ¶81.) Plaintiff alleges they fired about thirty-four rounds "in a matter of seconds." (*Id.* at ¶86.) Plaintiff alleges that one bullet entered the front of Mr. Jenuwine's upper chest and traveled downward, and that "[t]he position of the bullet suggests JOHN was moving to a standing position." (*Id.* at ¶99.) About three minutes after the shooting, Deputy Bechtol told a fellow officer that Mr. Jenuwine

"stood up with the shotgun in the window after he got up off the ground." (*Id.* at ¶215.) No firearm was later found. (*Id.* at ¶112.)

Five seconds after the first shots, a deputy radioed an ambulance. (R.17, Am. Compl., at ¶114.) At 2:07:34 a.m., a deputy radioed that Mr. Jenuwine was "armed with a shotgun." (*Id.* at ¶109.) Deputy Gombos told the deputies to "treat it like a barricade," and the deputies pulled back behind their patrol cars, called for a negotiator, and requested SWAT. (*Id.* at ¶76.) Sergeant Wallace, the command officer, directed that "due to the suspect being armed with a shotgun" the scene be treated "as a barricaded gunman." (*Id.* at ¶243.) SWAT activation was authorized. (*Id.* at ¶146.) Over the next twenty minutes, deputies watched the van from cover and used a loudspeaker to order Mr. Jenuwine to show his hands. (*Id.* at ¶¶117, 121.) Plaintiff alleges that Mr. Jenuwine moved, kicked, and yelled, and at one point a deputy reported, "He is trying to get up." (*Id.* at ¶¶117-119, 121.) Deputies were closely monitoring the danger. One deputy instructed other to "focus on the shotgun. Where is it?" (*Id.* at ¶118.) Medical units, which deputies had called, staged a few blocks away. (*Id.* at ¶114.) SWAT operators approached the van with ballistic shields at 3:57 a.m. and found Mr. Jenuwine dead. (*Id.* at ¶¶129–130.)

Plaintiff relies on the medical examiner's autopsy report throughout the First Amended Complaint and attached a wound chart prepared from it. (R.17, Am. Compl., at ¶¶95–103, 152.) The report found that Mr. Jenuwine was struck seven

times. (Ex. 2, Autopsy Report, at 1–2, 12.) One bullet entered the front of his chest, passed through his left lung near where its major blood vessels connect, and caused heavy bleeding into his chest. (*Id.* at 1, 5.) Another fractured his pelvis and tore a major vein in the pelvis. (*Id.* at 2, 6.) The medical examiner does not describe any gunshot wound as survivable. (*Id.*) Indeed, Plaintiffs concedes that the gunshot wound to the upper left chest was "fatal." (R.17, Am. Compl., at ¶97.) Toxicology testing found cocaine in Mr. Jenuwine's blood. (Ex. 2, Autopsy Report, at 10.)

Plaintiff's First Amended Complaint asserts eighteen counts. Counts I and II allege that Deputy Gombos used excessive force in the school-lot contact and the PIT maneuver. Counts III, IV, and V allege excessive force against Deputies Cuso, Heath, and Bechtol for the shooting. Count VI alleges failure to intervene against Deputies Earley, Gombos, and Tripp and Sergeants Pennington and Wallace. Count VII alleges deliberate indifference to medical needs against each individual Defendant. Count VIII alleges supervisory liability against the two sergeants. Count IX asserts a *Monell* claim against Washtenaw County. Counts X through XVII allege gross negligence and willful and wanton misconduct against each individual Defendant, and Count XVIII alleges assault and battery against Deputies Cuso, Heath, Bechtol, and Gombos. (R.17, Am. Compl. at ¶¶162–303.)

## Argument

To avoid dismissal under Rule 12(b)(6), a complaint must provide "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court need not accept "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678. The Court may also consider exhibits "so long as they are referred to in the Complaint and are central to the claims contained therein." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008).

To survive a motion to dismiss on qualified-immunity grounds, Plaintiff must allege facts that plausibly make out a claim that the "defendant's conduct violated a constitutional right that was clearly established law at the time, such that a reasonable officer would have known that his conduct violated that right." *Johnson v. Moseley*, 790 F.3d 649, 653 (6th Cir. 2015); *see also Courtright v. City of Battle Creek*, 839 F.3d 513, 518 (6th Cir. 2016) (citation omitted). Plaintiff bears that burden. *Id.* If Plaintiff's "pleadings internally contradict verifiable facts central to his claims, that makes his allegations implausible." *Bailey v. City of Ann Arbor*, 860 F.3d 382, 387 (6th Cir. 2017) (holding that the court may consider video evidence

at the motion-to-dismiss stage in qualified immunity cases). "[W]hen uncontroverted video evidence easily resolves a case, we honor qualified immunity's principles by considering the videos." *Bell v. City of Southfield*, 37 F.4th 362, 364 (6th Cir. 2022) (internal citations and quotations omitted).

## I. Deputy Gombos is entitled to qualified immunity on Counts I and II because his use of his patrol car to end Mr. Jenuwine's flight was reasonable and violated no clearly established law.

"The defense of qualified immunity shields government officials from 'liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Humphrey v. Mabry*, 482 F.3d 840, 846 (6th Cir. 2007) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Courts employ a "two-tiered inquiry" at the motion-to-dismiss stage. *Courtright*, 839 F.3d at 518. The first step asks whether the facts alleged make out a violation of a constitutional right, and the second asks whether that right was clearly established when the event occurred such that a reasonable officer would have known that his conduct violated it. *Id.* The claim fails unless Plaintiff satisfies both steps. *Id.*; *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

### A. Both vehicle contacts were reasonable responses to a driver who would not stop.

Intentionally stopping a fleeing vehicle by a collision is a seizure. *Brower v. County of Inyo*, 489 U.S. 593, 596–97 (1989). Courts judge the reasonableness of

that seizure from the perspective of a reasonable officer on the scene, "in light of the facts and circumstances confronting them." *Graham v. Connor*, 490 U.S. 386, 396-97 (1989). This analysis must recognize "that police officers are often forced to make spilt-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation" and not evaluate police actions "with the 20/20 vision of hindsight." *Id.* Court must also consider the totality of the circumstances "including facts and events leading up to the climactic moment." *Barnes v. Felix*, 605 U.S. 73, 76 (2025). The relevant considerations include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. Officers need not arrive at "a single, rigid right answer" or use "the best technique available," but the degree of force must have been reasonable under the circumstances. *Ashford v. Raby*, 951 F.3d 798, 801 (6th Cir. 2020).

Deputy Gombos was objectively reasonable when he initially collided with Mr. Jenuwine's van (Count I) and when Deputy Gombos executed the subsequent PIT maneuver when Mr. Jenuwine continued to lead officers on a prolonged and dangerous chase (Count II).

### 1. The First Contact Was Objectively Reasonable (Count I)

Deputy Gombos knew that an occupant of a white construction van had "pulled a handgun" on a woman. (R.17, Am. Compl., at ¶23.) The only eyewitness told deputies that a lone man in the van had waved something at her while yelling. (*Id.* at ¶26.) During the pursuit, deputies broadcast that the van was reversing toward them and it had "attempted to ram" a patrol car. (*Id.* at ¶¶28, 140.) A deputy announced, "we have a good [felonious assault]." (*Id.* at ¶29.) A reported armed assault followed by a long flight from marked patrol cars, including multiple attempts to ram police, is serious.

Plaintiff stresses that dispatch described "two black males" while Mr. Jenuwine was one white man. (*Id.* at ¶¶23, 42–43.) But the caller was relaying his wife's account secondhand and told the dispatcher, "I *think* it's two black guys," and the eyewitness herself described a single man. (*Id.* at ¶¶21–22, 26) (emphasis added). More to the point, Plaintiff's own theory is that Mr. Jenuwine was the driver who waved an object at the eyewitness on Clark Road. (*Id.* at ¶41.) A mistaken detail in a secondhand description did not make it unreasonable to stop the van that matched the rest of the report, and then fled, assaulted officers, and drove erratically through neighborhoods. *See Graham*, 490 U.S. at 396.

The flight itself posed a danger. The van fled through residential neighborhoods for about thirteen minutes, with its headlights off during the pitch

black, early morning hours of January, repeatedly stopping, turning around, and pulling into parking lots. (*Id.* at ¶¶36, 44.) It reversed toward deputies and stopped beside a deputy standing in the road. (*Id.* at ¶¶28, 38.) The video shows even more. The van drove on the wrong side of the road, reached at least 55 miles per hour, caused bystanders to pull to the side of the road, and aggressively reversed into path of patrol cars more than once. (Ex.1, Heath dashcam, 02:00-02:35, 02:35-03:00, 05:20-05:54, 11:50-11:58.) Such drivers "pose[] an actual and imminent threat to the lives of any pedestrians who might have been present, to other civilian motorists, and to the officers involved in the chase." *Scott v. Harris*, 550 U.S. 372, 383–84 (2007). And officers act reasonably when, as here, the driver "was intent on resuming his flight and that, if he was allowed to do so, he would once again pose a deadly threat for others on the road." *Plumhoff v. Rickard* 572 U.S. 765, 777 (2014).

Plaintiff emphasizes that the pursuit was mostly slow and that deputies broadcast "no traffic, no peds." (R.17, Am. Compl., at ¶44, 67.) The video contradicts both allegations. The van reached 55 miles per hour and climbing, and other motorists were on the road at several points during the chase and each bystander had to pull over to avoid being hit by the van. (Ex.1, Heath dashcam, 02:35-03:00, 03:25-03:37, 04:00-04:03, 08:34-08:37, 10:04-10:07, 13:15-13:17, 13:22-13:24.) Those allegations are therefore implausible. *Bailey*, 860 F.3d at 387. In any event, a flight that lasts thirteen minutes, defeats a stop-stick deployment, and

continues after a collision shows a driver who will not stop on his own. Plaintiff's own allegation that "[t]he only people near the van were deputies" confirms who was at risk (R.17, Am. Compl., at ¶67.) and *Scott* counts the safety of "the officers involved in the chase" too. 550 U.S. at 383–84.

The third *Graham* factor also weighs in the deputies' favor. Mr. Jenuwine was "attempting to evade arrest by flight" for the entire encounter. *Graham*, 490 U.S. at 396. Mr. Jenuwine dodged Sergeant Wallace's stop sticks and drove away from Deputy Cuso's attempt to puncture a tire with a knife. (R.17, Am. Compl., at ¶¶47, 50.) Plaintiff makes much of the allegation that the van had "stopped" (for one second) against a grassy hill one second before the contact. (*Id.* at ¶51.) The dashboard camera video shows that, seconds before the contact, the van slammed on its brakes in the dark lot and reversed into the path of the patrol cars, forcing deputies to back up to avoid being hit. (Ex.1, Heath dashcam, 11:50-11:58.) And a momentary stop in the middle of a flight is not a surrender. In *Plumhoff*, the fleeing car "came temporarily to a near standstill" after colliding with a police cruiser, but "that did not end the chase". 572 U.S. at 776. So too here. Within two or three seconds of the contact, the Mr. Jenuwine "pulls away onto the grass and drives out of the lot." (R.17, Am. Compl., at ¶153.)

On the other side of the balance, the intrusion was limited. Plaintiff concedes that the contact did not disable or stop the van. (R.17, Am. Compl., ¶¶54, 153.)

Plaintiff labels the collision "deadly force" because it alleges that Washtenaw County policy treats ramming that way. (*Id.* at ¶166.) But a policy label does not decide the constitutional question. "Under § 1983, the issue is whether [the officer] violated the Constitution, not whether he should be disciplined by the local police force." *Smith v. Freland*, 954 F.2d 343, 347 (6th Cir. 1992). A county "can certainly choose to hold its officers to a higher standard than that required by the Constitution without being subjected to increased liability under § 1983." *Id.* Washtenaw County did exactly that. Its Use of Force policy states that it "establishes a higher level of expectations than the constitutional standard and state law." (R.1-1, Use of Force Policy, PageID.63.) And although a policy violation may bear on reasonableness, "[t]he fact that an officer's conduct merely violates a departmental policy does not cause that officer to lose their qualified immunity." *Latits v. Phillips*, 878 F.3d 541, 553 (6th Cir. 2017) (citation omitted). Deputy Gombos's decision to use his patrol car to stop a van that had defeated every other effort to end the flight was reasonable.

### 2. The PIT Maneuver (Count II)

After the school-lot collision deployed the van's airbags, Mr. Jenuwine did not stop. He drove out of the lot and continued his flight onto a residential street, reaching about 40 miles per hour in a 25-mile-per-hour zone. (R.17, Am. Compl., at ¶¶65, 153.) Plaintiff alleges that the van's "mechanical issues" decreased resistance. (*Id.* at ¶¶54, 179.) The pleaded facts point the opposite way. A damaged van with

compromised handling, moving through a neighborhood above the speed limit under the control of a reportedly armed driver who had refused for thirteen minutes to stop, endangers everyone on those streets, including the deputies following it. (*Id.* at ¶¶44, 51, 67.) As in *Plumhoff*, "all that a reasonable police officer could have concluded was that [the driver] was intent on resuming his flight." 572 U.S. at 777. Deputies did not have to wait until a pedestrian was in the van's path. The PIT maneuver ended that danger, and it was reasonable.

Deputy Gombos' statement, "I am going to take primary and finish this" (*id.* at ¶¶56, 181) changes nothing. The Fourth Amendment inquiry is objective. It asks whether the officer's actions were reasonable "without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397.

### B. No clearly established law prohibited Deputy Gombos from using his patrol car to end the flight.

Even if Plaintiff had plausibly alleged a constitutional violation in Count I or Count II, Deputy Gombos would still be entitled to qualified immunity because no clearly established law prohibited him from colliding with, or executing a PIT maneuver on, Mr. Jenuwine's fleeing van under the facts as pleaded. "[S]pecificity is especially important in the Fourth Amendment context," and officers are therefore entitled to qualified immunity "unless existing precedent 'squarely governs' the specific facts at issue." *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (per curiam) (quoting *Mullenix v. Luna*, 577 U.S. 7, 12–13 (2015) (per curiam)); *Reich v. City of*

*Elizabethtown*, 945 F.3d 968, 981 (6th Cir. 2019). The law must have been "sufficiently clear" that "every reasonable official would understand that what he is doing is unlawful," *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018) (citation omitted), and existing precedent "must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). Outside the obvious case, the general principles of *Garner* and *Graham* cannot clearly establish the law. *Gordon v. Bierenga*, 20 F.4th 1077, 1082 (6th Cir. 2021). And because unpublished decisions do not give officers fair notice, they will not suffice. *Eastep*, 156 F.4th at 833.

Plaintiff relies on *Brower*, *Scott*, *Garner*, and *Graham*. (R.17, Am. Compl., at ¶¶170, 182.) But those decisions state general principles. *Garner* and *Graham* "cast at a high level of generality" and do not clearly establish the unlawfulness of particular force used to end a vehicle flight. *Plumhoff*, 572 U.S. at 779 (quoting *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004)). *Brower* addressed whether a roadblock was a seizure, not whether a particular seizure was reasonable. And *Scott*, far from prohibiting the use of a patrol car to end a flight, held that the officer acted reasonably when he did exactly that. 550 U.S. at 386. The Sixth Circuit decisions

Plaintiff cites all involve an officer who shot a driver, not a vehicle contact or a PIT maneuver. (R.17, Am. Compl., at ¶¶65, 178, 182.)

Nor does clearly established law support Count II's theory that Deputy Gombos is liable for the shooting that followed the PIT maneuver. (*Id.* at ¶184.) That theory has no footing in clearly established law. The shooting began about sixteen seconds after the PIT maneuver, after other deputies reached the van and one shouted that the driver had a gun. (*Id.* at ¶¶68, 79–81.) Deputy Gombos did not fire at all. (*Id.* at ¶¶74, 85.) Plaintiff must show that each defendant is liable only for "the official's *own* individual actions." *Ward v. Brotzke*, 178 F.4th 966, 973 (6th Cir. 2026) (emphasis in original) (quoting *Iqbal*, 556 U.S. at 676). Plaintiff cites no decision holding that an officer who performs a PIT maneuver becomes liable for other officers' separate decisions to fire.

Deputy Gombos is entitled to qualified immunity on Counts I and II.

## II. Deputies Cuso, Heath, and Bechtol are entitled to qualified immunity on Counts III, IV, and V.

### A. The deputies reasonably responded to a fellow deputy's warning that the driver of the van had a firearm.

An officer may use deadly force when he "has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." *Reich*, 945 F.3d at 978 (quoting *Tennessee v. Garner*, 471 U.S. 1, 11 (1985)). An officer "does not need to wait until a suspect points their weapon before firing."

*Romero v. City of Lansing*, 159 F.4th 1002, 1011 (6th Cir. 2025). And a reasonable mistake about a suspect being armed does not make the force unreasonable. *Ward*, 178 F.4th at 974. The question is what a reasonable officer would have perceived in the moment, considering everything that came before. *Barnes*, 605 U.S. at 76; *Eastep*, 156 F.4th at 828.

Consider what the three deputies faced here. Dispatch had broadcast that the occupant of a white van had pulled a handgun on a woman. (R.17, Am. Compl., at ¶23.) The driver had then fled for thirteen minutes, reversed toward deputies, dodged stop sticks, and kept driving after his airbags deployed. (*Id.* at ¶¶28, 44, 50, 153.) Along the way, he ran stop signs and red lights, drove on the wrong side of the road, and reversed into the path of patrol cars. (Ex. 1, Heath dashcam, 02:15-02:35, 05:20-05:54, 11:50-11:58.) The flight ended only when the van rolled onto its side. (R.17, Am. Compl., at ¶65.) At 2:07 a.m., the deputies reached the front of an overturned van and they could not see the driver. (*Id.* at ¶¶72–73, 79.) They ordered him to show his hands. (*Id.* at ¶79.) About three seconds later, a fellow deputy shouted repeatedly that the driver had a gun. (*Id.* at ¶80.) Deputies Cuso, Heath, and Bechtol fired within about one second. (*Id.* at ¶81.)

Those facts describe a split-second decision in the face of a reported firearm, and Plaintiff's own allegations about his erratic, dangerous behavior reinforce deputies' belief that Mr. Jenuwine was armed. A reasonable officer who has just

heard a fellow officer warn of a gun, at the end of a flight that began with a report of a handgun, has reasonable cause to believe he faces a threat of serious harm. The deputies did not have to wait to learn whether the warning was correct.

Nor does the number of shots make the force excessive. In *Eastep*, nine officers fired about thirty-three shots in five seconds after a man pointed an object at them, and the Sixth Circuit held at the pleading stage that eight of them acted reasonably, declining to "parse the few ticks of the clock that spanned the continuous shooting." 156 F.4th at 824, 829–30. Only the officer who began firing after the man had fallen, after a cease-fire call, and after every other officer had stopped faced a plausible claim. *Id.* at 830–33; *see also Plumhoff*, 572 U.S. at 777. Here, all three deputies opened fire within about one second of the warning, and the single volley lasted "a matter of seconds." (R.17, Am. Compl., at ¶¶81, 86.) Plaintiff does not allege that any deputy began firing after a cease-fire call or after the others had stopped.

Plaintiff's remaining arguments rely on impermissible hindsight or on requirements the Fourth Amendment does not impose. Plaintiff emphasizes that no gun was found. (*Id.* at ¶¶93, 112.) But reasonableness is judged "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. Plaintiff cites no case holding that a deputy who hears fellow officer's warning of a gun must independently confirm the weapon

before protecting himself. And *Garner* calls for a warning only "where feasible," 471 U.S. at 11–12. Plaintiff admits that the shooting here began within about one second of the warning. (R.17, Am. Compl., at ¶¶79–81, 91.)

Plaintiff points out that Deputy Ahmed did not fire. (*Id.* at ¶85.) But another officer's restraint only matters when the officers shared the same perspective. *Heeter v. Bowers*, 99 F.4th 900, 914 (6th Cir. 2024) (distinguishing *Jordan v. Howard*, 987 F.3d 537, 547 (6th Cir. 2021)). Plaintiff's own allegations on that point conflict. He alleges that Deputy Ahmed stood "to the far left" of the van, and also that he stood "in the same place" with "the same view." (R.17, Am. Compl., at ¶¶81, 85.) Plaintiff also alleges, on information and belief, that Deputy Heath saw Mr. Jenuwine holding a bottle earlier in the pursuit. (*Id.* at ¶¶39–40.) That allegation says nothing about what was within the driver's reach in a dark, overturned cabin minutes later, or about what Deputy Heath perceived in the second before he fired. Plaintiff's theory about the angles of six other wounds describes what happened after the firing began, not what the deputies reasonably perceived when they started. (*Id.* at ¶¶98–102.) Finally, Plaintiff's contention that the deputies should have contained the van from cover rather than approaching it, (*id.* at ¶¶75–77), does not state a violation. A plaintiff "cannot establish a Fourth Amendment violation based merely on bad tactics that result in a deadly confrontation that could have been avoided." *City & County of San*

*Francisco v. Sheehan*, 575 U.S. 600, 615 (2015) (internal quotation marks omitted); *see Reich*, 945 F.3d at 978–79.

Finally, the Court must analyze separately whether Plaintiff has stated a plausible violation by each defendant, and it "cannot ascribe the acts of all Individual Defendants to each individual defendant." *Eastep*, 156 F.4th at 835 (quoting *Heyne v. Metro. Nashville Pub. Schs.*, 655 F.3d 556, 564 (6th Cir. 2011)). However, Counts III, IV, and V rest on the same facts for each deputy. Each ran to the van, heard the warning, and fired. (R.17, Am. Compl., at ¶¶190, 201, 212.) Even so, those facts describe a reasonable response, not a constitutional violation.

**B. No clearly established law prohibited the deputies from firing.**

Even if Plaintiff had stated a violation, the deputies would be entitled to qualified immunity on the second prong. Plaintiff relies on general statements that a person has a right not to be shot unless he is perceived to pose a threat and that deadly force is justified only as long as the threat lasts. (R.17, Am. Compl., at ¶¶191, 202, 213.) But, clearly established law "must not be defined at a high level of generality." *Reich*, 945 F.3d at 981 (quoting *Kisela*, 584 U.S. at 104). The question is whether existing precedent squarely held that officers violate the Fourth Amendment when they fire within a second of a fellow officer's warning that the occupant of a vehicle has a gun, moments after the vehicle ended a long flight that began with a report of a handgun. Plaintiff cites no such case, and Defendants are aware of none.

The cases that Plaintiff does cite are inapposite, and each turns on facts missing here. (R.17, Am. Compl., at ¶191.) *Sample v. Bailey*, 409 F.3d 689 (6th Cir. 2005), involved an officer who found a burglary suspect hiding in a cabinet with his hands visible. In *Cupp* the shooting officer was never in danger. *Smith v. Cupp*, 430 F.3d 766, 774 (6th Cir. 2005). Similarly, *Godawa* involved a non-violent, suspected underage drinker shot after the officer was out of the car's path. *Godawa v. Byrd*, 798 F.3d 457, 465-66 (6th Cir. 2015). Unlike here, *Bletz* involved a misdemeanor arrest and a man lowering his rifle in apparent compliance with a command when he was shot. 641 F.3d 743 (6th Cir. 2011). *Bouggess v. Mattingly* involved a fleeing suspect officers had no reason to believe was armed. 482 F.3d 886 (6th Cir. 2007). None involved a prolonged flight following a reported armed assault or a fellow officer's warning of a gun. Plaintiff has not identified clearly established law that is sufficiently "particularized to the facts of the case." *White v. Pauley*, 580 U.S. 73, 79-80 (2017).

The deputies are entitled to qualified immunity on Counts III, IV, and V.

## III. Deputies Earley, Gombos, and Tripp and Sergeants Pennington and Wallace are entitled to qualified immunity on the failure-to-intervene claim (Count VI).

An officer who does not himself use force may be liable for failing to intervene only if he "(1) observed or had reason to know that excessive force would be or was being used, and (2) had both the opportunity and the means to prevent the

harm from occurring." *Romero*, 159 F.4th at 1014 (quoting *Bard v. Brown County*, 970 F.3d 738, 752–53 (6th Cir. 2020)). The second element requires Plaintiff to show that "the primary wrongdoer used the force for a 'long enough' time that the observing officer had a realistic chance to end it." *Id.* at 1014–15 (quoting *Chaney-Snell v. Young*, 98 F.4th 699, 722 (6th Cir. 2024)). The Sixth Circuit has generally held "that an officer without forewarning cannot intervene in actions that continue for less than ten seconds." *Id.* at 1015. Discrete and fleeting uses of force may not be combined into one continuous episode to manufacture an opportunity. *Groth v. City of Birmingham*, 761 F. Supp. 3d 1031, 1054 (E.D. Mich. 2025) (citing *Chaney-Snell*, 98 F.4th at 725); *Wells v. City of Dearborn Heights*, 538 F. App'x 631, 640 (6th Cir. 2013). And "an excessive use of force is a prerequisite to liability for a failure to intervene." *Allen v. Lo*, 751 F. Supp. 3d 863, 883 (M.D. Tenn. 2024) (citation omitted). A plaintiff with "no viable claim of excessive force" therefore "can show no harm that other officers could have intervened to prevent." *Id.* (quoting *Ondo v. City of Cleveland*, 795 F.3d 597, 611 (6th Cir. 2015)).

Plaintiff identifies three supposed opportunities to intervene. (R.17, Am. Compl., at ¶221.) The first is the twenty-eight seconds Deputy Gombos's radio call and the PIT maneuver. (*Id.*) Because the PIT maneuver was reasonable, there was nothing to prevent. And the window was brief. Deputy Gombos made his first attempt twenty seconds after his radio call, and the second attempt connected with

the van eight seconds later. (*Id.* at ¶¶56, 65.) Neither sergeant was at the location of the PIT maneuver. Sergeant Pennington was paralleling the pursuit in his own patrol car, and Sergeant Wallace was positioned on the flight path with stop sticks. *(Id.* at ¶¶50, 57–58.) Plaintiff cites no case holding that an officer listening to a pursuit on the radio has a constitutional duty to countermand a fellow officer's PIT maneuver within seconds. Deputy Earley, who rode with Deputy Gombos, is alleged to have encouraged the earlier contact. That is a theory of participation, not intervention, and it fails for the same reasons the claim against Deputy Gombos fails. (*Id.* at ¶222.)

The second is the shooting. Deputies reached the front of the overturned van about ten seconds after it came to rest and shouted commands. (R.17, Am. Compl., at ¶79.) About three seconds later a deputy shouted "gun." (*Id.* at ¶80.) "Within about one second of that shout," three deputies opened fire. (*Id.* at ¶81.) Plaintiff alleges that the deputies fired approximately thirty-four rounds "in a matter of seconds." (*Id.* at ¶86.) Nothing in that sequence gave any observing deputy forewarning. No one announced an intention to shoot before the warning, and the warning itself signaled a perceived threat, not that excessive force was about to be used.

Plaintiff's allegations about where each Defendant was confirms that no one was positioned to stop the shooting. Sergeant Pennington arrived "as the shots were fired, and did not leave his patrol car until they stopped." (*Id.* at ¶74.) Sergeant Wallace did not reach the crash location until 2:09:35 a.m., more than two minutes

after the shooting. (*Id.* at ¶120.) Deputies Gombos and Earley had driven into the animal-clinic lot facing the van. (*Id.* at ¶74.) Deputy Tripp had just "reached the engine block of the overturned van" when "gun" was shouted. (*Id.* at ¶¶74, 226.)

The third opportunity is the period after the shooting, when Plaintiff alleges the Defendants should have insisted on reaching Mr. Jenuwine. (*Id.* at ¶221.) That theory is the medical-care claim in Count VII under another name, and it fails for the reasons set forth below in Part IV. Without an underlying violation, there is nothing to intervene against. *Allen*, 751 F. Supp. 3d at 883. The Court should dismiss Count VI.

## IV. The individual Defendants are entitled to qualified immunity on the medical-care claim (Count VII)

The Due Process Clause requires officials to provide adequate medical care to a person "injured while being apprehended by the police." *Heeter*, 99 F.4th at 915 (quoting *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983)). Plaintiff must allege a sufficiently serious medical need and that each officer recklessly disregarded an unjustifiably high risk of harm and "responded" to that risk "in an unreasonable way." *Id.* at 915–16 (citations omitted). The Sixth Circuit recognizes that officers at a shooting scene face competing duties. An officer who takes cover and waits for backup because rendering aid would be dangerous does not violate the Constitution. *Id.* at 919 (discussing *Thomas v. City of Columbus*, 854 F.3d 361, 367 (6th Cir. 2017)). The line the court has drawn is between officers who delay aid to

secure the scene and officers who delay it "for non-medical reasons unrelated to securing the scene." *Scozzari v. Miedzianowski*, 597 F. App'x 845, 850 (6th Cir. 2015).

*Estate of Sowards v. City of Trenton* shows how this works when officers believe a wounded subject may still be armed. There, officers shot a man who had pointed a handgun at them through his apartment door. 125 F. App'x 31, 34 (6th Cir. 2005). Fearing he might still pose a threat, they did not enter. A SWAT team was called, and paramedics did not reach the man until the team entered six hours later and found him dead. *Id.* The Sixth Circuit held that the delay was not deliberate indifference because the officers were uncertain whether he was incapacitated or "had just been wounded and had retreated into the apartment" and "[e]ven if he had been wounded, he still would have posed a threat to officers in light of his threatening behavior prior to the shooting." *Id.* at 40. When officers must "consider the risks before them and then from those risks choose the course to follow," a plaintiff must show that they "knowingly and unreasonably opted for the course of conduct that entailed a substantially greater total risk than the available alternatives." *Id.* (citation omitted). The officers in *Sowards* saw a gun. The deputies here received

information that the driver of the van was armed and just heard a fellow deputy warn that the driver had a gun. (R.17, Am. Compl., at ¶¶20, 80, 215.)

The deputies here did what the law permits. Five seconds after the first shot, a deputy radioed for an ambulance. (R.17, Am. Compl., at ¶114.) Deputies believed Mr. Jenuwine had a shotgun, and the command officer directed that the scene be treated as a barricaded gunman "due to the suspect being armed with a shotgun." (*Id.* at ¶¶109, 243.) No one had searched the van, and Plaintiff alleges the cabin could not be seen into. (*Id.* at ¶¶68, 72.) The deputies took cover, called for negotiators and SWAT, and used a loudspeaker to order Mr. Jenuwine to show his hands. (*Id.* at ¶¶76, 121.) Deputies reported that he was moving, kicking, and "trying to get up," and they told him to "[k]eep your hands empty while you move." (*Id.* at ¶¶117, 121.) SWAT response was approved and, still concerned for officer safety, the tactical team approached with ballistic shields. (*Id.* at ¶¶129, 146.) Every step Plaintiff describes was directed at securing a scene the deputies believed held an armed man.

The autopsy report reinforces that conclusion, and the Court may consider it. A court may consider a document the complaint refers to and on which the plaintiff's claim depends, because otherwise a plaintiff could avoid dismissal "simply by failing to attach a dispositive document upon which it relied." *Weiner v. Klais & Co.*, 108 F.3d 86, 89 (6th Cir. 1997); *Blackwell v. Nocerini*, 123 F.4th 479, 486–87 (6th Cir. 2024); *Bailey*, 860 F.3d at 386–87. Plaintiff devotes a section of his

Complaint to the autopsy and attaches a chart prepared from it. (R.17, Am. Compl., at ¶¶95–103, 152.) He cannot use the parts of the report he likes as a sword while shielding the rest from the Court. Plaintiff alleges, on information and belief, that Mr. Jenuwine's wounds were survivable with prompt care. (*Id.* at ¶¶106–107, 238.) The report does not say so. Indeed, the autopsy report describes a chest wound that caused heavy internal bleeding and a separate wound that tore a major vein, and it concludes that the gunshot wounds caused his death. (Ex. 2, Autopsy Report, at 1–2, 5–6, 12.) Plaintiff's unsupported survivability allegation does not make it plausible that the decision to wait for a tactical team, rather than the gunshot wounds themselves, caused Mr. Jenuwine's death. *See Iqbal*, 556 U.S. at 678. This also matters to the proximate-cause elements of Plaintiff's state-law claims addressed below, in Part VII.

This case is unlike *Heeter* or *Scozzari*. In *Heeter*, the officer stood idle in a room beside a man who was bleeding on the floor, while other officers attended to scene security. 99 F.4th at 917–19. In *Scozzari*, a jury could find that officers delayed paramedics while they brought neighbors out of their homes to view the wounded man's weapons, conduct "unrelated to securing the scene." 597 F. App'x at 850. Here, no deputy had restrained or searched Mr. Jenuwine, the deputies believed he had a shotgun, and every delay Plaintiff identifies was tied to the risk of approaching

him. Plaintiff contends that deputies should have shared his hindsight view that there was no gun. (R.17, Am. Compl., at ¶234.) The Constitution does not require that.

At a minimum, the law did not clearly establish that officers who reasonably believe a wounded subject in a vehicle remains armed must approach him before a tactical team arrives. *Heeter* recognized that officers do not violate the Constitution by taking cover when rendering aid would be dangerous. 99 F.4th at 919. And *Sowards* found no violation on facts involving a longer wait. 125 F. App'x at 40.

Plaintiff cites *Estate of Owensby v. City of Cincinnati* for the general duty to obtain care. (R.17, Am. Compl., at ¶237.) But, unlike here, *Owensby* involved officers who had already subdued the detainee. 414 F.3d 596, 601 (6th Cir. 2005). Plaintiff's other authorities are further afield. *Estate of Carter v. City of Detroit* involved a detainee in police custody who complained of chest pain and showed the warning signs of a heart attack, 408 F.3d 305, 307 (6th Cir. 2005), and *Brawner* involved a jail detainee who suffered repeated seizures. Neither involved officers who believed the injured person was armed.

The Court should dismiss Count VII.

## V. Sergeants Pennington and Wallace are entitled to qualified immunity on the supervisory-liability claim (Count VIII)

Section 1983 does not permit liability based on a supervisor's rank. Each defendant is liable only for "the official's own individual actions." *Iqbal*, 556 U.S. at 676. Just as a county is not liable under Section 1983 "solely for employing a

tortfeasor," *Monell*, 436 U.S. at 694, a sergeant is not liable merely because he supervised the deputies involved. Plaintiff's own authority requires that a supervisor at least implicitly authorized, approved, or knowingly acquiesced in a subordinate's unconstitutional conduct. (R.17, Am. Compl., at ¶244.) Supervisory liability "must be based on active unconstitutional behavior and cannot be based upon a mere failure to act." *Shehee v. Lutterll*, 199 F.3d at 300 (6th Cir. 1999) (citation omitted). In *Shehee*, the Sixth Circuit rejected the view that supervisors who knew of a violation and failed to act while the situation was in their control had acquiesced in it. *Id.* *Peatross v. City of Memphis*, on which Plaintiff also relies, reaffirmed that "a mere failure to act will not suffice to establish supervisory liability." 818 F.3d 233, 241 (6th Cir. 2016). And without a subordinate's constitutional violation, there is nothing for a supervisor to have approved. For the reasons already set forth above, there was no violation.

Plaintiff's allegations against the sergeants are allegations of inaction. He alleges that they monitored the pursuit by radio, heard the broadcasts, and said nothing, and that they did not terminate the pursuit or forbid the PIT maneuver. (*Id.* at ¶¶57–58, 242–243.) That is a failure to act. Moreover, the pursuit itself was not a constitutional violation. The Sixth Circuit has recognized that "even 'deliberate indifference' is insufficient to demonstrate a Fourteenth Amendment violation on the basis of police conduct during a high speed chase." *Sowards*, 125 F. App'x at 39

(citation omitted). Plaintiff's remaining theory, that the sergeants directed a barricade rather than medical aid, describes their own conduct and duplicates Count VII. (R.17, Am. Compl., at ¶¶242–244.) It fails for the reasons stated in Part IV.

Finally, Plaintiff's reliance on the County's pursuit policy does not help him. (*Id.* at ¶¶59–64, 241.) A supervisor's failure to enforce an internal rule does not defeat qualified immunity, because "[i]t must have been clearly established that the conduct at issue violates the Constitution, not internal policies." *Latits*, 878 F.3d at 553. The sergeants are entitled to qualified immunity on Count VIII.

## VI. Plaintiff failed to plead a plausible *Monell* claim against Washtenaw County.

Under *Monell v. New York City Department of Social Services*, 436 U.S. 658, 694 (1978), a municipality is not liable under Section 1983 solely for employing a tortfeasor. Instead, to hold a municipality liable, a plaintiff must establish that an alleged constitutional violation occurred because of a municipal policy or custom. *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013) (citing *Monell*, 436 U.S. at 694). The plaintiff must therefore first establish an underlying constitutional violation. Because there was none here, Plaintiff's *Monell* claim fails as a matter of law. *Bailey*, 860 F.3d at 388; *Brent v. Wayne Cnty. Dep't of Human Servs.*, 901 F.3d 656, 698 (6th Cir. 2018).

But even if Plaintiff could establish an underlying constitutional violation, which he has not and cannot do, he must still identify the specific municipal policy,

custom, or established practice that allegedly caused the constitutional violation. *Bd. of Cty. Com'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 403 (1997). Requiring a plaintiff to identify a policy or custom ensures that a municipality is held liable only for decisions or widespread practices that carry the force of law. *Id.* at 403–04. To that end, the plaintiff must allege sufficient facts to support one of four theories of liability: (1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision-making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance of or acquiescence to federal rights violations. *Burgess*, 735 F.3d 462, 478.

### A. Plaintiff has not plausibly established that Washtenaw County acted with deliberate indifference.

To state a "failure to train or supervise" claim, the plaintiff must allege: (1) "the training or supervision was inadequate for the tasks performed"; (2) "the inadequacy was the result of the municipality's deliberate indifference"; and (3) "the inadequacy was closely related to or actually caused the injury." *Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006).

To establish deliberate indifference, the plaintiff must either allege: (1) "prior instances of unconstitutional conduct demonstrating that the [municipality] has ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury"; or (2) "a single violation of federal

rights, accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation." *Fisher v. Harden*, 398 F.3d 837, 849 (6th Cir. 2005). Deliberate indifference "requires more than a negligent series of oversights; the risk of a constitutional violation must be 'plainly obvious' and yet disregarded." *Okolo v. Metro. Gov't of Nashville*, 892 F. Supp. 2d 931, 944 (M.D. Tenn. 2012) (citing *Stemler v. City of Florence*, 126 F.3d 856, 865 (6th Cir. 1997)).

"A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (citations omitted). Liability attaches only where the failure to train "reflects a 'deliberate' or 'conscious' choice by a municipality." *City of Canton v. Harris*, 489 U.S. 378, 389 (1989). "A municipality's improper training or supervision must have 'actually caused' the plaintiff's injury." *Gambrel v. Knox Cnty., Kentucky*, 25 F.4th 391, 408 (6th Cir. 2022) (quoting *Connick*, 563 U.S. at 70). "Even if a municipal employee uses excessive force to harm a plaintiff, then, the plaintiff cannot hold the municipality liable without proof that proper training would have prevented this force." *Id.* (citation omitted). "And even if a plaintiff can establish this factual causation, the plaintiff still must show proximate causation—which requires, for example, that a municipality could reasonably foresee that an employee's wrongful act would follow from the lack of training." *Id.*

Plaintiff's complaint does not meet this standard. Count IX lists eight supposed failures in pursuit supervision, vehicle tactics, suspect descriptions, approaches to disabled vehicles, firing, and medical aid. (R.17, Am. Compl., at ¶249.) But Plaintiff's own pleading shows that the County had written policies on every one of these subjects. Plaintiff alleges that County policies "forbid ramming absent justification for deadly force," require de-escalation, containment, and justification for each firearm discharge, and "require medical aid for persons subjected to force." (*Id.* at ¶142.) The Vehicle Pursuits policy calls itself "a 'restrictive' policy" built on "carefully defined constraints" and "active supervision," and it requires that all authorized employees "receive training regarding vehicle pursuits." (R.1-5, Vehicle Pursuits Policy, PageID.130–31, 151.) The Use of Force policy states that it sets "a higher level of expectations than the constitutional standard and state law." (R.1-1, Use of Force Policy, PageID.63.) "Where a municipality provides training that addresses a purported risk, that 'does not present the same "highly predictable" constitutional danger.'" *Groth*, 761 F. Supp. 3d at 1059 (quoting *Mosier v. Evans*, 90 F.4th 541, 550 (6th Cir. 2024)).

Plaintiff instead infers deficient training from the events of a single night. He alleges that because six deputies and two sergeants departed from the written policies, their "actual custom and practice is different from what is written down." (R.17, Am. Compl., at ¶142.) The Sixth Circuit rejected that kind of inference in

*Romero*, affirming dismissal where the plaintiff offered "only speculation that [the officers] would have behaved differently had they been properly trained." 159 F.4th at 1015. Single-incident liability requires "a complete failure to train the police force, training that is so reckless or grossly negligent that future police misconduct is almost inevitable." *Harvey v. Campbell Cnty., Tenn.*, 453 F. App'x 557, 567 (6th Cir. 2011) (citation omitted). Plaintiff does not allege that the County failed to train at all. Nor does he identify a single prior incident. His only allegation on that point is that, "[b]ased on information and belief," these events "were not the first time that Washtenaw County deputies inappropriately engaged a suspect." (R.17, Am. Compl., at ¶147.) That is a conclusion, not a fact.

Plaintiff's theory thus reduces to the claim that if the deputies used excessive force, they must have been improperly trained and supervised. That is the vicarious-liability theory the Supreme Court and the Sixth Circuit have consistently rejected. *See Gambrel*, 25 F.4th at 408. Courts in this circuit routinely dismiss such claims under Rule 12(b)(6). *See Harvey*, 453 F. App'x at 563 ("[M]ere allegations that an officer was improperly trained or that an injury could have been avoided with better training are insufficient to make out deliberate indifference."); *Romero*, 159 F.4th at 1015; *Gordon v. Bierenga*, No. 18-CV-13834, 2019 WL 2205853, at *3 (E.D. Mich. May 22, 2019).

Plaintiff has pleaded only conclusory, threadbare allegations that do not satisfy *Iqbal* or *Twombly*. He cannot use discovery as a fishing expedition to find factual support for his *Monell* claim. *Moore v. Wkly.*, 159 F. Supp. 3d 784, 799 (E.D. Mich. 2016) ("Plaintiff cannot allege a municipal liability claim hoping that discovery will reveal facts to support the claim. A lawsuit is not a fishing expedition for a plaintiff to discover a claim against the defendant.") (internal citation omitted).

**B. Plaintiff's ratification and policymaker theories fail.**

Plaintiff also alleges that the County ratified the deputies' conduct after the fact. He points to Corporation Counsel's advice that the deputies not answer a State Police question about their magazines, the "No Narrative" reports, the absence of discipline, and an allegation "[o]n information and belief" that the Sheriff and Undersheriff reviewed and approved the deputies' conduct. (R.17, Am. Compl., at ¶¶148, 253.) None of this could have caused Mr. Jenuwine's death. A plaintiff must show that the County's "deliberate conduct [was] the moving force behind the violation." *Sowards*, 125 F. App'x at 40 (quoting *Graham ex rel. Estate of Graham v. County of Washtenaw*, 358 F.3d 377, 383 (6th Cir. 2004)). Decisions made after the shooting could not have been the "moving force" behind events that had already occurred.

Plaintiff identifies two policymaker decisions before Mr. Jenuwine's death. The first is the November 13, 2025 pursuit directive, which authorizes a car pursuit

only where there is probable cause that an occupant committed a violent to life-threatening felony. (R.17, Am. Compl., at ¶140.) Plaintiff does not allege the directive is unconstitutional. Rather, he alleges that it was not followed. (*Id*. at ¶¶140-141.) The second is the authorization of a SWAT response. (*Id*. ¶¶146, 252.) Authorizing a tactical team to approach a vehicle that deputies believed held an armed man is not an unconstitutional decision. *See Sowards*, 125 F. App'x at 40. The Court should dismiss Count IX.

## VII. Plaintiff's state law claims for gross negligence and willful and wanton misconduct fail as a matter of law. (Counts X-XVII)

Plaintiff's state-law claims rest on a pleading strategy that Michigan law does not permit. He asserts eight state-law counts captioned "gross negligence and willful and wanton misconduct," one against each individual Defendant (Counts X through XVII), and one count of assault and battery against Deputies Cuso, Heath, Bechtol, and Gombos (Count XVIII). (R.17, Am. Compl., at ¶¶257–303.) Each count seeks damages under Michigan's wrongful death statute, M.C.L. § 600.2922. (*Id.*) The gross negligence labels are an impermissible attempt to avoid governmental immunity. *See Bletz v. Gribble*, 641 F.3d 743, 756 (6th Cir. 2011) ("Although establishing that a governmental official's conduct amounted to 'gross negligence' is a prerequisite to avoiding that official's statutory governmental immunity, it is not an independent cause of action.").

In Michigan, for negligence torts, a governmental employee acting within the

scope of his authority while the agency is engaged in a governmental function is immune from tort liability unless his "conduct . . . amount[s] to gross negligence that is the proximate cause of the injury or damage." M.C.L. § 691.1407(2)(c). "Gross negligence" means "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results." M.C.L. § 691.1407(8)(a). When assessing whether a governmental employee was "the proximate cause" of the plaintiff's injuries, a court must determine whether the defendant's conduct was "the one most immediate, efficient, and direct cause of the injury." *Ray v. Swager*, 501 Mich. 52, 63–65; 903 N.W.2d 366 (2017). Intentional torts, by contrast, are not governed by the gross negligence exception but by the good-faith immunity test of *Odom v. Wayne County*, 482 Mich. 459; 760 N.W.2d 217 (2008).

Because the frameworks differ, Michigan law forbids exactly what Plaintiff attempts here. A plaintiff may not avoid the intentional-tort analysis by relabeling intentional conduct as negligence. Plaintiff's gross negligence counts rest on the deputies' *intentional* acts. Count X alleges that Deputy Gombos was grossly negligent by "[i]ntentionally ramming" the van and by performing the PIT maneuver. (R.17, Am. Compl., at ¶259.) Counts XI, XII, and XIII say they target the shooters' conduct "apart from the intentional shooting," yet they list rushing the van with pistols drawn, firing without giving Mr. Jenuwine time to respond, and taking positions that created a crossfire. (*Id.* at ¶¶263, 265, 269, 271, 275, 277.) Those are

descriptions of the shooting itself. Counts XIV through XVII rest on the same events and allege that the other Defendants failed to stop the PIT maneuver and the shooting. (*Id.* at ¶¶282, 287, 292, 297.)

Michigan "has rejected attempts to transform claims involving elements of intentional torts into claims of gross negligence." *Miller v. Sanilac County*, 606 F.3d 240, 254 (6th Cir. 2010) (quoting *VanVorous v. Burmeister*, 262 Mich. App. 467, 483–84; 687 N.W.2d 132 (2004), *abrogated in part on other grounds by Odom*, 482 Mich. 459). Indeed, in excessive force cases, "[t]he only cause of action available" is typically "assault and battery." *Bletz*, 641 F.3d at 756 (*citing VanVorous*, 687 N.W.2d at 143). In *VanVorous*, the Michigan Court of Appeals considered a plaintiff's claim that defendant officers "breached the duty of care they owed to Mr. VanVorous by utilizing excessive force to subdue or control Mr. VanVorous and failing to follow proper police procedure in apprehending him" and that the defendants "undertook the obligation to properly perform their duties to ensure the safety of all parties during the chase and subsequent attempted apprehension of Mr. VanVorous." 687 N.W.2d at 143. The court held that the "plaintiff's claim of gross negligence is fully premised on her claim of excessive force." *Id.* (citing *Smith v. Stolberg*, 586 N.W.2d 103, 104-05 (Mich. Ct. App. 1998)); *see also Latits v. Phillips*, 826 N.W.2d 190, 196 (Mich. Ct. App. 2012) ("[T]here was nothing negligent or reckless about defendant's decision to point his firearm and shoot."). Federal courts

applying Michigan law where state claims rest on the same facts as a constitutional excessive force claim have held that plaintiffs may proceed only on intentional tort theories. *See, e.g.*, *Bletz*, 641 F.3d at 756; *Collins v. Ferguson*, No. 17-cv-10898, 2017 WL 4387287, at *8 (E.D. Mich. Oct. 3, 2017); *Spicer v. Michigan*, No. 2:19-cv-13718, 2020 WL 12443428, at *5 (E.D. Mich. May 19, 2020); *Lyoya v. Schurr*, No. 1:22-cv-1160, 2026 WL 2666753, at *11-12 (W.D. Mich. Aug. 6, 2026).

Each of these counts is "fully premised" on the same force that underlies Plaintiff's constitutional claims. *VanVorous*, 687 N.W.2d at 143. No negligence theory can go forward under the *VanVorous* rule.

The gross negligence counts fail for independent reasons as well. To the extent Plaintiff relies on a failure to intervene, a deputy who had no realistic opportunity to stop the force cannot be grossly negligent for failing to do so. *Wells*, 538 F. App'x at 642; *Groth*, 761 F. Supp. 3d at 1057. And a delay in reaching a wounded subject while officers believe he is armed is "justified and does not rise to the level of gross negligence." *Sowards*, 125 F. App'x at 43.

Finally, gross negligence must be "the one most immediate, efficient, and direct cause" of the injury. *Ray*, 501 Mich. at 63–65. Plaintiff alleges that Mr. Jenuwine "bled to death" from "a gunshot wound," and he pleads in the alternative that the fatal bullet was fired by one of the shooters. (R.17, Am. Compl., at ¶¶238, 272.) A sergeant's silence on the radio, Deputy Tripp's failure to relay a witness

statement, Deputy Bechtol's post-shooting report of a shotgun, Deputy Heath's alleged silence about a bottle, or Deputy Earley's presence in a patrol car was not the most immediate, efficient, and direct cause of that death. (*Id.* at ¶¶272, 278, 282, 287, 292, 297.) Counts X through XVII should be dismissed.

**VIII. Count XVIII fails because the deputies' force was reasonable and they are entitled to governmental immunity.**

Count XVIII fails for two independent reasons. First, under Michigan law, an officer may use reasonable force in making an arrest, and "the standard is an objective one under the circumstances." *VanVorous*, 687 N.W.2d at 141. An assault and battery claim against an officer therefore fails when the officer's force was objectively reasonable. *Id.* at 142; *Wells*, 538 F. App'x at 640. For the reasons in Parts I and II, the force here was reasonable.

Second, the deputies are entitled to governmental immunity. An officer is immune from intentional-tort liability if his acts were undertaken during the course of employment while he was acting, or reasonably believed he was acting, within the scope of his authority, the acts were undertaken in good faith, and the acts were discretionary rather than ministerial. *Ward*, 178 F.4th at 975 (citing *Odom*, 760 N.W.2d at 218). "In other words, Michigan state law imposes a subjective test for governmental immunity for intentional torts, based on the officials' state of mind, in contrast to the objective test for federal qualified immunity." *Id.* The good-faith element "protects a defendant's honest belief and good-faith conduct with the cloak

of immunity while exposing to liability a defendant who acts with malicious intent." *Id.* (citation omitted). So long as the officers believed they were properly using deadly force, they are immune "regardless of whether [they were] correct in that belief." *Id.* (citation omitted). Although governmental immunity is an affirmative defense, the Sixth Circuit has affirmed it on a Rule 12(c) motion, after the defendants raised it in their answer, where the plaintiff "had not averred facts allowing the inference that defendants had acted with malice." *Brent*, 901 F.3d at 699.

### A. Deputy Gombos is entitled to governmental immunity for the vehicle contacts.

Deputy Gombos was on duty and acting within the scope of his employment as a deputy and K-9 handler. (R.17, Am. Compl., at ¶¶14, 177.) His decisions about how to end a pursuit were discretionary. See *Brent*, 901 F.3d at 700 (quoting *Norris v. Lincoln Park Police Officers*, 292 Mich. App. 574; 808 N.W.2d 578, 582 (2011)). And Plaintiff pleads no facts showing bad faith. Deputy Gombos used his patrol car only after the van had fled for thirteen minutes, intermediary measures like stop sticks and efforts to deflate a tire failed, and he used the PIT maneuver only after the van drove away from the first contact. (*Id.* at ¶¶44, 47, 50–51, 153.) He reported the first contact over the County radio and announced the second before he made it. (*Id.* at ¶¶53, 56.) Plaintiff's labels of malice and bad faith are conclusions, not facts. (*Id.* at ¶302.) *See Brent*, 901 F.3d at 699.

### B. Deputies Cuso, Heath, and Bechtol are each entitled to governmental immunity because they acted reasonably and in good faith when they shot Mr. Jenuwine, who they believed was armed and dangerous.

Deputies Cuso, Heath, and Bechtol are Washtenaw County deputies who, Plaintiff alleges, acted within the scope of their employment. (R.17, Am. Compl., at ¶¶11–13.) Their decision to fire was discretionary because it called for personal deliberation, decision, and judgment. *See Brent*, 901 F.3d at 700 (quoting *Norris*, 808 N.W.2d at 582).

The remaining question is whether the well-pleaded facts show that the deputies acted in subjective good faith. They do. Every pleaded fact points to an honest belief that Mr. Jenuwine was armed. Dispatch had broadcast that the occupant of the van pulled a handgun on a woman, and the eyewitness said the driver waved something at her. (*Id.* at ¶¶23, 26.) The driver then fled for thirteen minutes, with his headlights off in a residential area, reversed toward deputies, evaded all intermediary steps to stop him, and kept going even after his airbags deployed. (*Id.* at ¶¶28, 44, 153.) When the deputies reached the overturned van, a fellow deputy shouted repeatedly that the driver had a gun, and they fired within about one second. (*Id.* at ¶¶80–81.) The deputies then treated the scene as an armed barricade until SWAT arrived. (*Id.* at ¶¶76, 129, 243.) Officers who believe they face a man with a gun and act on that belief within a second are acting in good faith, "regardless of whether [they were] correct in that belief." *Ward*, 178 F.4th at 975 (citation omitted).

Plaintiff alleges in a single sentence that the Count XVIII Defendants "acted in bad faith and with malice." (*Id.* at ¶302.) He pleads no facts showing that any deputy harbored ill will toward Mr. Jenuwine or used force for any reason other than the perceived threat. Allegations that a belief was mistaken, or even unreasonable, do not plead malice. Under Michigan's subjective test, an honest but mistaken belief is protected. *Ward*, 178 F.4th at 975. Count XVIII should be dismissed.

## Conclusion

For these reasons, Defendants Washtenaw County, Deputy Jacob Cuso, Deputy Von Heath, Deputy Gabriel Bechtol, Deputy Jacob Gombos, Deputy Jonathan Earley, Sergeant Thomas Pennington, Deputy Bryan Tripp, and Sergeant Samuel Wallace respectfully request that the Court grant their motion and dismiss the First Amended Complaint in its entirety with prejudice.

Dated: November 13, 2026

MILLER JOHNSON
Attorneys for Defendants

By: */s/Erin K. Lane*
Erin K. Lane (P75822)
Sunita Doddamani (P67459)
45 Ottawa Avenue SW, Suite 1100
Grand Rapids, MI 49501-0306
616.831.1700
lanee@millerjohnson.com
doddamanis@millerjohnson.com

**CERTIFICATE OF SERVICE**

Erin K. Lane certifies that she served a copy of the foregoing Motion and Brief in Support on all attorneys of record via this Court's Electronic Filing System.

Dated: November 13, 2026

MILLER JOHNSON
Attorneys for Defendants

By: */s/Erin K. Lane*
Erin K. Lane (P75822)
Sunita Doddamani (P67459)
45 Ottawa Avenue SW, Suite 1100
Grand Rapids, MI 49501-0306
616.831.1700
lanee@millerjohnson.com
doddamanis@millerjohnson.com